## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Big Village Holding LLC, *et al.*,[1] | Case No. 23-10174 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) SCHEDULING A HEARING ON THE APPROVAL OF THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, AND THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (II) APPROVING CERTAIN BID PROCEDURES, BID PROTECTIONS, AND ASSUMPTION AND ASSIGNMENT PROCEDURES, AND THE FORM AND MANNER OF NOTICE THEREOF, AND (III) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) APPROVING ASSET PURCHASE AGREEMENTS, (II) AUTHORIZING THE SALES OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES OTHER THAN ASSUMED LIABILITIES AND PERMITTED ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") hereby submit this motion (this "**Motion**"), pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), for the entry of:  (a) an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"), (i) scheduling a hearing (the "**Sale Hearing**") on approval of the proposed sale (the "**Sale**") of all or substantially all of the Debtors' assets (the "**Assets**"), free and clear of

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Big Village Holding LLC (6595); Big Village Group Holdings LLC (5882); Big Village Group Inc. (6621); Big Village Insights, Inc. (8960); Big Village Media LLC (7288); EMX Digital, Inc. (5543); Big Village USA Corporation, Inc. (3414); Big Village Agency, LLC (0767); Balihoo, Inc. (9666); Deep Focus, Inc. (8234); and Trailer Park Holdings Inc. (1447).  The Debtors' service address is 301 Carnegie Center, Suite 301, Princeton, NJ 80540.

all Encumbrances other than Assumed Liabilities and Permitted Encumbrances,[2] including (i) the

sale of certain assets related to the Debtors' Agency and Insights businesses to NMMB, Inc. (the

"**A&I Stalking Horse Purchaser**"); (ii) the sale of certain assets related to the Debtors' managed

digital marketing services businesses to ZStream Acquisition LLC (the "**EMX Stalking Horse**

**Purchaser**" and together with the A&I Stalking Horse Purchaser, the "**Stalking Horse**

**Purchasers**") or, in the event the Stalking Horse Purchasers are not the successful bidder(s), then

to such bidder(s) (the "**Winning Bidders**"), and authorizing the assumption and assignment of

certain executory contracts and unexpired leases (each, an "**Assigned Contract**," and collectively,

the "**Assigned Contracts**") in connection therewith; (iii) authorizing and approving certain

bidding procedures for the Sale (collectively, the "**Bid Procedures**," a copy of which is attached

as <u>Exhibit 1</u> to the Bidding Procedures Order), bid protections for the Stalking Horse Purchasers

(as described more fully herein, the "**Bid Protections**"), and certain procedures for the assumption

and assignment of the Assigned Contracts (collectively, the "**Assumption and Assignment**

**Procedures**"), and the form and manner of notice thereof; and (iv) granting related relief; (b) (i)

an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "**A&I Sale Order**"),

authorizing and approving the Debtors' entry into the Asset Purchase Agreement with the A&I

Stalking Horse Purchaser attached hereto as <u>Exhibit C</u> (the "**A&I Stalking Horse APA**"); (ii) an

order, substantially in the form attached hereto as <u>Exhibit D</u> (the "**EMX Sale Order**" and together

with the A&I Sale Order, the "**Sale Orders**"), authorizing and approving the Debtors' entry into

the Asset Purchase Agreement with the EMX Stalking Horse Purchaser attached hereto as <u>Exhibit</u>

<u>E</u> (the "**EMX Stalking Horse APA**" and together with the A&I Stalking Horse APA, the

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Stalking Horse APAs (as defined below) or the Bid Procedures, as applicable.

"**Stalking Horse APAs**") or, in the event the Stalking Horse Purchasers are not the Winning Bidder(s), then an Alternative Transaction (as defined in the Stalking Horse APAs) with the Winning Bidder(s); (iii) authorizing and approving the Sale, free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances; (iv) authorizing and approving the assumption and assignment of the Assigned Contacts in connection therewith; and (v) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

## BACKGROUND

3.      On the date hereof (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**").

4.      As set forth in the *Declaration of Kasha Cacy In Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), the Debtors commenced the

Chapter 11 Cases to conduct a sale process for substantially all of the Assets pursuant to section 363 of the Bankruptcy Code (the "**Sale Process**"), which Sale Process is the subject of this Motion.

5.　　　　Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their business and financial affairs as debtors in possession.  No official committees have been appointed in the Chapter 11 Cases to date, and no request has been made for the appointment of a trustee or examiner.

6.　　　　Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

## THE SALE PROCESS

7.　　　　The Debtors have a clear strategy for these Chapter 11 Cases for the benefit of all stakeholders, including their employees, customers, and vendors—the sale of all or substantially all of their Assets through a robust marketing and sale process.  Among other things, the Sale Process will provide a transparent and comprehensive avenue through which the Debtors will seek bids for the Assets.  In connection with the Sale Process, the Stalking Horse Purchasers submitted binding bids for certain assets related to (i) the Debtors' Agency and Insights businesses (such assets, the "**A&I Stalking Horse Assets**") in the form of the A&I Stalking Horse APA, and (ii) certain assets related to the Debtors' managed digital marketing services business (the "**EMX Stalking Horse Assets**" and together with the A&I Stalking Horse Assets, the "**Stalking Horse Assets**").  While the Debtors have not been able to identify an actionable transaction for the entirety of the EMX business, they will continue to market all Assets, including those assets that are not subject to the Stalking Horse APAs.  Thus, upon the completion of the Sale Process, the Debtors will have fully market tested the value of all Assets.

8.      The Stalking Horse APAs, which are described more fully below, will serve as the baseline for all prospective bidders to negotiate from, and will be subject to higher or otherwise better bids for the Stalking Horse Assets pursuant to the Bid Procedures.  To enable the Debtors to fund the administration of the Chapter 11 Cases and pursue the Sale Process, the Debtors have also negotiated with the Prepetition Secured Parties for the consensual use of cash collateral, on the terms set forth in the Cash Collateral Order.

9.      As part of the Debtors' efforts to ensure that they secure a value-maximizing transaction for their Assets, prior to the Petition Date, in September of 2022, the Debtors retained Stephens Inc. ("**Stephens**"), an experienced investment banker in the Debtors' industry, to canvass the market for interested buyers.  Through these prepetition marketing efforts, it was determined that a sale of the Assets though a chapter 11 case would provide the highest and best value.  These Chapter 11 Cases were then initiated to effectuate the Sale Process, consistent with the milestones negotiated with the Prepetition Secured Parties for the consensual use of cash collateral and as set forth in the Stalking Horse APAs (collectively, the "**Milestones**").

10.      Shortly after the Petition Date, Stephens will commence the formal post-petition marketing process for all Assets by circulating a "teaser" to various prospective strategic, financial and hybrid buyers. The teaser will include a brief description of the Assets and the Sale Process, and will be accompanied by a form non-disclosure agreement (an "**NDA**").  In addition, prior to the Petition Date, Stephens finalized a confidential information memorandum for the Assets, and populated an electronic data room with related diligence information.

11.      In furtherance of Stephens' ongoing efforts to actively market the Assets for sale, and consistent with the Milestones and the Stalking Horse APAs, the Debtors have filed this Motion seeking authority to proceed with a bidding and auction process to consummate a sale

(or series of sales) that the Debtors expect will generate maximum value for their Assets.  To facilitate the Sale, the Debtors, in consultation with Stephens and their other professional advisors, have developed certain customary bidding procedures (i.e., the Bid Procedures) to preserve flexibility in the Sale Process, generate the greatest level of interest in the Assets, and result in the highest or otherwise best value for those Assets.  Among other things, these procedures, in the Debtors' business judgment, create an appropriate timeline for the Sale Process, consistent with the Milestones and the Stalking Horse APAs.

### STALKING HORSE APAs

12.     The Stalking Horse APAs, which the Debtors and the Stalking Horse Purchasers have negotiated in good faith and at arm's length, will serve as a baseline for all prospective bidders for the Stalking Horse Assets to negotiate from.  The consensual use of cash collateral negotiated with the Prepetition Secured Parties provides the Debtors with a sufficient runway to market all of their Assets.  However, given the exigencies of the Debtors' financial condition, a timely sale of the Assets, including the Stalking Horse Assets, in accordance with the Milestones, is the best way to avoid a fire-sale liquidation.  Such a liquidation would be a worst-case scenario for all of the Debtors' economic stakeholders.  The Debtors believe that consummation of the Stalking Horse APAs, subject to higher or otherwise better offers, will maximize value of the Stalking Horse Assets for the Debtors' estates, and importantly, provide for the continuation of the jobs of a significant portion of the Debtors' employees, while affording the Debtors' the best possible opportunity to continue to service their customers and maintain their business relationships with their vendors.

13.     The Debtors' board of managers met regularly, and with the assistance of the Debtors' professional advisors, not only reviewed, analyzed, and discussed the proposed

30082787.4

stalking-horse bids received from the Stalking Horse Purchasers for the Stalking Horse Assets, but also considered and analyzed other strategic alternatives under the circumstances. Following months of analysis and process, the Debtors' board of managers approved the Debtors' entry into the Stalking Horse APAs, and determined that commencing these Chapter 11 Cases to pursue a sale of the Assets, including a sale of the Stalking Horse Assets through the Stalking Horse APAs, provided the best opportunity to maximize value.

14.     As discussed throughout this Motion, the Bid Procedures and Milestones were designed with the objective of generating the greatest level of interest in and best value for the Assets, while allowing the Debtors to close the Sale in a timely and efficient manner. The Debtors and their professional advisors are confident that the Bid Procedures and the other relief requested herein will facilitate the sale of the Assets for the highest or otherwise best value, preserve as many jobs as possible for their dedicated employees, afford the Debtors the best possible opportunity to continue their relationships with their customers and vendors, and otherwise maximize recoveries for all stakeholders. Finally, the auction and sale process contemplated by the Bid Procedures will also serve as a market test to ensure that the Stalking Horse APAs and any other sale transactions will maximize value.

15.     Among other things, the Stalking Horse APAs contemplate (i) the A&I Stalking Horse Purchaser paying $12 million in cash, assuming certain liabilities and executory contracts, and satisfying all cure costs (the "**A&I Purchase Price**"); and (ii) the EMX Stalking Horse Purchaser paying $2.1 million in cash, acquiring certain outstanding accounts receivables on a dollar-for-dollar basis, assuming certain liabilities and executory contracts, and satisfying all cure costs (the "**EMX Purchase Price**"). The Stalking Horse APAs also include various customary representations, warranties and covenants by and from the Debtors and the Stalking

Horse Purchasers, and certain conditions to closing and rights of termination related to the Sale and the Chapter 11 Cases generally. The transactions contemplated by the Stalking Horse APAs are subject to approval by the Court and entry of the Bidding Procedures Order and the Sale Orders.

