## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Big Village Holding LLC, *et al.*,[1] | Case No. 23-10174 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 14** |

## DECLARATION OF SACHIN LULLA IN SUPPORT OF THE
## DEBTORS' BIDDING PROCEDURES MOTION:  DOCKET NO. 14

I, Sachin Lulla, make this declaration (this "**Declaration**") under 28 U.S.C. § 1746 and state as follows:

1.      I am a Managing Director and head of the Capital Solutions Group at Stephens Inc. ("**Stephens**"), with principal offices located at 111 Center Street, Little Rock, Arkansas 72201.

2.      Stephens has filed an application with the Court under 11 U.S.C. §§ 327(a) and 328(a)[2] to be retained as the investment banker to Big Village Holdings LLC and its debtor affiliates (each, a "**Debtor**" and collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Big Village Holding LLC (6595); Big Village Group Holdings LLC (5882); Big Village Group Inc. (6621); Big Village Insights, Inc. (8960); Big Village Media LLC (7288); EMX Digital, Inc. (5543); Big Village USA Corporation, Inc. (3414); Big Village Agency, LLC (0767); Balihoo, Inc. (9666); Deep Focus, Inc. (8234); and Trailer Park Holdings Inc. (1447).  The Debtors' service address is 301 Carnegie Center, Suite 301, Princeton, NJ 08540.

[2]     *See Debtors' Application for (I) an Order Authorizing the Retention and Employment of Stephens Inc. as Investment Banker for the Debtors, Effective as of the Petition Date, and (II) Modifying Certain Information Requirements of Local Rule 2016-2* [Docket No. 47].

3.       I have been a Managing Director at Stephens since 2018.  Prior to joining

Stephens, I was a Managing Director in the Restructuring Group at Evercore and held positions at

Lazard, Mesirow Advanced Strategies, and RoundTable Healthcare Partners.  I have over twenty

(20) years of experience in the field of financial advisory and corporate finance related services.  I

received dual degrees in Accounting and Finance from the University of Illinois.

4.       I submit this Declaration in support of the relief requested in the motion [Docket

No. 14] (the "**Bidding Procedures Motion**")[3] filed by the Debtors seeking, among other things,

entry of an order approving (i) certain bidding procedures (the "**Bidding Procedures**") and

assumption and assignment procedures; (ii) entry into two (2) asset purchase agreements with the

stalking horse bidders, subject to higher and better bids; and (iii) certain bidding protections (the

"**Bidding Protections**").

5.       Except as otherwise indicated, all statements in this Declaration are based upon

my review of relevant documents, my discussions with the Debtors and their professionals, my

discussions with other members of the Stephens team working on this engagement, and my

personal knowledge and experience.  If I were called upon to testify, I could and would testify to

each of the facts set forth below.

**A.       The Bidding Procedures and Sale Timeline**

6.       I have reviewed and am familiar with the Bidding Procedures Motion and the

related Bidding Procedures.  It is my opinion that the Bidding Procedures and the Debtors'

proposed sale timeline (the "**Sale Timeline**") will allow the Debtors to obtain the highest or

otherwise best value for the Assets under the circumstances of the chapter 11 cases and the

---

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the
Bidding Procedures Motion.

Debtors' businesses.  As discussed in detail below, prior to filing these cases, the Debtors, with the assistance of Stephens, extensively marketed the Assets and continued marketing the Assets post-filing.  The prepetition marketing and sale process was, in my experience, (a) thorough and exhaustive, (b) appropriately targeted to the most likely interested parties to acquire the Debtors' assets, and (c) for a duration that allowed any and all interested parties to conduct complete and thorough due diligence and fairly compete for be a bidder or stalking horse purchaser.  Despite the execution of the stalking horse bids on February 7, 2023, (and as discussed more fully below), the Debtors and Stephens have continued their efforts to market the Debtors' assets to other prospective bidders in what will be a nearly eight-week long post-petition marketing and sale process (February 7th to April 3rd, the current proposed bid deadline).

7.      Since the Petition Date, Stephens has made contact with over forty-three (43) potentially interested parties, supplemented the pre-petition Data Room with diligence documents (beyond the extensive documents already contained therein), provided a confidential informational presentations, and reengaged with formerly interested parties and fielded inquiries from new sources.

8.      The Bidding Procedures are designed to provide the Debtors with flexibility to solicit proposals, negotiate transactions, hold an auction, and consummate a transaction for the highest or best value.  The Bidding Procedures are intended to strike an appropriate balance between ensuring that there is a full and fair opportunity for the Debtors and their stakeholders to review and consider proposed transactions, managing the Debtors' operational and liquidity needs, and maintaining ongoing customer engagement.