16. Certain material terms of the A&I Stalking Horse APA, and certain provisions of the A&I Stalking Horse APA that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are described below:[3]

| A&I Stalking Horse Purchaser | NMMB, Inc., a Delaware corporation d/b/a Refuel Agency |
|---|---|
| **Purchased Assets**<br>A&I Stalking Horse APA §2.01 | (a) All Intellectual Property that is owned by Sellers or any of their respective Affiliates, or in which Sellers or any of Sellers' respective Affiliates have any interest or right, and used or held for use by Sellers or any of Sellers' respective Affiliates in the Business, wherever located, including, but not limited to:<br><br>(1) the copyright registrations set forth in Section 2.01(a)(1) of the Disclosure Schedule;<br><br>(2) the Trademarks set forth in Section 2.01(a)(2) of the Disclosure Schedule, and goodwill associated therewith, including the historical trademark files;<br><br>(3) the internet domain name registrations, web addresses, web pages, websites and related content, and social media accounts set forth in Section 2.01(a)(3) of the Disclosure Schedule, including, without limitation, big-village.com;<br><br>(4) all rights of publicity and all similar rights, including all commercial merchandising rights, owned or controlled by Sellers and either (A) derived from, based upon, inherent in or attaching to the Intellectual Property Assets or (B) used or held for use by Sellers in the conduct of the Business, in each case, to the extent permitted to be assigned by Sellers under any Contract or applicable Law;<br><br>(5) all customer data and information derived from customer purchase files and branded loyalty promotion programs and other similar information related to customer purchases, including personal information (such as name, address, telephone number, e-mail address, website, and any other database information) and customer purchase history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information prohibited by Law) relating to customers of the retail stores and ecommerce sites operated or controlled by Sellers; |

---

[3] Any summary of the A&I Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the A&I Stalking Horse APA. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the A&I Stalking Horse APA, the actual terms and conditions of the A&I Stalking Horse APA shall control. Capitalized terms used in this section shall have the meanings given in the A&I Stalking Horse APA.

(6) all Sellers' email addresses under the Transferred Domain Name;

(7) the right to enforce and to represent to third parties that Buyer is the successor to all rights with respect to the Intellectual Property Assets;

(8) all originals and copies of all files and assignment documentation pertaining to existence, validity, availability, registrability, infringement, enforcement or ownership of any of the Intellectual Property Assets and documentation of the development, conception or reduction to practice thereof, in each case, under any Seller's possession or control; provided that Sellers shall be entitled to retain copies thereof for legal record-keeping purposes; and

(9) all other Intellectual Property owned by Sellers, or in which Sellers have any interest or right, and used or held for use by them in the conduct of the Business.

(b) All of Sellers' indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

(c) all Accounts Receivable (including, for the avoidance of doubt, the NVA Receivable) and notes receivable of the Business (whether current or non-current), including unbilled revenue under the Assigned Contracts, and all causes of action pertaining to the collection of the foregoing;

(d) all prepaid expenses of Sellers relating to any of the Assigned Contracts, including deposits, security deposits, merchant deposits and other prepaid expenses;

(e) as relating to the Acquired Assets and the Business, originals or copies of all books and records; books of account, ledgers, and general financial information; databases, files, ledgers, documentation, instruments, research, papers, data, sales or technical literature or similar information; financial and accounting records; customer lists; product catalogs; customer purchasing histories; quality control records and procedures; customer complaints and inquiry files; research and development files, records, and data (including all correspondence with any Governmental Authority); technical scientific and other know-how and information (including promotional material); trade secrets; confidential information, methods, processes, practices, formulas, designs, design rights, patterns, assembly procedures, and specifications; sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies, and practices); internal financial statements; marketing, advertising and promotional materials and surveys; and materials, research, and files relating to the Acquired Assets and the Assigned Contracts;

(f) all Assigned Contracts, including all rights and benefits thereunder;

...

(h) the right to receive and retain mail and other communications related to the Acquired Assets;

(i) all goodwill and other intangible assets associated with the Acquired Assets (to the extent transferable), including customer and supplier lists;

| | |
|---|---|
| | (j) all IT Assets and, to the extent transferable, Licensed Software; |
| | ... |
| | (m) All tangible and intangible assets, all inventory, equipment, and fixed assets related to or used in operation of the Business; all internal systems and software owned by, or used pursuant to a transferable license, by Sellers related to the operation of the Business; copies of all records, customer lists, books, files, papers, ledgers, correspondence, databases, information systems, programs, materials, documents and records of each Seller relating to the Business as physically maintained or maintained on any other medium; and to the extent transferable, all permits of Sellers used in the Business; and |
| | (n) except as set forth in Section 2.02(a), claims, causes of action and other legal rights and remedies against other Persons (including for royalties, fees or other income, past, present or future infringement, misappropriation or violation of, any of the Acquired Assets) to the extent arising from or relating to or in connection with the Acquired Assets or the Assumed Liabilities (regardless of whether or not asserted by any Seller), all of the proceeds from the foregoing which are accrued and unpaid as of the Closing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers, or manufacturers, rights of contribution, rights to refunds (except to the extent constituting Excluded Assets), rights of reimbursement, and other rights of recovery possessed by any Seller against other Persons and the prosecution files of Sellers related thereto, in each case, to the extent related to the Acquired Assets or the Assumed Liabilities (regardless of whether such rights are currently exercisable). |
| **Excluded Assets**<br>A&I Stalking Horse APA §2.02 | All assets of the Sellers that do not constitute Acquired Assets. Specifically:<br><br>(1) all cash, including the Purchase Price, cash equivalents, bank accounts, and securities of Sellers; provided, that, to the extent that any Acquired Assets are deposited into Sellers' bank accounts after the Closing Date, Sellers shall promptly pay to Buyer by wire transfer all collected funds constituting Acquired Assets;<br><br>(2) all Contracts other than the Assigned Contracts;<br><br>(3) any assets of Sellers used primarily in the EMX Business, including, without limitation, any contract rights of EMX Digital under any Assigned Contracts with any other Seller;<br><br>(4) the BV Australia Equity Interests and any other equity interests in any direct or indirect Subsidiary that is incorporated or organized in a jurisdiction outside the United States of America;<br><br>(5) all Benefit Plans; and<br><br>(6) the rights that accrue or will accrue to any Seller under the Transaction Documents. |
| **Assumed Liabilities**<br>A&I Stalking Horse APA §2.03 | All Liabilities and obligations arising under or relating to the Assigned Contracts, but solely to the extent such Liabilities and obligations are to be performed on or after the Closing; the Cure Claims; the Seller 2022 Bonus Payments; and all other Liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Acquired Assets on or after the Closing. |

| | |
|---|---|
| **Excluded Liabilities**<br>A&I Stalking Horse APA §2.04 | (a) All Liabilities and obligations arising under or relating to any Contract of any Seller that is not an Assigned Contract (including, for the avoidance of doubt, Liabilities and obligations arising under any Contract concerning the lease of real property);<br><br>(b) any and all Liabilities of Sellers under an Assigned Contract arising prior to the Closing, other than the Cure Claims determined pursuant to a Final Order;<br><br>(c) any indebtedness or obligation for borrowed money of any Seller;<br><br>(d) all Liabilities arising from the Excluded Assets;<br><br>(e) all Liabilities for any and all Taxes for which the Sellers or any of their Affiliates or direct or indirect partners, shareholders or members is or may be liable, regardless of the taxable period to which such Taxes relate, and any and all Taxes relating to or imposed or payable in connection with the Business or any of the Acquired Assets to the extent attributable to (or payable in respect of) any Pre-Closing Tax Periods, in each instance regardless of whether such Taxes are assessed or determined to be due or payable on, before or after the Closing, excluding, however, any Transfer Taxes payable by Buyer pursuant to Section 3.04;<br><br>(f) all Liabilities under any Benefit Plans;<br><br>(g) any and all Liability for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Seller, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under this Agreement or the other Transaction Documents;<br><br>(h) any Liabilities with respect to negative credit balances under any accounts receivable of the Sellers;<br><br>(i) any and all Liabilities arising from or related to the operation or condition of the Acquired Assets or the Assumed Liabilities prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect to the Acquired Assets or the Assumed Liabilities prior to the Closing;<br><br>(j) Liabilities arising out of or resulting from layoffs or termination of employees by any Seller prior to Closing and/or the consummation of the transactions contemplated by this Agreement sufficient in the aggregate to, in and of themselves, require notice under the WARN Act;<br><br>(k) any Liabilities arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions that occurred, or arise from events that occurred, prior to the Closing Date;<br><br>(l) any Liabilities to Stephens Inc. or any other investment banker, broker, or agent engaged by Sellers with respect to the payment |

| | |
|---|---|
| | of any commission or other compensation regarding the consummation of the transactions contemplated by this Agreement; |
| | (m) any Liabilities associated with any and all indebtedness of any Seller for borrowed money not included in the Assumed Liabilities; |
| | (n) any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any applicable Laws concerning environmental, health or safety matters, whether known or unknown), arising out of or relating to the Sellers' conduct, action or omission or its leasing, ownership or operation of real property on or prior to the Closing Date, no matter when raised; and |
| | (o) any Liabilities with respect to any Encumbrances which (i) do not constitute Permitted Encumbrances or (ii) will be removed pursuant to the Sale Order. |
| **Assignment of Contracts and Rights**<br>A&I Stalking Horse APA §4.04 | The A&I Stalking Horse APA contemplates the assignment of contracts and rights. |
| **Purchase Price**<br>A&I Stalking Horse APA §2.05 | The Closing Cash Consideration, plus the assumption of Assumed Liabilities. |
| **Bankruptcy Court Matters**<br>A&I Stalking Horse APA §10.03 | (a) The Sale and Bid Procedures Motion. On the Petition Date, Sellers shall file with the Bankruptcy Court the Sale and Bid Procedures Motion seeking entry of the Sale Order and the Bidding Procedures Order. Sellers shall not amend, supplement, or modify, or cause to be amended, supplemented, or modified, either or both the Sale Order and the Bidding Procedures Order, in any manner adverse to Buyer without Buyer's prior consent. |
| | (b) Bidding Procedures Order. The Sellers shall not change or modify, or request that the Bankruptcy Court change or modify, any of the dates or procedures set forth in this Agreement or the Bidding Procedures Order, including the dates of the hearing on the Sale and Bid Procedures Motion, without Buyer's prior consent. The purchase and sale of the Acquired Assets will be in accordance with the Bidding Procedures Order. The Bidding Procedures Order shall require (i) any Competing Bids to be based on the form of this Agreement, (ii) a minimum bid and a minimum bidding increment to be agreed upon by the Buyer and the Sellers in their reasonable discretion, (iii) that any Qualified Bids received be shared with Buyer upon receipt, and (iv) that, subject to Section 10.04, Buyer shall serve as Back-Up Bidder (as defined in the Bidding Procedures Order) and Buyer is willing to do so. |
| **Sale Free and Clear** | The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code. |
| **No Successor Liability** | The Debtors are seeking to sell the Assets free and clear of successor liability claims. |
| **Conditions to Closing**<br>A&I Stalking Horse APA §3.02 | At the Closing, Sellers will deliver or cause to be delivered to Buyer the following, each of which shall be duly executed (if applicable) by the applicable Seller (or an Affiliate thereof): a copy of the Sale Order entered by the Bankruptcy Court; the Bill of Sale; the Assumption and Assignment Agreement; the Intellectual Property Assignment Agreements; the Sellers Closing Certificate; a Form W-9 from each Seller, which shall serve as a certificate of non-foreign person status |