**B.**    **Stephens's Engagement and Prepetition Involvement with the Debtors**

9.      Since August 2022, professionals employed by Stephens have advised the Debtors in connection with their efforts to explore strategic and financial restructuring alternatives. During this time, they have become intimately familiar with the Debtors' businesses, affairs, assets, and contractual arrangements. They have worked closely with the Debtors and their management to analyze the Debtors' financial position and to assist the Debtors in evaluating various asset sale, financing, and restructuring options. Accordingly, Stephens has the necessary background to address the current and potential interest for a sale of some, all, or substantially all of the Debtors' assets, as well as how to maximize the value of the Assets through a thorough and efficient sale process under the circumstances, and the need to provide the Debtors' proposed stalking horse bidders with bid protections.

10.      Shortly after their retention, Stephens began preparing for a formal marketing process for the sale of the Debtors' Agency and Insights businesses. The Agency sale process launched in September 2022 and the Insights process launched in October 2022. Due to the Debtors' declining liquidity, in November 2022, Stephens began formally marketing all of the Debtors' assets, including the EMX business, both on an integrated basis as well as on a business line basis. As part of these efforts, Stephens created detailed marketing materials and assembled related diligence information for a confidential electronic data room (the "**Data Room**") and a confidential information presentation with the assistance of the Debtors and their other professional advisors. Prior to the Petition Date, Stephens contacted forty-five (45) strategic and financial prospective purchasers for the Agency and Insights businesses, and approximately thirty-one (31) purchasers for the EMX business. Stephens also circulated, via email, a detailed "teaser" and description of the opportunity to acquire the Debtors' assets to all of the prospective

Case 23-10174-CTG    Doc 124    Filed 03/12/23    Page 5 of 10

purchasers.  Ultimately, thirty (30) parties executed non-disclosure agreements (each, an "**NDA**" and collectively, the "**NDAs**") and were granted access to the Data Room to evaluate all, or some combination of, the Assets.

11.     Stephens responded to various inquiries, and discussed various preliminary indications of interest for the Debtors' Assets, including a potential acquisition of the secured debt obligations of the Debtors' secured lenders.  Prior to the Petition Date, three (3) parties provided formal offers, including a mark-up of a definitive purchase agreement, to acquire certain of the Debtors' Assets.

**D.      Selection of the Stalking Horse Bidders**

12.      During January and February 2023, the Debtors conducted good faith, arms'-length negotiations with these prospective buyers simultaneously, and, in parallel, these prospective buyers then conducted confirmatory diligence regarding the Debtors' businesses in order to finalize their proposals.

13.       Ultimately, two (2) prospective buyers—NMMB, Inc. (the "**A&I Stalking Horse Bidder**") and ZStream Acquisition LLC (the "**EMX Stalking Horse Bidder**" and together with the A&I Stalking Horse Bidder, the "**Stalking Horse Bidders**")—submitted actionable final bids for a subset of the Assets (such bids, the "**Stalking Horse Bids**").  Specifically, the A&I Stalking Horse Bidder submitted a bid for the sale of certain assets related to the Debtors' Agency and Insights businesses and the EMX Stalking Horse Bidder submitted a bid for the sale of certain assets related to the Debtors' managed digital marketing services business.

**E.  Selection of the Stalking Horse Bidders**

14.      After it was determined that the Stalking Horse Bidders offered the only executable offers in the time the Debtors had available to them, the Debtors executed LOIs with

the Stalking Horse Bidders and engaged with them in extensive arms'-length negotiations, after which the Debtors and the Stalking Horse Bidders agreed on the terms of the stalking horse bids. After further negotiations, on February 7, 2023, the Debtors ultimately executed an asset purchase agreement with each of the Stalking Horse Bidders (the "**A&I Stalking Horse APA**" and the "**EMX Stalking Horse APA**" respectively, and together, the "**Stalking Horse APAs**").

F.    **The Stalking Horse APAs**

15.    The Debtors determined, after considering all circumstances and in consultation with their professional advisors, that the Sale of the Assets through the chapter 11 cases would provide the best opportunity to maximize the value of the Assets.  After extensive arms'-length negotiations, the Debtors and Stalking Horse Bidders entered into the Stalking Horse APAs, which provides baseline bids for the Sale.

16.    The purchase price contemplated by the A&I Stalking Horse APA is $12 million in cash consideration, plus the assumption of certain liabilities and executory contracts and the satisfaction of all cure costs related thereto.  The  A&I Stalking Horse Bidder was also required to provide the Debtors with a $1.2 million deposit to be held in escrow pending closing of the sale.

17.    The purchase price contemplated by the EMX Stalking Horse APA is $2.1 million in cash consideration, plus (i) the acquisition of certain outstanding accounts receivable on a dollar-for-dollar basis, (ii) the assumption of certain liabilities and executory contracts, and (iii) satisfaction of all cure costs.  The EMX Stalking Horse Bidder has also agreed to provide continued employment for 18 employees of the Debtors' EMX business and has provided the Debtors with a $150,000 deposit to be held in escrow pending closing of the sale.