| | |
|---|---|
| | for purposes of Section 1445(b)(2) of the Code and Treasury Regulation Section 1.1445-2(b); physical possession of the Books and Records and other tangible Acquired Assets at the location or locations where such Books and Records and Acquired Assets are located on the Closing Date; and such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.  At the Closing, Buyer will deliver to the Sellers Representative the following, each of which shall be duly executed by Buyer (if applicable): the Closing Payment; instructions to the Escrow Holder to deliver the Deposit to Sellers; the Assumption and Assignment Agreement; the Intellectual Property Assignment Agreements; and the Buyer Closing Certificate. |
| **Sale to Insider** | The A&I Stalking Horse Bidder is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management** | None. |
| **Releases** | None. |
| **Auction (L.R. 6004-1(b)(iv)(D)** | An Auction is contemplated in these Chapter 11 Cases. The Debtors will be soliciting competing offers for the Assets and will not otherwise limit shopping of the Assets. |
| **Closing and Other Deadlines**<br>A&I Stalking Horse APA §3.01 | Closing shall occur on the earlier of (i) the fourth (4th) Business Day following the satisfaction or waiver of each of the conditions set forth in Article VII (other than those conditions which can be satisfied only at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) and (ii) at such other time, date or place as the Sellers Representative and Buyer may mutually agree upon in writing; provided, however, that such other time or date shall be on or before the End Date. |
| **Good Faith Deposit**<br>A&I Stalking Horse APA §2.05(c) | $1,200,000 |
| **Interim Arrangements with A&I Stalking Horse Purchaser (L.R. 6004-1(b)(iv)(G))** | N/A |
| **Use of Proceeds (L.R. 6004-1(b)(iv)(H))** | The Debtors are not seeking to release or allocate any sale proceeds without further order of the Court. |
| **Tax Exemption (L.R. 6004-1(b)(iv)(I))** | N/A |
| **Record Retention (APA § 5.06(a); L.R. 6004-1(b)(iv)(J))**<br>A&I Stalking Horse APA §6.03 | To the extent that Sellers deliver Books and Records or copies of Books and Records to Buyer at the Closing Date, then for a period of three (3) years after the Closing, Buyer shall provide to the Sellers Representative (after reasonable notice and during normal business hours and without charge to Sellers) access to (a) Buyer's personnel who have custody of Books and Records for periods prior to the Closing and (b) all Books and Records for periods prior to the Closing and shall preserve such Books and Records or deliver copies of such Books and Records to Sellers Representative, subject to compliance with applicable Law.  Such access to Books and Records shall include |

| | access to any such information in electronic form to the extent reasonably available. Sellers shall have the right to retain copies of Books and Records for periods prior to the Closing. With respect to any litigation and claims, Buyer shall, at Sellers' sole expense, render all reasonable assistance that any Seller may request in defending such litigation or claim and shall make available to Sellers, for and at reasonable times, Buyer's personnel most knowledgeable about the matter in question. |
|---|---|
| **Sale of Avoidance Actions (L.R. 6004-1(b)(iv)(K))**<br>A&I Stalking Horse APA §2.02 | The Avoidance Actions are not included in the Acquired Assets |
| **Credit Bid (L.R. 6004-1(b)(iv)(N)** | None. |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(A))** | To maximize the value received for the Acquired Assets, the Debtors seek to close the A&I Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |
| **Breakup Fee and Expense Reimbursement (L.R. 6004-1(c)(i)(C)(2))** | To provide an incentive and to compensate the A&I Stalking Horse Purchaser for performing the substantial due diligence and incurring the expenses necessary and entering into the A&I Stalking Horse APA, with the knowledge and risk that arises from participating in the Sale and subsequent bidding process, the Debtors have agreed to pay the A&I Stalking Horse Purchaser, under the conditions and in the amount set forth in the Bidding Procedures Order: (i) a break-up fee in the amount of $350,000, and (ii) an expense reimbursement up to an aggregate amount of $250,000 (exclusive of any amounts paid to Buyer prior to the Petition Date). |

17.     The Debtors have also agreed that, as set forth below in the Bid Procedures, the minimum overbid amount for the A&I Stalking Horse Assets shall be at least $100,000 (the "**A&I Minimum Overbid Amount**").

18.     Certain material terms of the EMX Stalking Horse APA, and certain provisions of the EMX Stalking Horse APA that are required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are described below:[4]

| **EMX Stalking Horse Purchaser** | ZStream Acquisition, LLC |
|---|---|
| **Purchased Assets**<br>EMX Stalking Horse APA §2.01 | (a) All Intellectual Property that is owned by Seller or any of their respective Affiliates, or in which Seller or any of Seller's Affiliates have any interest or right, and used or held for use by Seller |

---

[4] Any summary of the EMX Stalking Horse APA contained herein is qualified in its entirety by the actual terms and conditions of the EMX Stalking Horse APA. To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the EMX Stalking Horse APA, the actual terms and conditions of the EMX Stalking Horse APA shall control. Capitalized terms used in this section shall have the meanings given in the EMX Stalking Horse APA.

or any of Seller's Affiliates in the Business, wherever located, including, but not limited to:

(1) the copyright registrations set forth in Section 2.01(a)(1) of the Disclosure Schedule;

(2) the Trademarks set forth in Section 2.01(a)(2) of the Disclosure Schedule, and goodwill associated therewith, including the historical trademark files;

(3) the internet domain name registrations, web addresses, web pages, websites and related content, and social media accounts set forth in Section 2.01(a)(3) of the Disclosure Schedule;

(4) the patents set forth in Schedule 2.01(a)(4) of the Disclosure Schedule;

(5) all rights of publicity and all similar rights, including all commercial merchandising rights, owned or controlled by Seller or any of their respective Affiliates and either (A) derived from, based upon, inherent, in or attaching to the Intellectual Property Assets or (B) used or held for use by Seller or such Affiliates in the conduct of the Business, in each case, to the extent permitted to be assigned by Seller under any Contract or applicable Law;

(6) all customer data and information derived from customer purchase files and branded loyalty promotion programs and other similar information related to customer purchases, including personal information (such as name, address, telephone number, e-mail address, website, and any other database information) and customer purchase history at a transaction level (including dollar amounts, dates, and items purchased, but excluding from the foregoing any credit card numbers or related customer payment source, social security numbers, or other information prohibited by Law) relating to customers of the retail stores and ecommerce sites operated or controlled by Seller in all instances related to the Business;

(7) all Seller's email addresses under the Transferred Domain Names;

(8) the right to enforce and to represent to third parties that Buyer is the successor to all rights with respect to the Intellectual Property Assets;

(9) all originals and copies of all files and assignment documentation pertaining to existence, validity, availability, registrability, infringement, enforcement or ownership of any of the Intellectual Property Assets and documentation of the development, conception or reduction to practice thereof, in each case, under Seller's possession or control; provided that Seller shall be entitled to retain copies thereof for legal record-keeping purposes;

(10) and all other Intellectual Property owned by Seller, or in which Seller has any interest or right, and used or held for use by it exclusively in the conduct of the Business.

(b) All of Seller's indemnities and all similar rights against third parties to the extent related to any Acquired Assets;

(c) as relating to the Acquired Assets, the Assigned Contracts and the Business, originals or copies of all books and records; books of

account, ledgers, and general financial information; databases, files, ledgers, documentation, instruments, research, papers, data, sales or technical literature or similar information; financial and accounting records; customer lists; product catalogs; customer purchasing histories; quality control records and procedures; customer complaints and inquiry files; research and development files, records, and data (including all correspondence with any Governmental Authority); technical scientific and other know-how and information (including promotional material); trade secrets; confidential information, methods, processes, practices, formulas, designs, design rights, patterns, assembly procedures, and specifications; sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies, and practices); internal financial statements; marketing, advertising and promotional materials and surveys; and other materials, research, and files relating to the Acquired Assets, the Assigned Contracts and the Business;

(d) all Assigned Contracts, including all rights and benefits thereunder;

(e) all Accounts Receivable;

(f) deposits and prepayments held by any third parties pursuant to any Assigned Contract;

(g) the right to receive and retain mail and other communications related to the Acquired Assets and the Business;

(h) all goodwill and other intangible assets associated with the Acquired Assets and the Business (to the extent transferable), including customer and supplier lists;

(i) to the extent not set forth above, all of Seller's respective right, title, and, interest in and to all assets properties, interests, and other rights of Seller primarily used in the Business, including without limitation: (i) all tangible and intangible assets, all inventory, equipment, and fixed assets; (ii) all internal systems and software owned by, or used pursuant to a transferable license, by Seller; (iii) copies of all records, customer lists, books, files, papers, ledgers, correspondence, databases, information systems, programs, materials, documents and records of Seller relating to the Businesses as physically maintained or maintained on any other medium; and (iv) to the extent transferable, all permits of Seller; and

(j) except as set forth in Section 2.02(a), claims, causes of action and other legal rights and remedies against other Persons (including for royalties, fees or other income, past, present or future infringement, misappropriation or violation of, any of the Acquired Assets) to the extent arising from or relating to or in connection with the Acquired Assets or the Assumed Liabilities (regardless of whether or not asserted by Seller), all of the proceeds from the foregoing which are accrued and unpaid as of the Closing, all rights of indemnity, warranty rights, guaranties received from vendors, suppliers, or manufacturers, rights of contribution, rights to refunds, rights of reimbursement, and other rights of recovery possessed by Seller against other Persons and the prosecution files of Seller related thereto, in each case, to the extent related to the Acquired Assets or the Assumed Liabilities (regardless of whether such rights are currently exercisable); provided, however, that the foregoing shall exclude any Avoidance Actions.