18.     The Stalking Horse APAs also include various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Purchasers, and certain conditions to closing and rights of termination related to the sale and the chapter 11 cases.

19.     The Stalking Horse APAs provide the best option to maximize value for stakeholders.  The Debtors, with the assistance of Stephens and the Debtors' other professional advisors, engaged in good-faith, arms'-length negotiations with the Stalking Horse Bidders regarding the Stalking Horse APAs.  The Debtors' entry into the Stalking Horse APAs permits the Debtors to conduct a value-maximizing sale process that is backstopped by the proposed Stalking Horse Bids.  The Debtors' consummation of either sale pursuant to the terms of the Stalking Horse APAs subject to higher or otherwise better offers (in whole or through a combination of bids) that the Debtors may receive for the Assets pursuant to the Bidding Procedures.  Accordingly, there is a strong business justification for the Debtors' entry into the each of the Stalking Horse APAs.

20.     Further, the Stalking Horse Bids benefit the Debtors by serving as a floor for an overbid process to ensure that the Debtors receive the highest or otherwise best offer for the Assets. Accordingly, if the Debtors were to continue to market the Assets without the benefit of either Stalking Horse Bid serving as the floor, the Debtors might encounter greater challenges in their pursuit of the highest or otherwise best offer for the Assets.

G.     **The Postpetition Marketing Process**

21.     Since February 8, 2023 (the "**Petition Date**"), Stephens has contacted over forty-three (43) potentially interested parties, including various parties that had been contacted prior to the Petition Date, regarding the Assets and the Sale.  To date, Stephens continues its efforts to market the Assets and ensure that the Debtors are able to obtain the highest and best value for the Assets.  Thus far, all potentially interested parties have received an updated process letter outlining

the proposed bidding procedures and the associated timelines, and there are over twenty-three (23) parties who have access to the Data Room. Upon the Court's approval of the Bidding Procedures, Stephens, with the assistance of the Debtors' professionals, will continue to market the Assets and ensure a robust and competitive sale process that maximizes value for the Debtors' stakeholders.

    **H.**    **The Bidding Protections**

    22.    As a key inducement to the execution of the Stalking Horse Bids, the Debtors have agreed, subject to Court approval, to provide each of the Stalking Horse Bidders with certain Bidding Protections, should the Debtors consummate an alternative transaction for the Assets with another bidder. With respect to the A&I Stalking Horse APA, such stalking horse protections include: (i) a break-up fee in the amount of $350,000, and (ii) an expense reimbursement up to an aggregate amount of $250,000 (exclusive of any amounts paid to the A&I Stalking Horse Bidder prior to the Petition Date). In order to incentivize the A&I Stalking Horse Bidder to engage with the Debtors and incur significant costs related to the negotiation of the A&I Stalking Horse APA, the Debtors determined that it was necessary to advance the A&I Stalking Horse Purchaser with a work fee in the amount of $100,000 (the "**Work Fee**") on December 15, 2022. Payment of the Work Fee was contingent on the A&I Stalking Horse Purchaser's agreement to offer a purchase price of not less than $10 million for substantially all of the assets and substantially all of the liabilities of the businesses it ultimately purchased. Absent payment of the Work Fee, the A&I Stalking Horse Purchaser was not willing to serve as a stalking horse bidder. With respect to EMX Stalking Horse APA, such stalking horse protections include: (i) a break-up fee in an amount equal to three (3) percent of the cash purchase price, and (ii) an expense reimbursement of up to $150,000.

23.     The Bidding Protections were the subject of good faith negotiations.  Without the Bidding Protections, the A&I Stalking Horse Bidders would not have agreed to serve as a stalking horse with respect to the Assets in question at the values reflected in the Stalking Horse Bid, which may have degraded the value of the Agency and Insights Assets and imperiled a postpetition sale process.  Without the Bidding Protections, the EMX Stalking Horse Bidder would not have agreed to serve as a stalking horse with respect to the managed services Assets and that business would have been shut-down prior the Petition Date, likely rendering those assets worthless.

24.     Based on my substantial experience and personal knowledge of the Debtors' sale and marketing efforts, I believe the proposed Bidding Protections are (a) fair and reasonable; (b) designed to encourage bidding and obtain the best price for the Assets; and (c) in the best interests of the Debtors, their creditors and their estates.

**I.      The Debtors' Sale Process Is Intended to
         Maximize Value and Should be Approved**

25.     In conclusion, for the reasons discussed above, I believe that approval of the proposed Bidding Procedures, Sale Timeline, and Bidding Protections will enable the Debtors to obtain the highest or otherwise best offer for the Assets under the circumstances and will thereby maximize value for the benefit of all stakeholders in the chapter 11 cases.

*[Remainder of Page Intentionally Left Blank]*

30160792.7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  March 10, 2023

/s/ Sachin Lulla
Sachin Lulla
Senior Managing Director
Stephens Inc.