| | |
|---|---|
| **Excluded Assets**<br>EMX Stalking Horse APA §2.02(a) | All cash, including the Purchase Price, cash equivalents, bank accounts, and securities of Seller; provided, that, to the extent that any Acquired Assets are deposited into Seller's bank accounts after the Closing Date, Seller shall promptly pay to Buyer by wire transfer all collected funds constituting Acquired Assets; all Contracts other than the Assigned Contracts; all Avoidance Actions; and the rights that accrue or will accrue to Seller under the Transaction Documents. |
| **Assumed Liabilities**<br>EMX Stalking Horse APA §2.03 | All Liabilities and obligations arising under or relating to the Assigned Contracts, but solely to the extent such Liabilities and obligations are to be performed on or after the Closing; the Cure Claims; the Assumed Employee Liabilities; the Assumed Post-Petition Payables; and all other Liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Acquired Assets on or after the Closing. |
| **Excluded Liabilities**<br>EMX Stalking Horse APA §2.04 | (a) All Liabilities and obligations arising under or relating to any Contract of Seller that is not an Assigned Contract;<br><br>(b) any and all Liabilities of Seller under an Assigned Contract arising prior to the Closing, other than the Cure Claims determined pursuant to a Final Order;<br><br>(c) any indebtedness or obligation for borrowed money of Seller;<br><br>(d) all Liabilities arising from the Excluded Assets;<br><br>(e) all Liabilities for any and all Taxes for which Seller or any of its Affiliates or direct or indirect partners, shareholders or members is or may be liable, regardless of the taxable period to which Taxes relate, and any and all Taxes relating to or imposed or payable in connection with the Business or any of the Acquired Assets to the extent attributable to (or payable in respect of) any Pre-Closing Tax Periods, in each instance regardless of whether such Taxes are assessed or determined to be due or payable before or after the Closing;<br><br>(f) all Liabilities under any Benefit Plans;<br><br>(g) any and all Liability for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Cases (including the U.S. Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Seller, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under this Agreement or the other Transaction Documents;<br><br>(h) any Liabilities with respect to negative credit balances under any accounts receivable of the Seller;<br><br>(i) any and all Liabilities arising from or related to the operation or condition of the Acquired Assets or the Assumed Liabilities prior to the Closing or facts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect to the Acquired Assets or the Assumed Liabilities prior to the Closing;<br><br>(j) any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any |

| | |
|---|---|
| | applicable Laws concerning environmental, health or safety matters, whether known or unknown), arising out of or relating to the Seller's conduct, action or omission or its leasing, ownership or operation of real property on or prior to the Closing Date, no matter when raised;<br><br>        (k) and any Liabilities with respect to any Encumbrances that (i) do not constitute Permitted Encumbrances or (ii) will be removed pursuant to the Sale Order. |
| **Assignment of Contracts and Rights**<br>EMX Stalking Horse APA §4.04 | The EMX Stalking Horse APA contemplates the assignment of contracts and rights. |
| **Purchase Price**<br>EMX Stalking Horse APA §2.05 | (i) The Closing Cash Consideration plus (ii) the assumption of Assumed Liabilities plus (iii) the amount of the Accounts Receivable, net of the AR Reserve and the Assumed Post-Petition Payables |
| **Bankruptcy Court Matters**<br>EMX Stalking Horse APA § 10.02 | (a) Within five (5) Business Days following the Petition Date, Seller shall file with the Bankruptcy Court the Sale and Bid Procedures Motion seeking entry of the Sale Order and the Bidding Procedures Order. Seller shall not amend, supplement, or modify, or cause to be amended, supplemented, or modified, either or both the Sale Order and the Bidding Procedures Order, in any manner adverse to Buyer without Buyer's prior consent.<br><br>        (b) The Seller shall not change or modify, or request that the Bankruptcy Court change or modify, any of the dates or procedures set forth in this Agreement or the Bidding Procedures Order, including the dates of the hearing on the Sale and Bid Procedures Motion, without Buyer's prior consent. The purchase and sale of the Acquired Assets will be in accordance with the Bidding Procedures Order. The Bidding Procedures Order shall require (i) any competing Bids to be based on the form of this Agreement, (ii) a minimum bid and a minimum bidding increment to be agreed upon by the Buyer and the Seller in their reasonable discretion, (iii) that any Qualified Bids received be shared with Buyer within one (1) Business Day of being qualified by the Seller, and (iv) that, subject to Section 10.04, Buyer shall serve as Back-Up Bidder (as defined in the Bidding Procedures Order) and Buyer is willing to do so. |
| **Sale Free and Clear** | The Debtors are seeking to sell the Assets free and clear of all liens, claims, and encumbrances to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code. |
| **No Successor Liability** | The Debtors are seeking to sell the Assets free and clear of successor liability claims. |
| **Conditions to Closing**<br>EMX Stalking Horse APA §3.02 | At the Closing, Seller will deliver or cause to be delivered to Buyer the following, each of which shall be duly executed (if applicable) by the Seller (or an Affiliate thereof): a copy of the Sale Order entered by the Bankruptcy Court; the Bill of Sale; the Assumption and Assignment Agreement; the Intellectual Property Assignment Agreements; the Transition Services Agreement, duly executed by Seller or its applicable assignee(s); the IP License, duly executed by Seller or its applicable assignee(s); the Seller's Closing Certificate; and such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.<br><br>At the Closing, Buyer will deliver to the Seller's Representative the following, each of which shall be duly executed by Buyer (if |

| | |
|---|---|
| | applicable): the Closing Payment; the Assumption and Assignment Agreement; the Intellectual Property Assignment Agreements; the Transition Services Agreement; the IP License; and the Buyer Closing Certificate. |
| **Sale to Insider** | The EMX Stalking Horse Bidder is not an "insider," as such term is defined in section 101(31) of the Bankruptcy Code. |
| **Agreements with Management** | None |
| **Releases** | None |
| **Auction  (L.R. 6004-1(b)(iv)(D)** | An Auction is contemplated in these Chapter 11 Cases. The Debtors will be soliciting competing offers for the Assets and will not otherwise limit shopping of the Assets. |
| **Closing and Other Deadlines** <br> EMX Stalking Horse APA §3.01 | The later of (i) the fourth (4th) Business Day following the satisfaction or waiver of each of the conditions set forth in ARTICLE VII (other than those conditions which can be satisfied only at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) and (ii) such other time, date, or place as the Seller's Representative and Buyer may mutually agree upon in writing; provided, however, that such other time or date shall be on or before the End Date. |
| **Good Faith Deposit** <br> EMX Stalking Horse APA §2.05(c) | $150,000 |
| **Interim Arrangements with EMX Stalking Horse Purchaser (L.R. 6004-1(b)(iv)(G))** | The EMX Stalking Horse APA contemplates a Transition Services Agreement among Buyer and Seller. |
| **Use of Proceeds (L.R. 6004-1(b)(iv)(H))** | The Debtors are not seeking to release or allocate any sale proceeds without further order of the Court. |
| **Tax Exemption (L.R. 6004-1(b)(iv)(I))** | N/A |
| **Record Retention; L.R. 6004-1(b)(iv)(J))** <br> EMX Stalking Horse APA §6.03 | To the extent that Seller delivers Books and Records to Buyer at the Closing Date, then from and after the Closing, Buyer shall provide to the Seller's Representative (after reasonable notice and during normal business hours and without charge to Seller) access to (a) Buyer's personnel who have custody of Books and Records for periods prior to the Closing and (b) all Books and Records for periods prior to the Closing and shall preserve such Books and Records or deliver copies of such Books and Records to Seller's Representative, subject to compliance with applicable Law, for purposes of (i) preparing any Tax Returns, (ii) enforcing rights or obligations of Seller under this Agreement or any of the Transaction Documents, (iii) complying with the requirements of, or responding to inquiries by, any Governmental Authority, or (iv) administering the Bankruptcy Cases; provided, however, that, for the avoidance of doubt, the foregoing shall not require Buyer to take any such action if (x) such action may result in a waiver or breach of any attorney/client privilege or conflict with any confidentiality obligations to which Buyer is bound, or (y) such action could reasonably be expected to result in violation of applicable Law or Order.  Such access to Books and Records shall include access to any such information in electronic form to the extent reasonably |

| | available.  Seller shall have the right to retain copies of Books and Records for periods prior to the Closing |
|---|---|
| **Sale of Avoidance Actions (L.R. 6004-1(b)(iv)(K))** EMX Stalking Horse APA §2.02 | The Avoidance Actions are not included in the Acquired Assets |
| **Credit Bid (L.R. 6004-1(b)(iv)(N))** | None. |
| **Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(b)(iv)(O))** | To maximize the value received for the Acquired Assets, the Debtors seek to close the EMX Sale as soon as possible after the Sale Hearing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |
| **Breakup Fee and Expense Reimbursement (L.R. 6004-1(c)(i)(C)(2))** | To provide an incentive and to compensate the EMX Stalking Horse Purchaser for performing the substantial due diligence and incurring the expenses necessary and entering into the EMX Stalking Horse APA, with the knowledge and risk that arises from participating in the Sale and subsequent bidding process, the Debtors have  agreed to pay the EMX Stalking Horse Purchaser, under the conditions and in the amount set forth in the Bidding Procedures Order: (i) a break-up fee in an amount equal to three (3) percent of the cash purchase price, and (ii) an expense reimbursement of up to $150,000. |

19.     The Debtors have also agreed that, as set forth below in the Bid Procedures, the minimum overbid amount for the EMX Stalking Horse Assets shall be at least $50,000 (the "**EMX Minimum Overbid Amount**").

## BID PROCEDURES[5]

20.     The Debtors are in the process of soliciting bids for all of the Assets, or any number or combination thereof, in accordance with the Bid Procedures.  The Bid Procedures describe, among other things, (i) the Assets available for sale, (ii) the manner in which bids become "qualified," (iii) the coordination of diligence efforts among the bidders and the Debtors, (iv) receipt and negotiation of bids received, (v) the conduct of any Auction, and (vi) the selection and approval of the Winning Bidder and the selection of the Back-Up Bidder.  The Bid Procedures

---

[5] Any summary of the Bid Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bid Procedures as provided for in the Bidding Procedures Order.  To the extent that there is any conflict between any summary contained herein and the actual terms and conditions of the Bid Procedures as provided for in the Bidding Procedures Order, the actual terms and conditions of the Bid Procedures as provided for in the Bid Procedures Order shall control.

reflect the Debtors' objective of conducting the Sale Process in an orderly, fair and open manner, while ensuring that the highest or best bid is generated for the Assets.

21.    Certain of the key terms of the Bid Procedures, which shall apply to Potential Bidders, Qualifying Bidders, the submission, receipt, and analysis of all bids relating to the Sale, and the conduct of the Sale and the Auction, are included below:

(a)    **Qualification as Bidder**:  Any person or entity that wishes to participate in the bidding process for the Assets (each, a "**Potential Bidder**") must first become a "**Qualifying Bidder**".  To become a Qualifying Bidder, and thus being able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "**Data Room**"), a Potential Bidder must submit to the Debtors and their advisors:

(i) documentation identifying the interested party, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(ii) an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors;

(iii) a statement and other factual support demonstrating to the Debtors' reasonable satisfaction, after consultation with the Consultation Parties, that the interested party has a *bona fide* interest in consummating a sale transaction; and

(iv) sufficient information, as determined by the Debtors, after consultation with any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**" and together with the Debtors and the Prepetition Secured Parties, the "**Consultation Parties**"), to allow the Debtors to determine that the interested party (x) has, or can obtain, the financial wherewithal and any required internal corporate, legal or other authorizations to close a sale transaction, including, but not limited to, current audited financial statements of the interested party (or such other form of financial disclosure acceptable to the Debtors in their discretion), and (y) can provide adequate assurance of future performance under any executory contracts and unexpired leases to be assumed by the Debtors and assigned to such bidder, pursuant to section 365 of the Bankruptcy Code, in connection with the Sale.

(v) Notwithstanding anything to the contrary herein, and for the avoidance of doubt, for all purposes under the Bid Procedures: (i) the Stalking Horse Purchasers shall be considered Qualifying Bidders, and the Stalking Horse APAs shall be considered Qualifying Bids, for all purposes under the Bid Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchasers; and (ii) in determining whether the

Potential Bidders constitute Qualifying Bidders, the Debtors may consider a combination of bids for the Assets.

(b)   **Due Diligence**:  The Debtors will provide any Qualifying Bidder with reasonable access to the Data Room and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances.  All additional due diligence requests shall be directed to: (a) the proposed investment banker for the Debtors, Stephens Inc., Sachin Lulla (Sachin.Lulla@stephens.com); and/or (b) proposed counsel for the Debtors, Michael R. Nestor (mnestor@ycst.com), Joseph M. Barry (jbarry@ycst.com), and Joseph M. Mulvihill (jmulvihill@ycst.com). The due diligence period shall extend through and including the Bid Deadline.  The Debtors may, but shall not be obligated to, in their business judgment, furnish any due diligence information after the Bid Deadline.  The Debtors reserve the right, in their reasonable discretion, to withhold or limit access to any due diligence information that the Debtors determines is business-sensitive or otherwise not appropriate for disclosure to a Qualifying Bidder.  Notwithstanding any prepetition limitations, including, without limitation, any non-disclosure, confidentiality or similar provisions relating to any due diligence information, the Debtors and their estates shall be authorized to provide due diligence information to Qualifying Bidders provided that such Qualifying Bidders have delivered an executed confidentiality agreement in form and substance acceptable to the Debtors.  The Debtors and their estates are not responsible for, and shall have no liability with respect to, any information obtained by, or provided to, any Qualifying Bidders in connection with the Bid Procedures and the Sale.

(c)   **Bid Requirements**:

i.   *Qualifying Bid*.  Other than in the case of the Stalking Horse Purchasers and the Stalking Horse APAs, which shall be considered Qualifying Bidders and Qualifying Bids, respectively, for all purposes under the Bid Procedures, without regard to any of the requirements or conditions set forth therein and without any other or further action by the Stalking Horse Purchasers, to be deemed a "**Qualifying Bid**," a bid must be received from a Qualifying Bidder on or before the Bid Deadline and satisfy each of the following requirements (each, a "**Bid Requirement**"):

a.   be in writing;

b.   fully disclose the identity of the Qualifying Bidder (and to the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the identity of the Qualifying Bidder's parent company or sponsor), and provide the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wishes to discuss the bid submitted by the Qualifying Bidder;

c.   set forth the purchase price to be paid by such Qualifying Bidder;

d.     not propose payment in any form other than cash;

e.     state the liabilities proposed to be paid or assumed by such Qualifying Bidder;

f.     specify the Assets that are included in the bid and state that such Qualifying Bidder offers to (i) purchase the Assets, or a number or combination of the Assets, and (ii) assume liabilities, upon substantially the same terms as, or terms more favorable to the Debtors and their estate than, the terms set forth in the applicable Stalking Horse APA;

g.     be accompanied by an alternative asset purchase agreement (an "**Alternative APA**") that reflects any variations from the applicable Stalking Horse APA;

h.     state that such Qualifying Bidder's offer is formal, binding and unconditional and is irrevocable until two (2) business days after the closing of the Sale;

i.     state that such Qualifying Bidder is financially capable of consummating the transactions contemplated by the Alternative APA and provide written evidence in support thereof;

j.     contain such financial and other information to allow the Debtors to make a reasonable determination, after consultation with the Consultation Parties, as to the Qualifying Bidder's financial and other capabilities to close the transactions contemplated by the Alternative APA, including, without limitation, such financial and other information supporting the Qualifying Bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, including the Qualifying Bidder's financial wherewithal and willingness to perform under any contracts and leases that are assumed and assigned to the Qualifying Bidder, in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases potentially being assumed and assigned in connection with the Sale within one (1) business day after the Debtors' receipt of such information.  To the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor;

k.   (A) identify with particularity each and every executory contract and unexpired lease the assumption and assignment of which is a condition to close the transactions contemplated by the Alternative APA, (B) provide for the payment of cure costs related to such executory contracts and unexpired leases, and (C) demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Qualifying Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases;

l.   a commitment to close the transactions contemplated by the Alternative APA by no later than April 20, 2023;

m.   not request or entitle such Qualifying Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of fee or payment;

n.   if the Alternative APA contemplates the purchase of the A&I Stalking Horse Assets, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the A&I Purchase Price, (B) the A&I Bid Protections, and (C) $100,000;

o.   if the Alternative APA contemplates the purchase of the EMX Stalking Horse Assets, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the EMX Purchase Price, (B) the EMX Bid Protections, and (C) $50,000;

p.   if the Alternative APA contemplates the purchase of a combination of both the A&I Stalking Horse Assets and the EMX Stalking Horse Assets, the aggregate consideration proposed by the Qualifying Bidder must equal or exceed the sum of the amount of (A) the Purchase Price set forth in the Stalking Horse APAs, (B) the Bid Protections, and (C) $150,000;

q.   not contain any contingencies of any kind, including, without limitation, contingencies related to financing, internal approval or due diligence;

r.   contain written evidence satisfactory to the Debtors, in consultation with the Consultation Parties, that the Qualifying Bidder has a commitment for financing or other evidence of the ability to close the transactions contemplated by the Alternative APA, with appropriate contact information for such financing sources;

30082787.4

s.     contain a written acknowledgement and representation that the Qualifying Bidder (i) has had an opportunity to conduct any and all due diligence regarding the Assets, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and other information in making its Qualifying Bid, (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any documents or other information provided in connection with the Bid Procedures and the Sale, and (iv) the sale of the Assets on an "as-is, where-is" basis;

t.     sets forth (i) a statement or evidence that the Qualifying Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (ii) any regulatory and third-party approvals required for the Qualifying Bidder to close the transactions contemplated by the Alternative APA, and the time period within which the Qualifying Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five (5) days following execution and delivery of such Qualifying Bidder's Alternative APA, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); provided that a Qualifying Bidder agrees that its legal counsel will coordinate in good faith with the Debtors' legal counsel to discuss and explain Qualifying Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the Alternative APA; provided, further that the offer contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

u.     provides for the Qualifying Bidder to serve as a backup bidder (the "**Back-Up Bidder**") if the Qualifying Bidder's bid is the next highest and best bid (the "**Back-Up Bid**") after the Winning Bid, in accordance with the terms of the Alternative APA;

v.     includes written evidence of authorization and approval from the Qualifying Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of the Alternative APA;

30082787.4

w.  provides a good faith cash deposit (the "**Deposit**") in an amount equal to ten percent (10%) of the purchase price provided for in the Alternative APA (or such additional amount as may be determined by the Debtors in consultation with the Consultation Parties) provided, however, that the Stalking Horse Purchasers are not required to make any additional deposit; and

x.  provides that in the event of the Qualifying Bidder's breach of, or failure to perform under, the Alternative APA, the Debtors and their estates shall be entitled to retain the Deposit as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

A bid from a Qualifying Bidder satisfying all of the above requirements, as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a Qualifying Bid. The Debtors reserve the right to work with any Qualifying Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualifying Bid.

Each Qualifying Bidder submitting a bid shall be deemed to: (a) acknowledge and represent that it is bound by all of the terms and conditions of the Bid Procedures; and (b) have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its bid, the Bid Procedures, and the Sale.

ii.  *Bid Deadline*

A Qualifying Bidder, other than the Stalking Horse Purchasers, that desires to make a bid shall deliver a written and electronic copy of its bid in both PDF and MS-WORD format to the Bidding Procedures Notice Parties (as defined in the Bid Procedures) and the Consultation Parties so as to be received on or before **March 27, 2023, at 5:00 p.m. (ET)** (the "**Bid Deadline**"); provided that the Debtors may extend the Bid Deadline without further order of the Court, after consultation with the Consultation Parties. To the extent that the Bid Deadline is extended for all parties, the Debtors shall file a notice on the docket of these Chapter 11 Cases indicating the same. **Any party that does not submit a bid by the Bid Deadline will not be allowed to (a) submit any offer after the Bid Deadline, or (b) participate in the Auction.**

iii.  *Evaluation of Qualifying Bids*. The Debtors will deliver, within one (1) business day after receipt thereof, copies of all bids from Qualifying Bidders to the Consultation Parties. The Debtors, in consultation with the Consultation Parties, shall make a determination regarding whether a timely submitted bid from a Qualifying Bidder is a Qualifying Bid. No later than March 29, 2023, the Debtors shall: (i) notify all Qualifying Bidders whether

their bids have been determined to be a Qualifying Bid; and (ii) determine, in consultation with the Consultation Parties, which of the Qualifying Bids, at such time, is the highest or best bid for purposes of constituting the opening bid of the Auction (the "**Baseline Bid**" and the Qualifying Bidder submitting the Baseline Bid, the "**Baseline Bidder**"), and shall promptly notify the Stalking Horse Purchasers and all Qualifying Bidders with Qualifying Bids of the Baseline Bid.

iv. *No Qualifying Bids*. If no timely Qualifying Bids other than the Stalking Horse Purchasers' Qualifying Bids are submitted on or before the Bid Deadline, the Debtors shall not hold an Auction and shall request at the Sale Hearing that the Court approve the Stalking Horse APAs and the transactions contemplated thereunder.

(d) **Auction**: If the Debtors timely receive competing Qualifying Bids for any Assets, then the Debtors shall conduct an auction (the "**Auction**"). Following the Auction, the Debtors will determine, in consultation with the Consultation Parties, which Qualifying Bid is the highest or best bid for the Assets, which will be determined by considering, among other things, the following non-binding factors: (a) the number, type and nature of any changes to the Stalking Horse APAs requested by each bidder; (b) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors and their estates of such modifications or delay; (c) the total consideration to be received by the Debtors and their estates; (d) the transaction structure and execution risk, including conditions to, timing of and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approval; (e) the net benefit to the Debtors' estates; and (f) any other factors the Debtors may reasonably deem relevant. The Auction shall be governed by the following procedures:

i. the Auction shall be held on **March 30, 2023, at 10:00 a.m. (ET)** at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801 or virtually via telephone and/or video conference pursuant to information to be timely provided by the Debtors to the Auction Participants (as defined below);

ii. only the Stalking Horse Purchasers and the other Qualifying Bidders with Qualifying Bids (together, the "**Auction Bidders**") shall be entitled to make any subsequent bids at the Auction;

iii. the Auction Bidders shall appear in person at the Auction, or through a duly authorized representative;

iv. only the Debtors, the Auction Bidders, the Consultation Parties, and all creditors of the Debtors, together with the professional advisors to each of the foregoing parties, may attend the Auction (collectively, the "**Auction Participants**"); provided that any such creditors provide counsel for the

Debtors written notice of their intent to attend the Auction no later than noon (ET) the day prior to the Auction;

v.  the Debtors and their professional advisors shall direct and preside over the Auction, which shall be transcribed;

vi.  the Auction Bidders shall confirm that they have not engaged in any collusion with respect to the Bid Procedures, the Auction or the Sale;

vii.  bidding shall commence at the amount of the Baseline Bid, and the Auction Bidders may submit successive bids in increments of at least $150,000, $100,000, or $50,000, as applicable under the Bidding Procedures, provided that: (i) each such successive bid must be a Qualifying Bid; and (ii) the Debtors shall retain the right to modify the bid increment requirements at the Auction;

viii.  In any successive bid by the Stalking Horse Purchaser, the amount of the Bid Protections shall be included in the calculation of such bid;

ix.  the Auction may include individual negotiations with any of the Auction Bidders, but all bids shall be made on the record and in the presence of all of the Auction Bidders;

x.  all material terms of the bid that is deemed to be the highest and best bid for each round of bidding shall be fully disclosed to the Auction Bidders, and the Debtors shall use reasonable efforts to clarify any and all questions that the Auction Bidders may have regarding the Debtors' announcement of the then-current highest and best bid;

xi.  the Debtors and their professional advisors, in consultation with the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time allotted to make subsequent bids) for conducting the Auction, provided that such rules are (i) not inconsistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, or any applicable order of the Court entered in connection with these Chapter 11 Cases, including, without limitation, the Bidding Procedures Order and the DIP Order, and (ii) disclosed to the Auction Bidders;

xii.  each Auction Bidder shall (i) be deemed to have waived any right to a jury trial in connection with, and consented and submitted to the exclusive jurisdiction of the Court over, any actions or proceedings arising from or relating the Bid Procedures, the Sale, the Auction and the construction and enforcement of the contemplated transaction documents of the Auction Bidders, (ii) bring any such action or proceeding in the Court, and (iii) be deemed to have consented to the Court entering a final judgment determining any such action or proceeding and that such final judgment in any such action or proceeding, including all appeals, shall be conclusive and

may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law;

xiii.  the Auction Bidders shall have the right to make additional modifications to the Stalking Horse APAs or any Alternative APA, as applicable, in conjunction with each Qualifying Bid submitted in each round of bidding during the Auction, provided that (i) any such modifications on an aggregate basis and viewed in whole, shall not, in the Debtors' discretion, in consultation with the Consultation Parties, be less favorable to the Debtors and their estates than the terms of the Stalking Horse APAs, and (ii) each Qualifying Bid shall constitute an irrevocable offer and shall be binding on the Auction Bidder submitting such bid until such party shall have submitted a subsequent Qualifying Bid at the Auction or the conclusion of the Sale Hearing, whichever occurs sooner, unless such bid is selected as the Winning Bid or the Back-Up Bid, which shall remain binding as provided for herein;

xiv.  the Debtors and the Consultation Parties shall have the right to request any additional financial information that will allow the Debtors and the Consultation Parties to make a reasonable determination as to an Auction Bidder's financial and other capabilities to consummate the transactions contemplated by the Stalking Horse APAs or any Alternative APA, as applicable, as may be amended during the Auction, and any further information that the Debtors may believe is reasonably necessary to clarify and evaluate any bid made by an Auction Bidder during the Auction;

xv.  upon the conclusion of the Auction, the Debtors shall determine, in consultation with the Consultation Parties, and subject to Court approval, the offer or offers for the Assets that is or are the highest or best from among the Qualifying Bids submitted at the Auction (the "**Winning Bid**").  In making this decision, the Debtors shall consider, in consultation with the Consultation Parties, the amount of the purchase price, the assumption of liabilities, the likelihood of the bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APAs or any Alternative APA submitted with the Winning Bid, as applicable, requested by each bidder, and the net benefit to the Debtors' estate.  The bidder submitting such Winning Bid at the Auction shall become the Winning Bidder and shall have such rights and responsibilities of the purchaser as set forth in the Stalking Horse APAs or any Alternative APA, as applicable.  The Debtors may, in their business judgment, designate the Back-Up Bid (and the corresponding Back-Up Bidder) to purchase the Assets in the event that the Winning Bidder does not close the Sale;

xvi.  within one (1) business bay of the close of the Auction, the Winning Bidder shall supplement the Winning Bidder's Deposit such that the Deposit shall be equal to an amount that is ten (10%) percent of the Winning Bid; and

xvii.    prior to the Sale Hearing, the Winning Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Winning Bid was made.

**THE WINNING BID AND ANY BACK-UP BID AND THEIR RELATED PURCHASE AGREEMENTS SHALL CONSTITUTE AN IRREVOCABLE OFFER AND BE BINDING ON THE WINNING BIDDER AND THE BACK-UP BIDDER, RESPECTIVELY, FROM THE TIME THE BID IS SUBMITTED UNTIL TWO (2) BUSINESS DAYS AFTER THE SALE HAS CLOSED. EACH QUALIFYING BID THAT IS NOT THE WINNING BID OR THE BACK-UP BID SHALL BE DEEMED WITHDRAWN AND TERMINATED AT THE CONCLUSION OF THE SALE HEARING.**

(e)    **Sale Hearing**: The Winning Bid and any Back-Up Bid (or if no Qualifying Bid other than that of a Stalking Horse Purchasers is received, then the Stalking Horse APAs) will be subject to approval by the Court. The Sale Hearing to approve the Winning Bid and any Back-Up Bid (or if no Qualifying Bid other than that of the Stalking Horse Purchasers are received, then the Stalking Horse APAs) shall take place on **April 6, subject to Court availability**. The Sale Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties and the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then in consultation with the Winning Bidders, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of these Chapter 11 Cases.

At the Sale Hearing, the Debtors will seek entry of the Sale Orders that, among other things authorizes and approves the Sale to the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then to the Winning Bidder, pursuant to the terms and conditions set forth in the Stalking Horse APAs or Alternative APA submitted by the Winning Bidder, as applicable.

(f)    **Backup Bidder**: Notwithstanding any of the foregoing, in the event that the Winning Bidder fails to close the Sale on or before April 20, 2023 (or such date as may be extended by the Debtors in consultation with the Consultation Parties), the Back-Up Bid will be deemed to be the Winning Bid, the Back-Up Bidder will be deemed to be the Winning Bidder, and the Debtors shall be authorized, but not directed, to close the Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid without the need for further order of the Court and without the need for further notice to any interested parties.

(g)    **Return of Deposits**: All Deposits shall be returned to each bidder not selected by the Debtors as the Winning Bidder or the Back-Up Bidder no later than five (5) business days following the conclusion of the Auction. The Deposit of the Back-Up Bidder shall be returned no later than five (5) business days following the

closing of the Sale.  The deposit of the Winning Bidder or, if the Sale is closed with the Back-Up Bidder, the deposit of the Back-Up Bidder, shall be applied to the purchase price for the Sale.  If the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) fails to consummate the Sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the Alternative APA or any Stalking Horse APA or any Alternative APA, as applicable, the Debtors and their estates shall be entitled to retain the Deposit of the Winning Bidder (or, if the Sale is to be closed with the Back-Up Bidder, then the Back-Up Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.  For the avoidance of doubt, the Debtors' retention of a Deposit shall not constitute a waiver of any of the Debtors' legal or equitable rights relating to a Winning Bidder's or Back-Up Bidder's breach or failure to perform, and all such rights and remedies are preserved.

(h)  **Reservation of Rights**.  Notwithstanding any of the foregoing, the Debtors and their estates reserve the right to, after consultation with the Consultation Parties, modify the Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all potential bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

22.  The following is a summary of the key dates established by the Bid Procedures and the Assumption and Assignment Procedures:

| DATE | DEADLINE/EVENT |
| --- | --- |
| **March 9, 2023** | Assumption Notice Deadline |
| **March 23, 2023 at 4:00 p.m. (ET)** | Sale Objection Deadline; Contract Objection Deadline[6] |
| **March 27, 2023** | Bid Deadline |
| **March 29, 2023** | Deadline for Debtor to Designate Qualifying Bids and Baseline Bid |
| **March 30, 2023** | Auction |

---

[6]  The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Assets and the assumption and assignment of the Assigned Contracts (including adequate assurance of future performance by the Stalking Horse Purchasers), with the exception of objections related to adequate assurance of future performance by a Winning Bidder *other than* the Stalking Horse Purchasers.

| As soon as practicable after completion of the Auction | Deadline to File and Serve Notice of Winning Bidder |
|---|---|
| **March 31, 2032, at 4:00 p.m. (ET)** | Adequate Assurance Objection Deadline for Winning Bidder Other Than the Stalking Horse Purchaser |
| **April 4, 2023 at noon (ET)** | Debtors' Deadline to Reply to Sale Objections |
| **April 6, 2023, subject to Court availability** | Sale Hearing |
| **April 20, 2023** | Sale Closing |

23.     The Debtors respectfully submit that the timeline set forth in the Bid Procedures is reasonable and necessary under the circumstances of these Chapter 11 Cases.  Such timeline provides an approximately 45-day period between the filing of this Motion and the Bid Deadline, which will allow parties in interest sufficient time to formulate bids for the Assets. Moreover, relevant information regarding the Debtors' business has been made available in the Data Room, allowing potential bidders (subject to the execution of an NDA) to immediately conduct diligence on the Debtors' Assets, and the Debtors and their advisors began marketing the Assets prior to the filing of this Motion.

## NOTICE PROCEDURES FOR THE SALE, BID PROCEDURES, AUCTION, AND SALE HEARING

24.     The Debtors also request approval of the sale notice (the "**Sale Notice**"), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.

25.     Upon entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice by regular mail on:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Stalking Horse Purchasers; (3) all parties known by the Debtors to assert a lien or encumbrances on any of the Assets; (4) all persons known or reasonably believed to have asserted an interest in or claim to any of the Assets; (5) all persons known or reasonably believed

to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (6) the Office of the United States Attorney for the District of Delaware; (7) the Office of the Attorney General in each state in which the Debtors have operated; (8) the Office of the Secretary of State in each state in which the Debtors have operated; (9) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (10) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (11) the Federal Trade Commission; (12) the United States Attorney General/Antitrust Division of Department of Justice; (13) all non-Debtor parties to any of the Assigned Contracts; (14) all of the Debtors' other known creditors and equity security holders; and (15) all other parties that have filed a notice of appearance and demand for service of papers in these Chapter 11 Cases as of the service date (collectively, the "**Sale Notice Parties**").

26.    The Debtors will also cause the Sale Notice to be published once in the national edition of *USA Today*, and post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Kroll Restructuring Administration, LLC at https://cases.ra.kroll.com/bigvillage.

## ASSUMPTION AND ASSIGNMENT PROCEDURES

27.    To facilitate the Sale, the Debtors seek authority to assume and assign to the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidder, then to the Winning Bidder, the Assigned Contracts in accordance with the Assumption and Assignment Procedures.

28.    The Assumption and Assignment Procedures are as follows:

(a)    On or before March 9, 2023 (the "**Assumption Notice Deadline**"), the Debtors shall file with the Court and serve on each counterparty (each, a "**Counterparty**," and collectively, the "**Counterparties**") to an Assigned Contract a notice,

substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the "**Assumption Notice**").

(b)     The Assumption Notice shall include, without limitation, the cure amount (each, a "**Cure Amount**"), if any, that the Debtors believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Assigned Contracts.  If a Counterparty objects to (i) the assumption and assignment of the Counterparty's Assigned Contract, (ii) the Cure Amount for its Assigned Contract or (iii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties a written objection (a "**Contract Objection**") on or before the applicable objection deadline set forth in these Assumption and Assignment Procedures.

(c)     On or before the Assumption Notice Deadline, the Debtors shall provide the Adequate Assurance Information for the Stalking Horse Purchasers to all Counterparties whose Assigned Contracts are included in the Stalking Horse APAs and that are the subject of the Assumption Notice.

(d)     Any Contract Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 **on or before 4:00 p.m. (ET) on March 23, 2023 at 4:00 p.m. (ET)** (the "**Contract Objection Deadline**"), and proof of service of such Contract Objection upon the Objection Notice Parties shall be filed with the Court as and when required by the Local Rules; (iv) be served upon the Objection Notice Parties; and (v) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the Assigned Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

*\*Any objections to adequate assurance of performance by the Stalking Horse Purchaser shall be filed by the Contract Objection Deadline.\**

*\*\*Any objections to adequate assurance of future performance by a Winning Bidder other than the Stalking Horse Purchaser shall be filed in accordance with subparagraph (g) below.\*\**

(e)     The "**Objection Notice Parties**" are as follows: (i) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor (mnestor@ycst.com), Joseph Barry (jbarry@ycst.com), and Joseph M. Mulvihill (jmulvihill@ycst.com)); (ii) proposed investment banker for the Debtors, Stephens Inc., Sachin Lulla (Sachin.Lulla@stephens.com); (iii) counsel to the A&I Stalking Horse Purchaser, Ballard Spahr LLP, 919 N Market Street, 11th Floor, Wilmington, Delaware 19801

(Attn: Tobey M. Daluz (daluzt@ballardspahr.com)); (iv) counsel to the EMX Stalking Horse Purchaser, DLA Piper LLP (US), 6225 Smith Avenue, Baltimore, Maryland 21209 (Attn: C. Kevin Kobbe (kevin.kobbe@dlapiper.com)); (v) counsel to the prepetition lenders, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020-1001 (Attn: Brian Trust (btrust@mayerbrown.com) and Scott M. Zemser (szemser@mayerbrown.com)) and Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108 (Attn. L. Katherine Good (kgood@potteranderson.com)); (vi) counsel to the Official Committee of Unsecured Creditors; and (vii) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Richenderfer (Linda.Richenderfer@usdoj.gov)).

(f)     As soon as reasonably practicable after the completion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "**Notice of Winning Bidder**"), which shall set forth, among other things, (i) the Winning Bidder and Back-Up Bidder (if any) and the amount of each of the Winning Bid and the Back-Up Bid (if any), (ii) the Selected Assigned Contracts, and (iii) the proposed assignee(s) of such Selected Assigned Contracts (as defined below).

(g)     As soon as reasonably practicable after the completion of the Auction, the Debtors will cause to be served by overnight mail and, if available, electronic mail, upon each affected Counterparty and its counsel (if known) the Notice of Winning Bidder.

    ***In the event the Stalking Horse Purchasers are not the Winning Bidders, the Counterparties shall file any Contract Objections <u>solely</u> on the basis of adequate assurance of future performance not later than <u>March 31, 2023, at 4:00 p.m. (ET)</u>.****

(h)     At the Sale Hearing, the Debtors will seek Court approval of the assumption and assignment to the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidder, then to the Winning Bidder, of only those Assigned Contracts that have been selected by the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidder, then the Winning Bidder, to be assumed and assigned (each, a "**Selected Assigned Contract**," and collectively, the "**Selected Assigned Contracts**"). The Debtors and their estates reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

(i)     If no Contract Objection is timely received with respect to a Selected Assigned Contract: (i) the Counterparty to such Selected Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then to the Winning Bidders, of the Selected Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Stalking Horse Purchasers or, in the event the Stalking

Horse Purchasers are not the Winning Bidders, then the Winning Bidders); (ii) any and all defaults under the Selected Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) the Cure Amount for such Selected Assigned Contract shall be controlling, notwithstanding anything to the contrary in such Selected Assigned Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Selected Assigned Contract against the Debtors and their estates or the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then the Winning Bidders, or the property of any of them, that existed prior to the entry of the Sale Orders.

(j)      To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "**Cure Dispute**"), such Contract Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors, in consultation with the Winning Bidder, or fixed by the Court; provided, however, that if the Contract Objection relates solely to a Cure Dispute, the Selected Assigned Contract may be assumed by the Debtors and assigned to the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then to the Winning Bidders, provided that the cure amount that the Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Counterparty) is deposited in a segregated account by the Debtors or the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then the Winning Bidders, pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(k)      Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Orders additional executory contracts or unexpired leases of the Debtors are determined to be Assigned Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties an Assumption Notice, and such Counterparties shall file any Contract Objections not later than fourteen (14) days thereafter.  If no Contract Objection is timely received, the Debtors shall be authorized to assume and assign such Assigned Contracts to the Stalking Horse Purchasers or, in the event the Stalking Horse Purchasers are not the Winning Bidders, then to the Winning Bidders, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Orders.

## RELIEF REQUESTED

29.     By this Motion, the Debtors seek entry of: (a) the Bidding Procedures Order, (i) scheduling a date for the Sale Hearing, (ii) authorizing and approving the Bid Procedures, Bid Protections, and the Assumption and Assignment Procedures, and the form and manner of notice thereof, and (iii) granting related relief; and (b) the Sale Orders, (i) authorizing and approving the Debtors' entry into the Stalking Horse APAs or, in the event the Stalking Horse Purchasers are not the Winning Bidders for the Stalking Horse Assets, then an Alternative APA with the Winning Bidders, (ii) authorizing and approving the Sale, free and clear of all Encumbrances other than Assumed Liabilities and Permitted Encumbrances, (iii) authorizing and approving the assumption and assignment of the Assumed Contacts to the Stalking Horse Purchaser or, in the event the Stalking Horse Purchaser is not the Winning Bidder, then to the Winning Bidder; and (iv) granting related relief.

## BASIS FOR RELIEF

**A.      Sufficient Business Justification Exists for Consummation of the Sale Under Sections 105(a) and 363(b) of the Bankruptcy Code**

30.     Pursuant to section 105(a) of the Bankruptcy Code, a "[c]ourt may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have required that such use, sale or lease be based upon the sound business judgment of the debtor. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (internal citation omitted); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,

1070–71 (2d Cir. 1983); <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of <u>In re Lionel Corp.</u>); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 175–76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in <u>Abbotts Dairies</u>); <u>Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242 B.R. 147, 153 (D. Del. 1999) (same).

31.    The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)</u>, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).

32.    The Debtors submit that their decision to consummate the Sale represents a reasonable exercise of the Debtors' business judgment, and accordingly the Sale should be approved under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors will continue to conduct an extensive and fulsome process to market the Assets, including the Stalking Horse Assets. The open and fair auction and the Sale Process contemplated by the Bid Procedures will ensure that the Debtors' estates receive the highest or best value available for the Assets, including the Stalking Horse Assets, by allowing the market to dictate the value of the Assets, and will provide a greater recovery than would be provided by any other available alternative. Furthermore, compliance with the Bid Procedures will ensure the fairness and reasonableness of the consideration to be paid by the Stalking Horse Purchasers or, in the event the Stalking Horse

Purchasers are not the Winning Bidder for the Stalking Horse Assets, then the Winning Bidders, and establish that the Debtors and such bidder have proceeded in good faith.

33.     Additionally, the Debtors believe that the notice procedures described above are reasonable and adequate under the circumstances.  Bankruptcy Rules 2002(a) and (c) require the Debtors to notify creditors of the Sale, the terms and conditions of the Sale, the time and place of the Auction, and the deadline for filing any objections.  The Debtors believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002, and are reasonably calculated to provide timely and adequate notice of the Stalking Horse APAs, the Bid Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a *bona fide* interest in acquiring the Assets.

34.     The Sale, conducted in accordance with the Bid Procedures, will generate significant value for the Debtors' estates, and represents the best path forward for maximizing recoveries in connection with these Chapter 11 Cases.  The Debtors submit that ample business justification exists for the consummation of the Sale, and therefore request that this Court approve such Sale.

**B.     The Sale of the Assets Free and Clear of All Encumbrances Is Authorized Under Section 363(f) of the Bankruptcy Code**

35.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

30082787.4

11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

36.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens and interests.  See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that because section 363(f) is written in the disjunctive, a court may approve a sale free and clear if any one subsection is met); see also Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). Furthermore, a debtor possesses broad authority to sell assets free and clear of liens.  See In re Trans World Airlines, Inc., 322 F.3d 283, 289 (3d Cir. 2003).

37.     The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Encumbrances other than Assumed Liabilities and Permitted Encumbrances (and except as otherwise expressly set forth in the Sale Orders), in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.  In particular, the Debtors believe that the requirements of section 363(f)(2) of the Bankruptcy Code will be met because the Prepetition Secured Parties are secured by the Assets, including the Stalking Horse Assets, have consented to the Sale of the Stalking Horse Assets to the Stalking Horse Purchasers pursuant to the Stalking Horse APAs, subject to higher or better terms as set forth in an Alternative APA, and is expected to consent to the Sale of any of the other Assets.

38.     Moreover, with respect to any other party asserting a lien, claim, encumbrance or the like against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented. See FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. at 345 (same).  Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the Sale of the Assets in accordance therewith shall be "consent" to such Sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

39.     Furthermore, the Debtors propose that any Encumbrances asserted against the Assets be transferred to, and attach to, the proceeds of the Sale, and application of the proceeds generated by the Sale will be subject to any applicable provisions of the Cash Collateral Order.

## C.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code

40.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending

appeal.  See 11 U.S.C. § 363(m).  In approving the Sale free and clear of Encumbrances other than Assumed Liabilities and Permitted Encumbrances, the Debtors request that the Court find and hold that all purchasers of Assets purchased in accordance with the Bid Procedures, including, without limitation, the Stalking Horse Purchaser, are entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that selection of the Winning Bidder will be the result of a competitive bidding process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction.  See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.), 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

D.    **The Court Should Approve the Bid Procedures**

41.    The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Integrated Res. Inc., 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

42.    The Debtors and their professional advisors, including Stephens, have designed the Bid Procedures to promote a competitive and fair bidding process and, thus, to maximize value for the Debtors estates and creditors.  The Bid Procedures will allow the Debtors to conduct the Auction in an orderly, fair and open fashion, which will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.  Furthermore, the Bid Procedures provide an

30082787.4

appropriate framework for the Debtors and their fiduciaries and professional advisors to review, analyze and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.  Stephens, the Debtors' investment banker in connection with the Sale Process, believes that the Bid Procedures are appropriately crafted to, and will maximize, the value of the Assets.  Moreover, the Debtors are required under the Cash Collateral Order to complete the Auction and the Sale Process on the timetable set forth therein and contemplated by the Bid Procedures, which timetable is fair and reasonable in light of the circumstances of these Chapter 11 Cases.

43.     The Debtors submit that the Bid Procedures are necessary and transparent and will derive the highest or best bids for the Assets.  Therefore, the Debtors request the Court to approve the Bid Procedures.

**E.     The Bid Protections have a Sound
Business Purpose and Should be Approved.**

44.     The Debtors submit that the proposed Bid Protections for the Stalking Horse Purchasers are appropriate in the circumstances of these Chapter 11 Cases and consistent with market practice and should be approved as administrative obligations of the Debtors' estates. Under the A&I Stalking Horse APA, the A&I Stalking Horse Purchaser is entitled to a break-up fee equal to $350,000, and an expense reimbursement of up to an aggregate amount of $250,000 (exclusive of any amounts paid to the A&I Stalking Horse Purchaser prior to the Petition Date). Under the EMX Stalking Horse APA, the EMX Stalking Horse Purchaser is entitled to receive a break-up fee of three (3) percent of the cash consideration, plus an expense reimbursement of up to $150,000.

45.     The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a

30082787.4

-43-

stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." Official Comm. of Unsecured Creditors v. Interforum Holding LLC, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders typically require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." Id. (internal citations omitted).

46.     Thus, the use of bid protections has become an established practice in chapter 11 cases, and break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of sale processes conducted under section 363 of the Bankruptcy Code. See In re Integrated Res., Inc., 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). Courts generally recognize that bid protections may be necessary to convince a bidder to make a public bid and set a floor, in that they provide compensation for the risks that the bidder is undertaking. In re Hupp Int'l Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

47.     After the pre-petition marketing process that the Debtors undertook, the bidder with the highest and best proposal ultimately insisted that it receive the Bid Protections, as contemplated by the Stalking Horse APAs, if it were going to provide a floor for the Debtors'

postpetition auction.  Without the promise of Bid Protections, the Stalking Horse Purchasers' participation in the diligence, bidding, and negotiation processes would likely have been significantly reduced and could have left the Debtors without the benefit of stalking horse bids.

48.     Thus, the Bid Protections enabled the Debtors to secure an adequate floor for the Stalking Horse Assets, thereby ensuring that competing bids will be materially higher or otherwise better than consideration provided for in the Stalking Horse APAs—a clear benefit to the Debtors' estates.  In addition, payment of the Bid Protections will not diminish the Debtors' estates to the extent the Bid Protections become payable as a result of the Debtors' consummation of a competing bid, as the Bid Procedures require that any initial Qualified Bid exceed the bid of the applicable Stalking Horse Purchaser by an amount in excess of the Bid Protections.

49.     The Stalking Horse Purchasers required the Bid Protections as a precondition to entering into the Stalking Horse APAs, and the Debtors believe offering the Bid Protections to the Stalking Horse Purchasers will maximize the realizable value of the Assets for the benefit of the Debtors' estates, their creditors, and other parties in interest.  Accordingly, the Debtors believe that the Bid Protections are fair and appropriate under the circumstances and should be approved.

**F.     The Assumption and Assignment of the Selected Assigned Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

50.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Second Circuit has stated that "[t]he purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'"  Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures

Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

51.    The standard applied to determine whether the assumption of a contract or an unexpired lease should be authorized is the "business judgment" standard.  See In re AbitibiBowater Inc., 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim, or caprice).  As described above, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'"  Integrated Res., Inc., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d at 872).  Indeed, "the sole issue is whether the rejection benefits the estate."  In re HQ Global, 290 B.R. at 511.

52.    The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See id.; see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease.  See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business

30082787.4

judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); see also N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 42-43 (2d Cir. 1979); In re Riodizio, Inc., 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

53.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Selected Assigned Contracts is in the best interests of the Debtors and their estates, and accordingly the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code.   See, e.g., In re Philadelphia Newspapers, LLC, 424 B.R. 178, 182-83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

54.     As set forth above, the Sale will provide significant benefits to the Debtors' estates.  To that end, the assumption, assignment and sale of the Selected Assigned Contracts is necessary for the Debtors to obtain the benefits of the Stalking Horse APAs or an Alternative APA, as applicable.  In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus,

following an assignment to the Winning Bidder of any Selected Assigned Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

55.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Selected Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to a Selected Assigned Contract, an Assumption Notice that states the proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Winning Bidder and to the proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Cure Amount, as provided for in the Bid Procedures, will be a condition to the Debtors' assumption and assignment of any Selected Assigned Contract.

56.    Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed assumption.  See In re Fleming Cos., Inc., 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

57.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

58.     Here, the Winning Bidder will have provided adequate assurance of future performance with respect to any Selected Assigned Contract.  For its bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including:  (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance.  To the extent that the Qualifying Bidder is a newly formed acquisition entity or the like, the financial and other information supporting the Qualifying Bidder's financial wherewithal shall include financial and other information supporting the financial wherewithal of the Qualifying Bidder's parent company or sponsor.  Furthermore, given that the Debtors will submit evidence that all requirements for the assumption and assignment of such contracts have been met at the Sale Hearing, the Court and other interested parties will have the opportunity to evaluate the ability of each Winning Bidder to provide adequate assurance of future performance.

59.     Therefore, the Debtors respectfully request the Court to (a) approve the proposed assumption and assignment of the Selected Assigned Contracts, and (b) find that all anti-assignment provisions of such contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[7]

### WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) AND 6006(d)

60.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Furthermore, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  As set forth throughout this Motion, any delay in the Debtors' ability to consummate the Sale on the timeline contemplated by the Bid Procedures would be detrimental to the Debtors, their creditors and estates.

61.     For this reason and those set forth above, the Debtors submit that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h) and 6006(d), to the extent applicable.

### NOTICE

62.     Notice of this Motion has been provided to:  (1) the Office of the United States Trustee for the District of Delaware; (2) counsel to the Stalking Horse Purchasers; (3) all

---

[7]  Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

parties known by the Debtors to assert a lien or encumbrance on any of the Assets; (4) all persons known or reasonably believed to have asserted an interest or claim in any of the Assets; (5) all persons known or reasonably believed to have expressed an interest in acquiring all or a substantial portion of the Assets within the one (1) year prior to the Petition Date; (6) the Office of the United States Attorney for the District of Delaware; (7) the Office of the Attorney General in each state in which the Debtors have operated; (8) the Office of the Secretary of State in each state in which the Debtors have operated; (9) the Internal Revenue Service and all state and local taxing authorities in the states in which the Debtors have or may have any tax liability; (10) all environmental authorities having jurisdiction over any of the Assets, including the Environmental Protection Agency; (11) the Federal Trade Commission; (12) the United States Attorney General/Antitrust Division of Department of Justice; (13) the Debtors' largest unsecured creditors (excluding insiders); and (14) all other parties that have filed a notice of appearance and demand for service of papers in the Chapter 11 Cases as of the date hereof.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request entry of the Bidding Procedures Order and the

Sale Orders, granting the relief requested herein and such other and further relief as is just and

proper.

Dated: February 8, 2023
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Joseph M. Mulvihill*
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Matthew B. Lunn (No. 4119)
Joseph M. Mulvihill (No. 6061)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
        jbarry@ycst.com
        mlunn@ycst.com
        jmulvihill@ycst.com

*Proposed Counsel for Debtors and Debtors in Possession*

30082787.4