## EXHIBIT A

**Combined Disclosure Statement and Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Big Village Holding LLC, *et al.*,[1] | Case No. 23-10174 (CTG) |
| Debtors. | (Jointly Administered) |

## AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF BIG VILLAGE HOLDING LLC AND ITS AFFILIATED DEBTORS

Dated: August 24, 2023
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Michael R. Nestor (Del. Bar No. 3526)
Joseph Barry (Del. Bar No. 4221)
Joseph M. Mulvihill (Del. Bar No. 6061)
Heather P. Smillie (Del. Bar No. 6923)
1000 North King Street
Rodney Square
Wilmington, Delaware 19801
Tel.: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
    jbarry@ycst.com
    jmulvihill@ycst.com
    hsmillie@ycst.com

*Counsel for Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Big Village Holding LLC (6595); Big Village Group Holdings LLC (5882); Big Village Group Inc. (6621); Big Village Insights, Inc. (8960); Big Village Media LLC (7288); EMX Digital, Inc. (5543); Big Village USA Corporation, Inc. (3414); Big Village Agency, LLC (0767); Balihoo, Inc. (9666); Deep Focus, Inc. (8234); and Trailer Park Holdings Inc. (1447). The Debtors' service address is 301 Carnegie Center, Suite 301, Princeton, NJ 80540.

# TABLE OF CONTENTS

DISCLAIMER ............................................................................................................1

INTRODUCTION .....................................................................................................2

ARTICLE  I DEFINED TERMS AND RULES OF INTERPRETATION ........................2

ARTICLE  II CLASSIFICATION OF CLAIMS AND INTERESTS AND
ESTIMATED RECOVERIES ....................................................................15

    2.1      Classification..................................................................................15

ARTICLE  III BACKGROUND AND DISCLOSURES ..................................................17

    3.1      General Background ........................................................................17
    3.2      Events Leading to Chapter 11 ...........................................................19
    3.3      The Chapter 11 Cases .....................................................................21

ARTICLE  IV CONFIRMATION AND VOTING PROCEDURES.................................30

    4.1      Confirmation Procedure...................................................................30
    4.2      Procedure for Objections .................................................................30
    4.3      Requirements for Confirmation .........................................................31
    4.4      Classification of Claims and Interests..................................................31
    4.5      Impaired Claims or Interests.............................................................32
    4.6      Confirmation Without Necessary Acceptances; Cramdown ....................33
    4.7      Feasibility....................................................................................34
    4.8      Best Interests Test and Liquidation Analysis.........................................34
    4.9      Acceptance of the Plan....................................................................35

ARTICLE  V CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING36

    5.1      The Plan May Not Be Accepted .......................................................36
    5.2      The Plan May Not Be Confirmed ......................................................36
    5.3      Distributions to Holders of Allowed Claims under the Plan May Be
          Inconsistent with Projections ...........................................................37
    5.4      Objections to Classification of Claims .................................................37
    5.5      Failure to Consummate the Plan ........................................................38
    5.6      Plan Releases May Not Be Approved..................................................38
    5.7      Reductions to Estimated Creditor Recoveries .......................................38
    5.8      Certain Tax Considerations...............................................................38

ARTICLE  VI TREATMENT OF UNCLASSIFIED CLAIMS.......................................38

    6.1      Administrative Claims .....................................................................38

6.2     Priority Tax Claims ..........................................................................39

ARTICLE  VII TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ...........40

7.1     Class 1:  Priority Non-Tax Claims ..................................................40
7.2     Class 2:  Other Secured Claims .......................................................40
7.3     Class 3: Prepetition Loan Secured Claims .......................................40
7.4     Class 4:  General Unsecured Claims .................................................40
7.5     Class 5:  Intercompany Claims .........................................................41
7.6     Class 6: Interests ...............................................................................41
7.7     Reservation of Rights Regarding Claims and Interests ...................41

ARTICLE  VIII ACCEPTANCE OR REJECTION OF THE PLAN ...............................41

8.1     Class Entitled to Vote ......................................................................41
8.2     Acceptance by Impaired Classes of Claims or Interests ..................41
8.3     Presumed Acceptance by Unimpaired Classes .................................41
8.4     Presumed Rejections by Impaired Classes .......................................41
8.5     Confirmation Pursuant to Bankruptcy Code Section 1129(b) ..........41
8.6     Controversy Concerning Impairment ...............................................42
8.7     Elimination of Vacant Classes .........................................................42

ARTICLE  IX IMPLEMENTATION OF THE PLAN .....................................................42

9.1     Implementation of the Plan ..............................................................42
9.2     Source of Consideration ...................................................................42
9.3     Vesting of Assets .............................................................................42
9.4     Deemed Consolidation of Class 4 ....................................................42
9.5     Directors and Officers .....................................................................43
9.6     Wind-Up and Dissolution of the Debtors .......................................43
9.7     Plan Administrator and Plan Administration Agreement ..................43
9.8     Distributions by Plan Administrator .................................................44
9.9     Cash Investments .............................................................................44
9.10    Limitation of Liability; Indemnification ..........................................44
9.11    Compensation and Duties of Plan Administrator .............................45
9.12    Certain Tax Considerations ..............................................................45

ARTICLE  X PROVISIONS GOVERNING DISTRIBUTIONS ....................................49

10.1    Distributions for Allowed Claims ....................................................49
10.2    Interest of Claims .............................................................................50
10.3    Distributions by Plan Administrator as Disbursement Agent ...........50
10.4    Means of Cash Payment ...................................................................50
10.5    Fractional Distributions ...................................................................50
10.6    De Minimis Distributions ................................................................50
10.7    Delivery of Distributions; Unclaimed Distributions .......................51
10.8    Application of Distribution Record Date ..........................................51

| 10.9 | Withholding, Payment and Reporting Requirements With Respect to Distributions | 51 |
| 10.10 | Setoffs | 52 |
| 10.11 | No Distribution in Excess of Allowed Amounts | 52 |
| 10.12 | Allocation of Distributions | 52 |
| 10.13 | Forfeiture of Distributions | 52 |

ARTICLE XI PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS ....................................................................................................... 53

| 11.1 | Claims Administration Responsibility | 53 |
| 11.2 | Claims Objections | 53 |
| 11.3 | Estimation of Contingent or Unliquidated Claims | 53 |
| 11.4 | Expungement and Disallowance of Certain Claims | 53 |
| 11.5 | Distributions on Account of Disputed Claims | 53 |
| 11.6 | RESERVED | **Error! Bookmark not defined.** |
| 11.7 | Claims Paid and Payable by Third Parties | 54 |
| 11.8 | Adjustment to Claims Without Objection | 54 |

ARTICLE XII EXECUTORY CONTRACTS ............................................................. 54

| 12.1 | Executory Contracts Deemed Rejected | 54 |

ARTICLE XIII CONFIRMATION AND CONSUMMATION OF THE PLAN ............ 54

| 13.1 | Conditions Precedent to the Effective Date | 54 |
| 13.2 | Notice of Effective Date | 55 |
| 13.3 | Waiver of Conditions Precedent to the Effective Date | 55 |
| 13.4 | Effect of Non-Occurrence of Effective Date | 55 |

ARTICLE XIV EFFECTS OF CONFIRMATION ...................................................... 55

| 14.1 | Exculpation, Releases, and Injunctions | 55 |
| 14.2 | Term of Bankruptcy Injunction or Stays | 57 |
| 14.3 | Comprehensive Settlement of Claims and Controversies | 57 |

ARTICLE XV RETENTION OF JURISDICTION ...................................................... 58

| 15.1 | Exclusive Jurisdiction of Bankruptcy Court | 58 |

ARTICLE XVI MISCELLANEOUS PROVISIONS ................................................... 60

| 16.1 | Modification of the Plan | 60 |
| 16.2 | Revocation, Withdrawal, or Non-Confirmation of the Plan | 60 |
| 16.3 | Binding Effect | 60 |
| 16.4 | Subordination Rights | 60 |
| 16.5 | Severability of Plan Provisions | 61 |
| 16.6 | Payment of Statutory Fees; Filing of Quarterly Reports | 61 |

16.7    Payment of Restructuring Expenses ...........................................................61
16.8    Dissolution of the Committee ...................................................................62
16.9    Exemption from Section 1146 ...................................................................62
16.10   Closing of Chapter 11 Cases; Caption Change............................................62
16.11   Filing of Additional Documents ...............................................................62
16.12   Insurance .............................................................................................63
16.13   Successors and Assigns............................................................................63
16.14   Governing Law .....................................................................................63
16.15   Exhibits and Schedules ...........................................................................63
16.16   Computation of Time ..............................................................................63
16.17   Reservation of Rights..............................................................................63

# DISCLAIMER

THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE (I) DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (II) ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR (III) DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. THE DELIVERY OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST. THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND BANKRUPTCY RULE 3016(b) AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-APPLICABLE BANKRUPTCY LAWS.

SEE ARTICLE V HEREIN, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE COMBINED DISCLOSURE STATEMENT AND PLAN.

## INTRODUCTION[2]

The Debtors hereby jointly propose the following combined Disclosure Statement and Plan for the liquidation of the Debtors' remaining Assets and distribution of the proceeds of the Assets to the Holders of Allowed Claims against the Debtors as set forth herein. Each Debtor is a proponent of the Plan within the meaning of Bankruptcy Code section 1129.

This combined Disclosure Statement and Plan contains, among other things, a discussion of the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, summary and analysis of the Plan, and certain other related matters.

**ALL HOLDERS OF CLAIMS AND INTERESTS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN BANKRUPTCY CODE SECTION 1127, BANKRUPTCY RULE 3019, AND IN THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN, OR ANY PART THEREOF, AT ANY TIME, INCLUDING PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

**THE DEBTORS AND THE COMMITTEE SUPPORT THE PLAN AND RECOMMEND THAT ALL HOLDERS OF CLAIMS RECEIVING A BALLOT VOTE IN FAVOR OF THE PLAN.**

## ARTICLE I
## DEFINED TERMS AND RULES OF INTERPRETATION

**Defined Terms**

1.1     **"503(b)(9) Claims"** shall mean Claims arising under Bankruptcy Code section 503(b)(9).

1.2     **"A&I Sale"** shall mean the sale of certain of the Debtors' Assets to Bright Mountain Media, Inc., pursuant to that certain Purchase Agreement by and among Big Village Insights, Inc., Big Village Agency LLC, Big Village Group, Inc., Deep Focus, Inc., Balihoo, Inc., and Big Village Media LLC and Bright Mountain Media, Inc., dated as of April 5, 2023, and as approved by that certain *Order (I) Approving APA, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of all Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 234].

---

[2] Capitalized terms not defined in this Introduction shall have the meanings ascribed below.

**1.3** **"A&I Stalking Horse Purchase Agreement"** shall mean that certain Asset Purcahse Agreement dated as of February 8, 2023, by and between Big Village Insights, Inc., Big Village Agency LLC, Big Village Group, Inc., Deep Focus, Inc., Balihoo, Inc., and Big Village Media LLC, as sellers and NMMB, Inc. as buyer.

**1.4** **"Administrative Claim"** shall mean a Claim for costs and expenses of administration of the Chapter 11 Cases allowed under Bankruptcy Code sections 503(b), 507(b) or, if applicable, 1114(e)(2), including but not limited to: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including, but not limited to, wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims by Governmental Units for taxes (including Claims related to taxes which accrued after the Petition Date, but excluding Claims related to taxes which accrued on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting and other services and reimbursement of expenses allowed by the Bankruptcy Court under Bankruptcy Code sections 328, 330, 331, 363 or 503(b) to the extent incurred on or prior to the Effective Date; (c) all fees and charges assessed against the Estates under United States Code title 28 section 1930; (d) any 503(b)(9) Claims; and (e) any Claims that have been designated "Administrative Claims" by order of this Court.

**1.5** **"Affiliate"** shall mean "affiliate" as defined in Bankruptcy Code section 101(2).

**1.6** **"Allowed"** shall mean all or a portion of a Claim against the Debtors or an Interest in the Debtors (a) that has been listed by the Debtors in the Schedules as liquidated in amount and not "disputed" or "contingent," and with respect to which no contrary Claim or proof of Interest has been filed, (b) as to which no objection or request for estimation has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Bankruptcy Court, (c) as to which any objection has been settled, waived, withdrawn or denied by a Final Order, or (d) that is allowed (i) by a Final Order, (ii) pursuant to the terms of the Plan, or (iii) by a Stipulation between the Holder of such Claim or Interest and the Plan Administrator on or after the Effective Date. For purposes of computing Distributions under the Plan, a Claim or Interest that has been deemed "Allowed" shall not include interest, costs, fees or charges on such Claim or Interest from and after the Petition Date.

**1.7** **"Assets"** shall mean any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records.

**1.8** **"Avoidance Actions"** shall mean any and all avoidance or equitable subordination or recovery actions under the Bankruptcy Code, including sections 105(a), 502(d), 510, 542 through 551, and 553, or any similar federal, state, or common law causes of action except for any avoidance or equitable subordination or recovery actions that have been sold or otherwise transferred in connection with the Sales.

**1.9** **"Ballot"** shall mean the ballot form distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

**1.10** **"Balihoo Sale"** shall mean the sale of certain of the Debtors' Assets to Insticator, Inc., pursuant to that certain Purchase Agreement by and among Balihoo, Inc., and Insticator, Inc., dated

as of April 5, 2023, and as approved by that certain *Order (I) Approving APA, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of all Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 236].

**1.11** **"Bankruptcy Code"** shall mean title 11 of the United States Code, 11 U.S.C. §§ 101–1532, and as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.12** **"Bankruptcy Court"** shall mean the United States Bankruptcy Court for the District of Delaware.

**1.13** **"Bankruptcy Rules"** shall mean the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, or the Local Rules, and as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.14** **"Bar Date"** shall mean, with respect to any particular Claim, the specific date set by the Bankruptcy Court as the last day for Filing Proofs of Claim or proofs of Interest against the Debtors in the Chapter 11 Cases for that specific Claim or Interest.

**1.15** **"Bar Date Order"** shall mean that certain *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (B) Approving the Form and Manner of Notice Thereof* [D.I. 101].

**1.16** **"Bidding Procedures Order"** shall mean that certain *Order Establishing Bidding Procedures Relating to the Sales of All or a Portion of the Debtors' Assets* [D.I. 129].

**1.17** **"Borrowers"** shall mean, in connection with the Prepetition Credit Agreement, Debtor Big Village Group, Inc., EMX Digital, Inc., Big Village Insights, Inc., Big Village Group Holdings, LLC, and certain subsidiaries party thereto.

**1.18** **"Business Day"** shall mean any day, other than a Saturday, Sunday or a legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.19** **"Cash"** shall mean money that is legal tender of the United States of America.

**1.20** **"Causes of Action"** shall mean all Claims, actions, causes of action, choses in action, suits, debts, dues, damages, defenses, judgments, third-party claims, counterclaims, and cross claims that are or may be pending or existing on the Effective Date against any Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, known or unknown, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order, and including the unknown Causes of Action.

**1.21** **"Chapter 11 Cases"** shall mean the chapter 11 cases commenced by the Debtors and jointly administered under case number 23-11074 (CTG) in the Bankruptcy Court.

**1.22** **"Claim"** shall mean a claim against any Debtor, as such term is defined in Bankruptcy Code section 101(5).

**1.23** **"Claims Agent"** shall mean the Debtors' claims agent, Kroll Restructuring Administration, LLC.

**1.24** **"Claims Objection Deadline"** shall mean one hundred eighty (180) days after the Effective Date, or such later date as may be ordered by the Bankruptcy Court; *provided however*, that the Plan Administrator, in consultation with the Prepetition Agent, may seek extensions of this date from the Bankruptcy Court at any time.

**1.25** **"Class"** shall mean each category or group of Holders of Claims or Interests that has been designated as a class in Article II of the combined Disclosure Statement and Plan.

**1.26** **"Committee"** shall mean the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

**1.27** **"Confirmation"** shall mean entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

**1.28** **"Confirmation Date"** shall mean the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

**1.29** **"Confirmation Hearing"** shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan and final approval of the Disclosure Statement, as such hearing may be adjourned or continued from time to time.

**1.30** **"Confirmation Notice"** shall mean the notice of Confirmation Hearing to be delivered pursuant to Bankruptcy Rules 2002(c)(3) and 2002(f).

**1.31** **"Confirmation Order"** shall mean the order of the Bankruptcy Court confirming the Plan pursuant to, among others, Bankruptcy Code section 1129.

**1.32** **"Consummation"** shall mean the occurrence of the Effective Date.

**1.33** **"Contingent"** shall mean, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.34** **"Creditor"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(10).

**1.35** **"Debtors"** shall mean, collectively, Big Village Holding LLC; Big Village Group Holdings LLC; Big Village Group Inc.; Big Village Insights, Inc.; Big Village Media LLC; EMX Digital, Inc.; Big Village USA Corporation, Inc.; Big Village Agency, LLC; Balihoo, Inc.; Deep Focus, Inc.; and Trailer Park Holdings Inc.

**1.36** **"Disallowed"** shall mean, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in a Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn, in whole or in part, by the Holder thereof; (iii) is listed in the

Schedules as zero or as Disputed, Contingent or Unliquidated and in respect of which a proof of Claim or a proof of Interest, as applicable, has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (iv) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any proof of Claim or proof of Interest; (v) is evidenced by a proof of Claim or a proof of Interest which has been Filed, or which has been deemed to be Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such proof of Claim or proof of Interest was not timely or properly Filed; (vi) is unenforceable to the extent provided in Bankruptcy Code section 502(b); or (vii) where the Holder of a Claim is an Entity from which property is recoverable under Bankruptcy Code sections 542, 543, 550, or 553 or that is a transferee of a transfer avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a), unless such Entity or transferee has paid the amount, or turned over any such Property, for which such Entity or transferee is liable under Bankruptcy Code section 522(i), 542, 543, 550, or 553, and if required by the Bankruptcy Code, an Objection or adversary proceeding has been Filed. In each case a Disallowed Claim or a Disallowed Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.37** **"Disbursement Agent"** shall mean Plan Administrator, provided, however, that the Plan Administrator may, in its discretion and subject to the Wind Down Budget, retain a third party to act as Disbursement Agent.

**1.38** **"Disclosure Statement"** shall mean the disclosure statement, as amended, supplemented, or modified from time to time, that is embodied within the combined Disclosure Statement and Plan and distributed in accordance with, among others, Bankruptcy Code sections 1125, 1126(b), and 1145, Bankruptcy Rule 3018 and other applicable law.

**1.39** **"Disputed"** shall mean any Claim or Interest which has not yet been Allowed or Disallowed in accordance with the terms of the Plan.

**1.40** **"Disputed Claim Reserve"** shall mean the reserve established and subject to the Wind Down Budget and maintained by the Plan Administrator for payment of Disputed Claims, which reserve shall be established in an amount equal to the face value of all Disputed Administrative Claims, Disputed Priority Tax Claims, Disputed Priority Non-Tax Claims, and Disputed Other Secured Claims, or such other amount as may be ordered by the Bankruptcy Court.

**1.41** **"Distribution"** shall mean a delivery of Cash by the Disbursement Agent to the Holders of Allowed Claims pursuant to the Plan.

**1.42** **"Distribution Date"** shall mean the date on which a Distribution is made pursuant to the Plan.

**1.43** **"Distribution Record Date"** shall mean the date established for determining the Holders of Claims entitled to Distributions pursuant to the Plan, which shall be the General Bar Date or such other date established by order of the Bankruptcy Court, including the Confirmation Order.

**1.44** **"Distribution Proceeds"** shall mean all Cash realizable from the Assets after Payment in Full or satisfaction of (i) Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, (ii) Initial Distribution Amount, (iii) Second Distribution Amount, (iv) the GUC Cash Allocation, and (v) the payment of and reserving for, Plan Administration Expenses, in each case subject to the Wind Down Budget.

**1.45** **"Effective Date"** shall mean the first Business Day after the later of the date on which (a) all conditions in Article XIII of the Plan have been satisfied or waived in accordance with that Article and (b) no stay of the Confirmation Order is in effect.

**1.46** **"Effective Date Notice"** shall mean the notice of the Effective Date.

**1.47** **"EMX Sale"** shall mean the sale of certain of EMX Digital Inc.'s Assets to ZStream Acquisition LLC pursuant to that certain Purchase Agreement by and among EMX Digital, Inc. and ZStream Acquisition LLC, dated as of February 8, 2023, and as approved by that certain *Order (I) Approving APA, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of all Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 235].

**1.48** **"EMX Stalking Horse Purchase Agreement"** shall mean that certain Asset Purchase Agreement dated as of February 8, 2023, by and between EMX Digital, Inc. as seller and ZStream Acquisition LLC, as buyer**.**

**1.49** **"Entity"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(15).

**1.50** **"Estate"** shall mean each of the Debtors' estates created by Bankruptcy Code section 541 upon the commencement of the Chapter 11 Cases on the Petition Date.

**1.51** **"Exculpated Parties"** shall mean, solely in their capacities as such, (a) the Debtors and their Estates, (b) the Debtors' officers, directors, and managers serving on and after the Petition Date; (c) the Professionals retained by the Debtors pursuant to a Final Order of the Bankruptcy Court; (d) the Committee; (e) the members of the Committee; and (f) the Professionals retained by the Committee pursuant to a Final Order of the Bankruptcy Court.

**1.52** **"Executory Contract"** shall mean a contract or unexpired lease to which the Debtor is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.53** **"File," "Filed,"** or **"Filing"** shall mean, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.54** **"Final Administrative Claim Bar Date"** shall mean the date that is thirty (30) days after the date the Effective Date Notice is filed and served, which date shall be the deadline for filing requests for payment of Administrative Claims that arose after the date of entry of the Solicitation Procedures Order, but prior to the Effective Date.

**1.55** **"Final Distribution"** shall mean the final Distributions to Holders of Allowed Claims.

**1.56** **"Final Cash Collateral Order"** shall mean the *Final Order (A) Authorizing the Debtors' Use of Cash Collateral; (B) Granting Adequate Protection to the Prepetition Secured Parties; (C) Scheduling a Final Hearing; and (D) Granting Related Relief* [D.I. 130].

**1.57** **"Final Order"** shall mean an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that is not subject to stay or appeal, and for which the applicable time within which to take such action has expired, or for which such actions has been adjudicated by the highest court with jurisdiction over the matter.

**1.58** **"First Day Declaration"** shall mean the *Declaration of Kasha Cacy in Support of Petitions and First day Pleadings* [D.I. 2].

**1.59** **"General Bar Date"** shall mean 5:00 p.m. (prevailing Eastern Time) on April 27, 2023, as established by the Bar Date Order.

**1.60** **"General Unsecured Claim"** shall mean a Claim against a Debtor, but excluding any Administrative Claims (including Professional Fee Claims), Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, Prepetition Loan Secured Claims, Intercompany Claims, and Interests. For the avoidance of doubt, any Prepetition Loan Deficiency Claims shall not constitute General Unsecured Claims.

**1.61** **"Global Settlement"** shall mean the settlement by and among the Debtors, the Committee, the Prepetition Lenders, and Lake Capital, resolving, among other things, (a) any potential Challenges (as defined in the Final Cash Collateral Order), and (b) any potential objections to this Plan, which settlement is incorporated into the terms of this Plan.

**1.62** **"Governmental Unit"** shall have the meaning ascribed to such term in Bankruptcy Code section 101(27).

**1.63** **"GUC Cash Allocation"** shall mean the reserve of $795,000 funded into escrow within five (5) Business Days of the Effective Date for the sole and exclusive purpose of satisfying Allowed General Unsecured Claims in accordance with this Plan, *provided, however*, that the Lake Capital Claims and the Prepetition Loan Deficiency Claim shall not participate in any Distributions from the GUC Cash Allocation.

**1.64** **"Holder"** shall mean any Entity holding a Claim or Interest.

**1.65** **"Impaired"** shall mean, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.66** **"Impaired Class"** shall mean a Class of Claims or Interests that is Impaired.

**1.67** **"Initial Distribution Amount"** shall be an amount not less than $14,000,000.

**1.68** **"Initial Distribution Date"** shall mean the date that is no later than five (5) Business Days after the Effective Date.

**1.69** **"Intercompany Claim"** shall mean a Claim by a Debtor against another Debtor.

**1.70** **"Interests"** shall mean the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Entity in the Debtors including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtors, partnership interests in the Debtors' stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtors or obligating the Debtors to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

**1.71** **"Initial Administrative Claims"** shall mean Administrative Claims, other than 503(b)(9) Claims and Professional Fee Claims, incurred on or after the Petition Date through and including the date the Bankruptcy Court enters the Solicitation Procedures Order.

**1.72** **"Initial Administrative Claim Bar Date"** shall mean the deadline for filing requests for payment of Initial Administrative Claims, as established by the Solicitation Procedures Order.

**1.73** **"IRC"** shall mean the Internal Revenue Code of 1986, as amended.

**1.74** **"IRS"** shall mean the Internal Revenue Service.

**1.75** "**Lake Capital**" shall mean Lake Capital Management LLC

**1.76** "**Lake Capital Claims**" shall mean proof of claim numbers 243, 245, 246, 247, 248, 249, 251, 252, 253, 254, and 255, each in the amount of $6,875,000.00, filed by Lake Capital.

**1.77** **"Local Rules"** shall mean the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

**1.78** **"Objection***"* shall mean any objection, application, motion, complaint or any other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim).

**1.79** **"Other Secured Claim"** shall mean any Secured Claim other than a Prepetition Loan Secured Claim.

**1.80** **"Paid in Full," "Payment in Full," or "Pay in Full"** shall mean, with respect to an Allowed Claim, payment in Cash or other consideration in an aggregate amount equal to the Allowed amount thereof.

**1.81** **"Petition Date"** shall mean February 8, 2023, the date on which the Debtors commenced Filing the Chapter 11 Cases in the Bankruptcy Court.

**1.82** **"Plan"** shall mean this joint plan of liquidation under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with any documents submitted in support hereof and the Bankruptcy Code or the Bankruptcy Rules.

**1.83** **"Plan Administration Agreement"** shall mean the form of agreement that appoints the Plan Administrator and governs the powers, duties, and responsibilities of the Plan Administrator, subject to the Wind Down Budget. The Plan Administration Agreement shall be filed as part of the Plan Supplement and shall be in form and substance reasonably acceptable to the Prepetition Agent.

**1.84** **"Plan Administration Assets"** shall consist of all Assets of the Estates as of the Effective Date, including, but not limited to, (i) all Cash, (ii) the Retained Causes of Action, (iii) any proceeds realized or received from such Assets, (iv) all rights of setoff, recoupment, and other defenses against Claims, (v) all rights under the asset purchase agreements from the Sales and any other documents related to the Sales, (vi) all bank accounts (as set forth in the Plan Administration Agreement), and (vii) all documents, communications, and information protected by the attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges. For the avoidance of doubt, the Plan Administration Assets shall not include any Claims and Causes of Action that have been released pursuant to this Plan or other Final Order.

**1.85** **"Plan Administration Expenses"** shall mean, the reasonable and documented fees, expenses, and costs incurred by the Plan Administrator in connection with carrying out the obligations under the Plan, including the maintenance or disposition of the Plan Administration Assets (including, but not limited to, Plan Administrator fees, attorneys' fees, the fees of professionals, and other Persons retained by the Plan Administrator, personnel-related expenses and any Taxes imposed on the Plan Administration Assets), and any other expenses incurred in accordance with the Plan Administration Agreement, all of which shall be subject to the Wind Down Budget.

**1.86** **"Plan Administrator"** shall mean the person or Entity or any successor(s) thereto pursuant to the terms of the Plan Administration Agreement. The Plan Administrator shall initially be Zachary Rose of Triple P RTS, LLC.

**1.87** **"Plan Supplement"** shall mean the ancillary documents necessary to the implementation and effectuation of the Plan, including the Plan Administration Agreement, which shall be in form and substance satisfactory to the Prepetition Agent and Filed on or before the date that is seven (7) days prior to the Voting Deadline, provided, however, that the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**1.88** **"Post-Effective Date Debtors"** means the Debtors after the Effective Date.

**1.89** **"Prepetition Agent"** shall mean BNP Paribas as administrative agent under the Prepetition Financing Documents.

**1.90** **"Prepetition Credit Agreement"** shall mean that certain *Amended and Restated Credit and Guaranty Agreement, dated as of November 17, 2020* (as amended by that certain Amendment

No. 1 to Credit Agreement, dated as of March 2021, as further amended by that certain Amendment No. 2 and Limited Consent, dated as of February 22, 2022, as further amended by that certain First Amendment to Amendment No. 2 and Limited Consent, dated as of September 1, 2022, and as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time).

1.91 **"Prepetition Financing Documents"** shall mean the Prepetition Credit Agreement together with all other related documents, guarantees, and agreements, including, without limitation, security agreements mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Prepetition Credit Agreement.

1.92 **"Prepetition Lenders"** shall mean the financial institutions in their capacities as prepetition lenders under the Prepetition Credit Agreement.

1.93 **"Prepetition Loan Claim"** shall mean any claim by the Prepetition Agent or the Prepetition Lenders under the Prepetition Financing Documents, in the aggregate principal amount, as of the Petition Date, of $49,291,858.41 plus interest, fees (including agency fees), costs, expenses (including attorneys' and financial advisors' fees), charges, indemnities, and other additional amounts that are chargeable, reimbursable, or otherwise owing under the Prepetition Financing Documents, including any adequate protection claims held by the Prepetition Agent or the Prepetition Lenders under the Final Cash Collateral Order. Pursuant to the Final Cash Collateral Order, the Prepetition Loan Claim is Allowed.

1.94 **"Prepetition Loan Deficiency Claim"** shall mean, collectively, the portion of any Prepetition Loan Claim that is not a Prepetition Loan Secured Claim.

1.95 **"Prepetition Loan Secured Claim"** shall mean, collectively, any Prepetition Loan Claim that is a Secured Claim.

1.96 **"Prepetition Secured Parties"** shall mean the Prepetition Agent and the Prepetition Lenders.

1.97 **"Priority Non-Tax Claim"** shall mean any and all Claims accorded priority in right of payment under Bankruptcy Code section 507(a), other than Priority Tax Claims and Administrative Claims.

1.98 **"Priority Tax Claim"** shall mean a Claim or a portion of a Claim for which priority is asserted under Bankruptcy Code section 507(a)(8).

1.99 **"Professional"** shall mean an Entity employed pursuant to a Final Order in accordance with Bankruptcy Code sections 327, 328, 333, 363, 1103 and to be compensated for services rendered prior to the Confirmation Date, pursuant to Bankruptcy Code sections 327, 328, 329, 330, and 331, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 503(b)(4).

**1.100 "Professional Fee Claims Bar Date"** shall mean the deadline for Filing all applications for Professional Fee Claims, which shall be forty-five (45) days after the filing of the Effective Date Notice.

**1.101 "Professional Fee Claims"** shall mean all fees and expenses (including but not limited to, transaction fees and success fees) for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date, *provided, however*, fees accrued by the Committee Professionals shall not exceed the amount approved in the approved budget set forth in the Final Cash Collateral Order.

**1.102 "Related Parties"** shall mean, in their capacities as such, an Entity's officers and directors serving on and after the Petition Date, and the agents, attorneys, advisors, employees, professionals, shareholders, partners (general or limited), Affiliates, members, managers, equity holders, trustees, executors, predecessors in interest, or successors or assigns of any such Entity.

**1.103 "Released Parties"** shall mean (a) the Debtors and the Estates, (b) the Prepetition Agent, (c) the Prepetition Lenders, (d) Lake Capital, (e) the Committee and its members, and (f) with respect to each of the foregoing, their Related Parties, *provided, however,* that Released Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election, unless otherwise ordered by the Bankruptcy Court.

**1.104 "Release Opt-Out Election"** shall mean the timely election to "opt out" of being a Releasing Party by (a) submitting a Ballot by the Voting Deadline that (i) does not vote to accept the Plan and (ii) selecting the option set forth on the Ballot to <u>not</u> grant the releases set forth in Section 14.1(c) of this Plan, or (b) Filing a written objection to the releases set forth in Section 14.1(c) of this Plan by the objection deadline established by the Solicitation Procedures Order, unless otherwise ordered by the Bankruptcy Court.

**1.105 "Releasing Parties"** shall mean: (a) all Holders of Claims who are Unimpaired, (b) the Committee and its members, (c) the Prepetition Lenders, (d) the Prepetition Agent, (e) all Holders of General Unsecured Claims, (f) Lake Capital, and (g) with respect to each of the foregoing, their Related Parties, *provided, however,* that Releasing Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election, unless otherwise ordered by the Bankruptcy Court.

**1.106 "Restructuring Expenses"** shall mean the reasonable and documented fees and expenses of the Prepetition Agent, including the reasonable and documented fees and expenses of Mayer Brown LLP, FTI Consulting, Inc., and Potter Anderson & Corroon LLP, in their capacities as professionals retained by or on behalf of the Prepetition Agent in respect of the Chapter 11 Cases.

**1.107 "Restructuring Expenses Reserve"** shall mean such reserve of Cash to be reserved on the Effective Date to pay Restructuring Expenses incurred after the Effective Date.

**1.108 "Retained Causes of Action"** shall mean all Causes of Actions against third parties, including, without limitation, the rights and claims described in **Exhibit A** hereto,[3] excluding all Avoidance Actions, any Causes of Action against the Debtors' Directors and Officers, and all

---

[3] The Retained Causes of Action will be included in the Plan Supplement.

Causes of Action released pursuant to Article XIV hereof. For the avoidance of doubt, all Avoidance Actions are waived and released under this Plan upon the Effective Date.

**1.109 "Sales"** shall mean collectively, the A&I Sale, the EMX Sale, the SSP Sale, the Balihoo Sale, and any other sale of the Debtors' Assets approved pursuant to the Bidding Procedures Order.

**1.110 "Schedules"** shall mean the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to Bankruptcy Code section 521 and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

**1.111 "Second Distribution Amount"** shall be an amount not less than $4,000,000.

**1.112 "Second Distribution Date"** shall be thirty (30) days after the Initial Distribution Date.

**1.113 "Secured Claim"** shall mean, pursuant to Bankruptcy Code section 506, that portion of a Claim that is (a) secured by a valid, perfected and enforceable security interest, lien, mortgage, or other encumbrance, that is not subject to avoidance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtors in and to property of the Estates, to the extent of the value of the Holder's interest in such property as of the relevant determination date, or (b) Allowed as such pursuant to the terms of the Plan (subject to the Confirmation Order becoming a Final Order). The defined term Secured Claim includes any Claim that is (i) subject to an offset right under applicable law as of the Petition Date, and (ii) a secured claim against the Debtors pursuant to Bankruptcy Code sections 506(a) and 553.

**1.114 "Solicitation Procedures Order"** shall mean that certain *Order (I) Approving the Combined Disclosure Statement And Plan on an Interim Basis for Solicitation Purposes Only; (II) Establishing Solicitation and Tabulation Procedures; (III) Approving the Form of Ballot and Solicitation Materials; (IV) Establishing the Voting Record Date; (V) Fixing the Date, Time, and Place for the Combined Hearing and the Deadline for Filing Objections Thereto; (VI) Establishing Bar Date for Filing Requests for Allowance of Initial Administrative Claims; and (VI) Granting Related Relief* [Docket No. 383].

**1.115 "SSP Sale"** shall mean the sale of certain of the Debtors' Assets to Cadent, LLC, pursuant to that certain Purchase Agreement by and among EMX Digital, Inc. and Cadent, LLC, dated as of April 10, 2023, and as approved by that certain *Order (I) Approving APA, (II) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of all Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 241].

**1.116 "Stalking Horse Agreements"** shall mean, collectively, the A&I Stalking Horse Purchase Agreement, the EMX Stalking Horse Purchase Agreement and any other stalking horse asset purchase agreement approved pursuant to the Bidding Procedures Order.

**1.117 "Sub-Class"** shall mean, for each Class, the separate sub-Class for each Debtor, as described in Articles II and VII.

**1.118** **"Taxes"** shall mean all income, gross receipts, sales, use, transfer, payroll, employment, franchise, profits, property, excise, or other similar taxes, estimated import duties, fees, stamp taxes, and duties, value added taxes, assessments, or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax, or additional amounts imposed by any taxing authority of a Governmental Unit with respect thereto.

**1.119** **"Unclassified Claims"** shall mean any Administrative Claims, Professional Fee Claims, and Priority Tax Claims.

**1.120** **"Unimpaired"** shall mean, when used in reference to a Claim or Interest, any Claim or Interest that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.121** **"U.S. Trustee Fees"** shall mean fees payable pursuant to 28 U.S.C. § 1930.

**1.122** **"Voting Deadline"** shall mean **August 15, 2023, at 4:00 p.m. (prevailing Eastern Time)**, the date and time by which ballots to accept or reject the Plan must be received to be counted, as set forth by the Solicitation Procedures Order.

**1.123** **"Wind Down Budget"** shall mean the budget, in form and substance satisfactory to the Prepetition Agent, setting forth on a line-item basis (a) the estimated amounts of Allowed Administrative Claims, Other Priority Claims, Priority Tax Claims, Other Secured Claims, and the GUC Cash Allocation, in each case against the Debtors, that may be paid under this Plan; and (b) the Plan Administration Expenses.[4]

**Rules of Interpretation**

**1.124** For purposes of the Plan, except as expressly provided or unless the context otherwise requires, (a) any capitalized term used in the combined Disclosure Statement and Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable, (b) whenever the context requires, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter shall include the masculine, feminine and the neuter, (c) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, (d) any reference in the Plan to an existing document or exhibit means such document or exhibit as it may be amended, modified, or supplemented from time to time, (e) unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan, (f) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to any particular paragraph, subparagraph, or clause contained in the Plan, (g) captions and headings to articles and sections are inserted for convenience of reference only and shall not

---

[4] The Wind Down Budget will be included in the Plan Supplement.

limit or otherwise affect the provisions hereof or the interpretation of the Plan, and (h) the rules of construction set forth in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply.

## ARTICLE  II
## CLASSIFICATION OF CLAIMS AND INTERESTS AND ESTIMATED RECOVERIES

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**2.1** **Classification**.  The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including related to the claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distribution received by Creditors.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

The Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors.  The Plan does not provide for the substantive consolidation of the Debtors.  Rather, except as set forth in Section 9.4 with respect to Class 4, the Plan constitutes a separate Plan proposed by each Debtor, and the classifications set forth in Classes 1, 2, 3, 5, and 6 apply to each Debtor.  Each Class constitutes a separate Sub-Class of Claims against, and Interests in, each of the Debtors, as applicable, and each such Sub-Class of a Class of Claims entitled to vote on the Plan shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Fee Claims), and Priority Tax Claims, as described herein, have not been classified, and the respective treatment of such unclassified Claims is set forth below in Article VI of the Plan.  The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

| Class/ Designation | Plan Treatment | Estimated Amount of Total Claims | Status | Projected Recovery |
|---|---|---|---|---|
| **Class 1**: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | $228,068 | Unimpaired/ Deemed to accept Plan | 100% |
| **Class 2**: Other Secured Claims | Each Holder of an Allowed Class 2 Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Other Secured Claim; or (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing. | $2,000 | Unimpaired/ Deemed to accept Plan | 100% |
| **Class 3**: Prepetition Loan Secured Claims | Unless the Holder agrees to a different treatment, each Holder of a Prepetition Loan Secured Claim shall receive such Holder's pro rata share of (i) on or before the Initial Distribution Date, the Initial Distribution Amount, (ii) on or before the Second Distribution Date, the Second Distribution Amount, and (iii) as soon as practicable thereafter, the Distribution Proceeds until the Prepetition Loan Secured Claims are paid in full. | $49,291,858.41 | Impaired/ Entitled to vote | 40% |
| **Class 4**: General Unsecured Claims | Unless the Holder agrees to a different treatment, each Holder of a General Unsecured Claim shall receive such Holder's pro rata share of the GUC Cash Allocation, solely on account of the Global Settlement, *provided, however* that the Lake Capital Claims and the Prepetition Loan Deficiency Claim shall not participate in any Distributions from the GUC Cash Allocation. | $63,993,127 | Impaired/ Entitled to vote | 1-2% |

| Class/<br>Designation | Plan Treatment | Estimated<br>Amount of<br>Total Claims | Status | Projected<br>Recovery |
|---|---|---|---|---|
| **Class 5**:<br>Intercompany<br>Claims | Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims. | N/A | Impaired/<br>Deemed to<br>reject Plan | N/A |
| **Class 6**:<br>Interests | On the Effective Date, all Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests. | N/A | Impaired/<br>Deemed to<br>reject Plan | 0% |

## ARTICLE III
## BACKGROUND AND DISCLOSURES

### 3.1　General Background[5]

### *(a)*　*The Debtors' Business*

Prior to the Sales, the Debtors were a global advertising, technology, and data company with operations in the United States, European Union, and Australia. They assisted their clients in understanding and reaching their target audiences through market research, content creation, media execution, and measurement.

The Debtors' predecessor, founded in 2005 under the name Engine Group Ltd. ("**Engine**"), was a United Kingdom-based communications and advertising company. By 2013, Engine's operations had expanded to encompass more than 850 employees working across thirteen business lines. In 2014, Lake Capital Partners ("**Lake Capital**"), through certain of its subsidiaries and investment vehicles, completed a leveraged buyout for all of the equity in Engine for £100 million. Lake Capital's acquisition provided Engine with a new debt facility, which funded working capital and other potential acquisitions. Through this acquisition, Engine partnered with two of Lake Capital's portfolio companies: (a) ORC International Inc., a global market search and business intelligence business; and (b) Trailer Park Holdings, LLC ("**Trailer Park**"), an entertainment and content marketing agency. In May of 2018, the Debtors acquired three businesses that formed the foundation for the EMX business: bRealTime, Balihoo, and Clearstream. Engine operated in conjunction with these portfolio companies through mid-2021 until it sold substantially all of the assets of Trailer Park (the "**Trailer Park Sale**"). In addition, in March of 2022, Next Fifteen Communications Group acquired the United Kingdom division of Engine's business (the "**Next 15 Sale**"). Following this acquisition, the Debtors rebranded themselves as "Big Village." As of the Petition date, the Debtors continued to operate across the United States, European Union, and Australia.

---

[5] Additional information regarding the Debtors' business, assets, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in detail in the First Day Declaration.

The Debtors delivered their advertising and digital content across multiple media channels and online platforms, and facilitate the implementation of targeted, data-driven advertising strategies which encompass all of the technology and intelligence necessary to execute global advertising campaigns. To that end, the Debtors operated through three primary business lines: Big Village Digital Insights ("**Insights**"), EMX Digital ("**EMX**"), and Big Village Agency ("**Agency**"). As of the Petition Date, the Debtors partially ceased EMX's operations.

Insights was the Debtors' market research arm focused on business insights and strategy, qualitative and quantitative consumer insights, product research, consumer experience tracking, and brand measurement. These offerings assisted clients in delivering the right message and experience to the right consumer. For example, Insights worked with the Ad Council during their COVID-19 Vaccine Education Initiative to identify groups of people who were "open to COVID vaccines, though still hesitant to get one" and create segments of these consumers that could be targeted in media with messaging urging them to get more information about the vaccine. Insights also helped identify and effectively pursue new markets, audiences, and solutions. Notable clients of Insight include Altria, Aramark, Bissell, Fidelity, Healthcore, Johnson & Johnson, Optum Health, and T-Mobile.

Agency was an integrated, digitally-focused advertising agency that combines world-class digital-centric creative offerings, highly strategic media planning services, and expertise in understanding the Millennial and Z generations. Agency provided end-to-end marketing services as well as point solutions. For example, on the full service side of the business, Agency provided brand strategy, creative development, media execution, and measurement for the Aruba Tourism Board, executing all paid marketing efforts to drive US consumers to Aruba for vacation. On the point solutions side of the business, Agency is the social media agency of record for HBO and HBO Max, and executes all social media campaigns across a wide variety of social platforms on their behalf. Agency also houses Cassandra, the world's longest running youth and generational marketing research platform and consultancy. Cassandra sold a subscription service that provides access to insights and reports generated throughout the year, as well as bespoke consulting engagements for clients like Google, Facebook, and Amazon.

EMX was the Debtors' ad placement marketplace. It was a premium, direct-to-publisher supply-side platform that connected over 13,000 publishers and premium brands, generating more than 600 billion ad placement requests per month. The foundation of EMX was a real-time bidding exchange, which provides a competitive edge in maintaining low infrastructure costs, maximizing ad delivery speed, optimizing auction dynamics, and minimizing user data processing time. This custom-built, patented exchange technology maximized the efficiency of every transaction. For example, a major media group integrated EMX into their client-side bidding network, resulting in increased demand, higher bid competition, faster response rates, and ultimately, increased revenue. The EMX exchange was integrated into major direct service providers including The Trade Desk, Amobee, Adobe, and Criteo, and was integrated with 13,000 publishers including ABC Television Group, AMC Networks, SamsungTV Plus, Vizio, Conde Nast, Hearst, CBSi, and Verizon Media. In addition to the exchange, EMX also offered full-service programmatic campaign strategy, planning, execution, and measurement through a managed service offering and unique local marketing solutions to execute local campaigns (the "Managed Services Business").

*(b)*     ***The Debtors' Equity Ownership and Capital Structure***

i.      Equity Ownership

The equity interests of Debtor Big Village Holding LLC ("**Holding**"), a limited liability company organized under the laws of the State of Delaware, are held by: (a) the management of Holding, which hold 6.7% of its equity interests, (b) ORC Conduit, LLC, which holds 69.2% of Holding's equity interests, (c) Trailer Park, which holds 16.8% of Holding's equity interests, and (d) Holding's minority shareholders, which hold 7.3% of its equity interests. Holding, in turn, owns ninety-percent (90%) of Debtor Big Village Group Holdings LLC ("**BVGH**"). BVGH owns 100% of the equity interests in Debtor Big Village Group, Inc., a Delaware corporation. The entities beneath Big Village Group, Inc. consist of the Debtors' various operating subsidiaries.

ii.     Capital Structure

The Debtors' prepetition secured credit facilities were originally established in 2017. However, they were substantially amended and restated in 2020 as part of the Debtors' efforts to combat the effects on their operations and revenue streams from the COVID-19 pandemic. On November 17, 2020, Debtor Big Village Group, Inc., EMX Digital, Inc., Big Village Insights, Inc., Big Village Group Holdings, LLC, and certain subsidiaries party thereto as borrowers and the Prepetition Lenders and the Prepetition Agent entered into Prepetition Credit Agreement.

The Prepetition Credit Agreement provided for a restructuring of the Company's secured debt obligations by, among other things, (a) amending and restating that certain *First Lien Credit and Guaranty Agreement*, dated as of September 15, 2017, and (b) terminating that certain *Second Lien Credit and Guaranty Agreement*, dated as of September 15, 2017.

As of the Petition Date, the Borrowers were indebted to the Prepetition Secured Parties under the Prepetition Financing Documents, for (a) an aggregate principal amount of $49,291,858.41 of 2020 Term Loans (as defined in the Prepetition Credit Agreement), and (b) accrued and unpaid interest, fees, and costs, expenses (including any attorneys' and financial advisors' fees), charges, indemnities, and other obligations incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition Credit Agreement.

In addition, as of the Petition Date, the Debtors' books and records listed approximately $48 million in outstanding trade liabilities.

**3.2     Events Leading to Chapter 11**

Marketing services, research, and media are not often viewed as "mission-critical" functions and represent opportunities for cost savings during difficult economic times. In times of cash preservation, it can be the first place where budgets are cut. This is especially true with programmatic media, where there are limited up front commitments, allowing advertising partners to easily and quickly reduce spending. With almost every industry under pressure, the Debtors began to face significant financial challenges at the onset of the COVID-19 pandemic.

In a first step to address their liquidity issues in 2020, the Debtors entered into multiple forbearances and amendments with the Prepetition Lenders. These restructuring efforts ultimately

led to the establishment of the current Prepetition Credit Agreement and an equity infusion of cash in late 2020. Further, because the Debtors were ineligible for COVID-19 relief programs, they were forced to reduce headcount and implement temporary pay cuts for employees. The Debtors quickly recognized that the businesses could not sustain the significant debt burden, and began exploring alternatives to reduce their debt obligations. To that end, in 2021 the Debtors commenced a marketing process to sell or otherwise divest certain assets and business lines that did not have strong synergistic ties to their go-forward business plan.

In August of 2021, the Debtors consummated the Trailer Park Sale, and in March of 2022, the Debtors consummated the Next 15 Sale. The proceeds of both the Trailer Park Sale and the Next 15 Sale were used to pay down the amounts outstanding under the Prepetition Credit Agreement, which reduced the Debtors' overall debt and provided them with additional working capital. However, as the company divested these assets, they became unable to support their centralized service costs. While the Debtors initiated further cost-savings measures to right size headcount and cost structure, they have been unsuccessful in reducing their lease obligations. Indeed, two of the Debtors' leases, located in New York City and Los Angeles, represent nearly half of their fixed costs.

Following the Trailer Park Sale, the Next 15 Sale, and the above-mentioned cost-savings measures, the Debtors were able to stabilize the Agency and Insights businesses. EMX was also recovering in the first quarter of 2022, but was hit with the subsequent media spend pull-back due to declining economic conditions in the second and third quarters of 2022, along with broader industry headwinds. In response to the decline in revenue and unstable economic conditions, the Debtors further eliminated centralized costs and executed a restructuring of the EMX business.

EMX's primary asset is an automated technology platform that allows buyers and sellers to transact in real time. The technology has a relatively fixed cost to operate, and therefore, profitability increases significantly as additional revenue is received. In the past few months, the Debtors have made significant progress connecting additional buyers to the platform and improving revenue. These efforts enabled EMX to operate at lower revenue thresholds in 2023, and EMX was positioned to maximize revenue and profitability when the advertising market rebounds. However, demand for the EMX service continued to slow due to prevailing economic and industry factors.

Unfortunately, the Debtors' liquidity situation critically eroded before they were able to capitalize on the restructured EMX business. Traditionally, the fourth quarter is the Debtors' highest revenue quarter, but in order to capture these revenues, the Debtors must achieve strong sales during the preceding summer. The Debtors attempted to preserve their sale teams as much as possible to ensure that they could take advantage of the projected fourth quarter income, but the unavoidable layoffs and overall pullback in the media marketplace strained the business. The Debtors' revenues declined rapidly through the end of the third quarter, and by early October 2022, the Debtors were forced to reinitiate layoffs and preserve liquidity. In addition, due to the Debtors' deteriorating cash position, they were forced to partially shut down the EMX business, including the EMX exchange.

### 3.3 The Chapter 11 Cases

*(a)* ***Generally***

As set forth above, on the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The commencement of a chapter 11 case creates an estate that is composed of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession." Prior to the Sales, the Debtors have continued to operate their businesses and manage their properties as debtors and debtors in possession. By order entered on February 9, 2023, the Chapter 11 Cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in the Chapter 11 Cases. On February 24, 2023, the Office of the United States Trustee for the District of Delaware appointed the Committee.

The filing of the Debtors' bankruptcy petitions on the Petition Date triggered the immediate imposition of the automatic stay under Bankruptcy Code section 362, which, with limited exceptions, enjoins all collection efforts and actions by creditors, the enforcement of liens against property of the Debtors and both the commencement and the continuation of prepetition litigation against the Debtors. With certain limited exceptions and/or modifications as permitted by order of the Bankruptcy Court, the automatic stay will remain in effect from the Petition Date until the Effective Date of the Plan.

*(b)* ***"First Day" Motions and Related Applications***

Commencing on the Petition Date, the Debtors filed the following "first-day" motions and applications designed to ease the Debtors' transition into chapter 11, maximize the value of the Assets, and minimize the effects of the commencement of the Chapter 11 Cases (collectively, the "**First Day Motions**"):

    i.    *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases* [D.I. 3] ("**Joint Administration Motion**").

    ii.    *Debtors' Application for the Retention and Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent* [D.I. 4] ("**Claims Agent Retention Motion**").

    iii.    *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto* [D.I. 6] ("**Utility Motion**").

    iv.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Prepetition Employee Wages, Salaries, and*

*Other Compensation; (II) Payment of Prepetition Obligations Owed to Independent Contractors; (III) Continuation of Bonus Obligations to be Paid in the Ordinary Course of Business Expenses; (IV) Payment of Prepetition Employee Business Expenses; (V) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (VI) Payment of Severance Obligations; (VII) Payment of Workers' Compensation Obligations; (VIII) Payments for Which Prepetition Payroll Deductions Were Made; (IX) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (X) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto* [D.I. 5] ("**Wages Motion**").*

v. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363 and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (II) Continuation of Insurance Premium Financing Programs; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (III) Scheduling a Final Hearing* [D.I. 8] ("**Insurance Motion**").*

vi. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing* [D.I. 7] ("**Tax Motion**").*

vii. *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Honor Certain Prepetition Customer Deposit Programs, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief* [D.I. 9] ("**Customer Programs Motion**").*

viii. *Debtors' Motion for Entry of an Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Service Providers; (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (C) Granting Related Relief Cash Management* [D.I. 10] (the "**Critical Vendors Motion**").*

ix. *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 345, 363, 1107(a) and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Waiving the Requirements of Section 345(b) on an Interim Basis, and (D) Granting Certain Related Relief* [D.I. 11] (the "**Cash Management Motion**").*

x. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing; and (D) Granting Related Relief* [D.I. 12] (the "**Cash Collateral Motion**").

On February 9, 2023, the Bankruptcy Court entered orders (i) approving the relief requested in the Joint Administration Motion [D.I. 31], the Claims Agent Retention Application [D.I. 32] on a final basis, and (ii) approving the relief requested in the Wages Motion [D.I. 33], the Utilities Motion [D.I. 34], the Insurance Motion [D.I. 35], the Taxes Motion [D.I. 36], the Customer Programs Motion [D.I. 37], the Critical Vendors Motion [D.I. 38], the Cash Management Motion [D.I. 39] and the Cash Collateral Motion [D.I. 40] on an interim basis.

On March 6, 2023, the Bankruptcy Court entered orders approving, on a final basis, the relief requested in the Wages Motion [D.I. 96], the Utilities Motion [D.I. 97], the Insurance Motion [D.I. 98], the Taxes Motion [D.I. 99], the Customer Programs Motion [D.I. 89], the Critical Vendors Motion [D.I. 90], and the Cash Management Motion [D.I. 91]. On March 13, 2023, the Bankruptcy Court entered an order approving, on a final basis, the relief requested in the Cash Collateral Motion [D.I. 130].

Pursuant to the Final Cash Collateral Order, the Prepetition Secured Parties maintain a properly perfected, first priority security interest in substantially all of the Debtors' assets. That security interest is, as of the date of filing of this Plan, only subject to Challenge (as defined in the Final Cash Collateral Order) until the expiration of the Challenge Period (as defined in the Final Cash Collateral Order). Once the Challenge Period (as defined in the Final Cash Collateral Order) expires, the Prepetition Secured Parties shall have a first priority security interest in all Assets of the Debtors and the Estates, and any proceeds of the Sales constitute the Prepetition Lenders' collateral.

*(c)* **Retention of Professional Advisors**

In the wake of their liquidity constraints and operational challenges, in late 2022, the Board began to increasingly consider the need for the Debtors to restructure or otherwise receive a cash infusion to ensure that the Debtors could move forward as a viable business. In late October of 2022, the Debtors engaged Triple P RTS, LLC ("**Portage Point**"), as restructuring advisor, and Young Conaway Stargatt & Taylor, LLP, as restructuring counsel. In November of 2022, the Debtors appointed Jill Frizzley – a seasoned restructuring professional, attorney, and independent fiduciary – as an independent director and member of the Board. Shortly after the Petition Date, on February 9, 2023, the Debtors' Chief Executive Officer resigned.

Pursuant to orders entered on March 6, 2023, the Bankruptcy Court authorized the Debtors to retain and employ (i) Young Conaway Stargatt & Taylor, LLP as their bankruptcy counsel [D.I. 93]; (ii) "Portage Point, to provide the Debtors with certain management positions, and specifically Matthew Ray as Chief Executive Officer and Chief Restructuring Officer and Zachary Rose as Deputy Chief Restructuring Officer [D.I. 100]; and (iii) Kroll Restructuring, LLC as administrative advisor [D.I. 95]. On March 13, 2023, the Bankruptcy Court authorized the Debtors to retain and employ Stephens, Inc. as investment banker [D.I. 128]. The Bankruptcy Court also authorized the Debtors to retain and employ certain professionals utilized by the Debtors in the ordinary course of business prior to the Petition Date [D.I. 102].

Pursuant to orders entered on April 21, 2023, the Bankruptcy Court authorized the Committee to retain and employ (i) Pachulski Stang Ziehl & Jones as its legal counsel [D.I. 251], and (ii) Dundon Advisers, LLC as its financial advisors [D.I. 252].

*(d)*    ***The Asset Sales***

i.    <u>The Prepetition Sales Process</u>

In furtherance of their restructuring efforts, in September of 2022, the Debtors engaged Stephens Inc. ("**Stephens**"), as their investment banker.  In late October of 2022, the Debtors engaged Portage Point, as restructuring advisor, and Young Conaway Stargatt & Taylor, LLP, as restructuring counsel.

Shortly after their retention, Stephens began a formal marketing process for the sale of the Debtors' assets, both on an integrated basis as well as on a business line basis.  As part of these efforts, Stephens crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room (the "**Data Room**") and a confidential information presentation with the assistance of the Debtors and their other professional advisors.  Stephens developed an initial list of approximately forty-four (44) strategic and financial prospective purchasers for the Agency and Insights businesses, and approximately thirty (30) purchasers for the EMX business.  Stephens also circulated, via email, a detailed "teaser" and description of the opportunity to acquire the Debtors' assets to all of the prospective purchasers.  Ultimately, twelve (12) parties executed non-disclosure agreements (each, an "**NDA**") and were granted access to the Data Room.

After months of restructuring efforts, and after carefully considering, among other things, the Debtors' cash position, which was nearing an all-time low, and the increasing pressure from the Debtors' vendor and publisher base, the members of the Board determined that the only viable path to preserving and maximizing the value of the Debtors' assets was to commence these Chapter 11 Cases.  Around the same time, the Board determined that it was in the Debtors' best interest to sell some or substantially all of their assets through a Court-approved marketing and sale process (the "**Sale Process**").  The Sale Process will provide a transparent and comprehensive avenue through which the Debtors will seek bids for their assets to maximize value for the estates.

Despite their prepetition marketing efforts, the Debtors' were unable to identify an actionable transaction for the entire EMX business.  Absent significant cost-cutting measures, EMX's cash burn at full operation was unsustainable and would almost immediately drive the Debtors into a forced liquidation.  Accordingly, prior to the Petition Date, the Debtors partially ceased operation of the EMX business.  While the Debtors will maintain the Managed Services Business to be sold as a going concern, the remainder of EMX will be wound-down through these Chapter 11 Cases.  Outside of the Managed Services Business, the Debtors have significantly reduced the EMX employee headcount, and will maintain a small team to assist with the wind-down of the remaining business, which will include collection of EMX's outstanding accounts receivables.

In early January, the Debtors received two asset purchase agreements for the Agency and Insights businesses.  The Debtors then conducted good-faith, arms'-length negotiations with these prospective buyers simultaneously, and these prospective buyers conducted deeper diligence into

the Agency and Insights businesses. After multiple rounds of negotiations with two potential purchasers, the Debtors ultimately selected NMMB, Inc., an affiliate of one of the Prepetition Lenders, to serve as a stalking horse purchaser for the Agency and Insights Businesses (the "**A&I Stalking Horse Purchaser**"). The Debtors entered into the A&I Staking Horse Purchase Agreement with the A&I Stalking Horse Purchaser on February 8, 2023. The A&I Stalking Horse Purchase Agreement contemplateed a purchase price of $12 million in cash, plus the assumption of certain liabilities and executory contracts, and satisfaction of all cure costs.

Around the same time, the Debtors also received an offer for the Managed Services Business. After multiple rounds of negotiations with the potential purchaser, the Debtors selected ZStream Acquisition LLC to serve the stalking horse purchaser for the Managed Services Business (the "**EMX Stalking Horse Purchaser**"). The Debtors entered into the EMX Staking Horse Purchase Agreement with the EMX Stalking Horse Purchaser on February 8, 2023. The EMX Stalking Horse Purchase Agreement contemplated a purchase price of $2.1 million in cash, including the acquisition of certain outstanding accounts receivables on a dollar-for-dollar basis, plus the assumption of certain liabilities and executory contracts, and satisfaction of all cure costs.

ii.    The Postpetition Sales Process

As set forth in the First Day Declaration, the Debtors' paramount goal in the Chapter 11 Cases is to maximize the value of the estates for the benefit of the Debtors' creditor constituencies and other stakeholders through the sale of substantially all of the Assets. On the Petition date, the Debtors filed a motion (the "**Bidding Procedures Motion**") seeking authority to proceed with a bidding and auction process to consummate a sale or series of sales (the "**Sale Process**") that the Debtors expect will generate maximum value for their assets. To facilitate the Sale Process, the Debtors, in consultation with Stephens and their other professional advisors, proposed certain customary bidding procedures (the "**Bidding Procedures**") to preserve flexibility in the Sale Process, generate the greatest level of interest in the Debtors' assets, and result in the highest or otherwise best value for those assets. Given the Debtors' liquidity situation at the outset of the Chapter 11 Cases, the Debtors believed that a timely sale of their assets would maximize value to the greatest extent possible under the circumstances of these Chapter 11 Cases, and generate the highest possible recoveries in the most efficient and expeditious manner possible, which will inure to the benefit of the Debtors' creditors and other stakeholders. The Debtors also believed that it would ensure, to the benefit of their estates, that the market has certainty around the parameters of the Sale Process.

As set forth in the Bidding Procedures Motion, the Debtors, in consultation with Stephens and their other professional advisors worked extensively to implement a robust and expeditious Sale Process. On March 13, 2023, the Bankruptcy Court entered the Bidding Procedures Order, approving the Bidding Procedures and establishing, among other things, April 3, 2023, as the bid deadline, April 4, 2023, as the auction date, and April 6, 2023, as the hearing to approve the Sales.

The Stalking Horse Purchase Agreements served as the baseline for all prospective bidders to negotiate from, and were be subject to higher or otherwise better bids for the Assets pursuant to the Bidding Procedures. To this end, shortly after the Petition Date, Stephens commenced the formal post-petition marketing process for all Assets by circulating a "teaser" to various prospective strategic, financial and hybrid buyers. The teaser included a brief description of the Assets and the Sale Process, and was accompanied by a form NDA. In addition, prior to the

Petition Date, Stephens finalized a confidential information memorandum for the Assets, and populated the Data Room with related diligence information.

After the Petition Date, Stephens contacted or received inbound interest from twenty-four (24) potentially interested parties, including various parties that had been contacted prior to the Petition Date, regarding the Assets related to the Agency and Insight business. As to the Debtors' EMX business, Stephens contacted or received inbound interest from forty-five (45) parties through the postpetition marketing process, including various parties that had been contacted prior to the Petition Date.

Stephens continued its efforts to market the Assets and ensure that the Debtors were able to obtain the highest and best value for the Assets through the commencement of the auction. Prior to the commencement of the auction, all potentially interested parties received an updated process letter outlining the sale and auction process and there were over twenty-three (23) parties who were granted access to the Data Room.

The Debtors ultimately received bids from the following bidders:

| Business | Bidder(s) |
|---|---|
| Managed Services | ZStream Acquisition, LLC (Stalking Horse)<br><br>InMarket Media, LLC |
| Agency, Insights & Balihoo (together) | NMMB, Inc. (Stalking Horse)<br><br>Bright Mountain Media, Inc.<br><br>MDC Corporate (US) LLC |
| SSP | CPX Interactive LLC<br><br>Cadent LLC<br><br>InMarket Media, LLC |
| Balihoo | BH Acquisition LLC<br><br>Did-It.com LLC |
| Balihoo and SSP (together) | Insticator, Inc. |

In accordance with the Bidding Procedures Order, the Debtors commenced an auction on April 4, 2023, which lasted two days. During the course of the first day of the auction on April 4th, the Debtors worked with the bidders to align all of the bids to be on largely comparable terms on comparable assets in order to maximize the Debtors' ability to realize the largest bid increases

during live auction bidding. Following several off-the-record working sessions with the bidders and spirited live-auction bidding – which included thirty-eight (38) rounds of bidding on the Agency and Insights businesses alone – the following parties were declared as the winning bidders:

a.  Agency and Insights Businesses (together): Bright Mountain Media, Inc. for $19,274,000.

b.  Managed Services Business: ZStream Acquisition, LLC (the EMX Stalking Horse), for the stalking horse purchase price of $2.1 million, plus 100% of the accounts receivable for the managed services business estimated at approximately $1.5-1.6 million.

c.  Balihoo Business: Insticator, Inc. for $900,000

As a result of the first day of the auction, the Debtors were able to realize $8.174 million in cash value *over and above the stalking horse bid* for the Agency, Insights and Balihoo businesses and approximately $3.6-3.7 million in cash value for the managed services business. These cash values do not include any assumed liabilities and/or cure claims, which the Debtors' estimate to be an additional $8-9 million in sale consideration.

On April 5, 2023, the Debtors commenced the second day of the Auction for the SSP Sale. The winning bidder for the Assets related to the SSP business was Cadent LLC for a cash purchase price of $4,900,000 *plus* a cash payment equal to 70% of the SSP business's accounts receivable, which the Debtors estimate to be $2,184,000, for a total purchase price of $7,084,000. Notably, the Debtors had no stalking horse purchaser for these assets.

The Bankruptcy Court held a hearing and approved the Sales on April 6, 2023, and entered orders approving each of the Sales on April 10, 2023, and April 12, 2023 [D.I. 234, 235, 236, and 241]. The Sales closed between April 14 and April 22, 2023.

*(e)*     *Schedules and Bar Dates*

On March 6, 2023, the Bankruptcy Court entered the Bar Date Order, granting the relief requested in the Bar Date Motion [D.I. 101]. The Bar Date established the General Bar Date as April 27, 2023 at 5:00 p.m. (prevailing Eastern Time).

On March 13, 2023, the Debtors filed the Schedules. Among other things, the Schedules set forth the Claims of known or putative creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.

On July 12, 2023, the Bankruptcy Court entered the Solicitation Procedures Order that, among other things, established the Initial Administrative Claim Bar Date as August 15, 2023 at 5:00 p.m. (prevailing Eastern Time). As described in detail below, the Plan contemplates the establishment of a Final Administrative Claim Bar Date and Professional Fee Bar Date pursuant to the Confirmation Order.

The projected recoveries set forth in the Plan are based on certain assumptions, including the Debtors' estimates of the Claims that will eventually be Allowed in various Classes. There is no guarantee that the ultimate amount of each of such categories of Claims will correspond to the

Debtors' estimates. The Debtors or the Plan Administrator, as applicable, and their professionals will investigate Claims filed against the Debtors to determine the validity of such Claims. The Debtors or the Plan Administrator, as applicable, may file objections to Claims that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

*(f)* *The Global Settlement*

Pursuant to the Final Cash Collateral Order, the Committee was afforded until April 25, 2023 (the "**Challenge Deadline**"), to assert a challenge (a "**Challenge**") to the various stipulations and admissions by the Debtors in the Final Cash Collateral Order regarding, among other things, the extent, validity and priority of the liens and claims of the Prepetition Lenders (as defined in the Final Cash Collateral Order, the "**Prepetition Lien and Claim Matters**"). Following entry of the Final Cash Collateral Order, the Debtors produced a significant volume of documents to the Committee on a consensual basis and the Committee, the Prepetition Agent, and the Debtors engaged in thorough discussions further to the Committee's investigatory duties. On April 25, 2023, the Committee and the Prepetition Agent entered into that certain *Stipulation By and Among the Administrative Agent and the Committee Pursuant to the Final Cash Collateral Order* [D.I. 256] which resolved certain of the Prepetition Lien and Claim Matters. Thereafter, the Committee, the Prepetition Agent, and Debtors continued ongoing discussions regarding extant Prepetition Lien and Claim Matters, if any, and on May 9, 2023, the Committee made a proposal to the Debtors and the Prepetition Lenders to resolve such outstanding matters. The Committee, the Prepetition Lenders, Lake Capital, and the Debtors continued to engage in extensive, detailed good faith and arm's-length negotiations to resolve any outstanding issues and to formulate a fully consensual chapter 11 plan supported by the Committee and the Prepetition Lenders. Shortly before filing this Plan, the Committee, Prepetition Lenders, Lake Capital, and the Debtors finalized those discussions and ultimately agreed to the terms of the Global Settlement, the terms of which are:

    i.    The Committee supports this Plan, including but not limited to the release and exculpation provisions set forth in Article XIV hereof.

    ii.    $795,000 of the Prepetition Lenders' Cash Collateral (as defined in the Final Cash Collateral Order) shall be carved out of the Prepetition Lenders' Class 3 recovery and contributed to fund the GUC Cash Allocation.

    iii.    Under the Plan, all of the available sale proceeds and available Cash shall be distributed to the Prepetition Lenders after funding of any reserves required under the Plan and payment of allowed administrative expenses and priority claims in full, subject to the following.

    iv.    The GUC Cash Allocation shall be reserved for the sole and exclusive purpose of satisfying Allowed General Unsecured Claims in accordance with this Plan, which Allowed General Unsecured Claims against each of the Debtors shall be consolidated for purposes of voting, allowance, and distribution *provided, however*, that the Prepetition Lenders waive the Prepetition Loan Deficiency Claim and shall not participate in any Distributions from of the GUC Cash Allocation, and *provided further,* that

the Lake Capital Claims shall also not participate in any Distributions from of the GUC Cash Allocation.

v.      Any and all Avoidance Actions shall be waived and extinguished upon the Effective Date.

vi.      The Debtors, in consultation with the Committee shall exercise commercially reasonable efforts prior to the Effective Date to administer and reconcile General Unsecured Claims so that (a) the pool of allowed general unsecured claims is determined as soon as possible (taking into account that distributions will represent a small percentage of projected Allowed General Unsecured Claims), and (b) distributions can be made by the Debtors out of the GUC Cash Allocation promptly following the Effective Date of the Plan. The Debtors shall provide draft claim objections to the Committee three (3) days prior to filing, and will make appropriate personnel and advisors available to address any questions or concerns regarding such claim objections.

vii.      All approved fees and expenses of the Committee's professionals shall be paid in full through the Effective Date of this Plan in accordance with the approved budget set forth in the Final Cash Collateral Order.

Section 105(a) provides, in relevant part, that "[t]he court may issue any order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). In turn, Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The compromise or settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

"[T]he decision whether to approve a compromise under [Bankruptcy] Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). Courts should not, however, substitute their judgment for that of the debtor, but instead should canvas the issues to see whether the compromise falls below the lowest point in the range of reasonableness. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'") (internal citations and quotations omitted).

In the Debtor's judgment – with which the Committee and the Prepetition Lenders agree – the Global Settlement is reasonable and in the best interest of the Debtors, their estates, creditors and all parties in interest, including the Holders of Allowed General Unsecured Claims. The Global Settlement was the product of good-faith and arm's-length negotiations between the parties. The Global Settlement settles once and for all the disputes regarding potential outstanding Prepetition Lien and Claim Matters, objections to the Lake Capital Claims, and a possible Challenge in an efficient, consensual, and cost-effective manner that will avoid litigation and the uncertainty it involves. As a result of the Global Settlement, the General Unsecured Creditors will receive an assured recovery in Class 4 that would either be unlikely or the result of substantial, costly and time-consuming litigation, absent the Global Settlement. The Debtors have reasonably determined that entry into the Global Settlement is in the best interests of the estates and reflects a fair and reasonable compromise. Furthermore, the Committee and the Prepetition Lenders support the Global Settlement. Accordingly, the *Martin* factors are met, the Global Settlement fall well within the lowest "range of reasonableness" and, therefore, the Global Settlement should be approved pursuant to Bankruptcy Rule 9019.

(g) **The Wind-down of the Estates**

Since the closing of the Sales, the Debtors have focused on efficiently winding down their businesses, preserving Cash held in the Estates, and monetizing their remaining Assets. The remaining Assets currently consist of, among other things, Cash, certain deposits, prepayments, credits and refunds, insurance policies or rights to proceeds thereof, accounts receivables, and Retained Causes of Action. This combined Plan and Disclosure Statement provides for the Assets, to the extent not already liquidated, to be liquidated over time and the proceeds thereof to be distributed to holders of Allowed Claims in accordance with the terms of the Plan and the treatment of Allowed Claims described more fully herein. The Plan Administrator will effect such liquidation and distributions. The Debtors will be dissolved as soon as practicable after the Effective Date.

## ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

**4.1    Confirmation Procedure**. The Solicitation Procedures Order, among other things, conditionally approves the combined Disclosure Statement and Plan for solicitation purposes only and authorizes the Debtors to solicit votes to accept or reject the Plan. The Confirmation Hearing has been scheduled for August 24, 2023 at 1:00 p.m. (prevailing Eastern Time) at the Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom 7 Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to Bankruptcy Code section 1125 and (b) confirmation of the Plan pursuant to Bankruptcy Code section 1129. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

**4.2    Procedure for Objections**. Any objection to final approval of the combined Disclosure Statement and Plan as providing adequate information pursuant to Bankruptcy Code section 1125 or confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (a) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square,

1000 North King Street, Wilmington, DE 19801, (Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Joseph Barry, Esq. (jbarry@ycst.com), and Joseph M. Mulvihill, Esq. (jmulvihill@ycst.com)); (b) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE, 19801, (Attn: Linda Richenderfer (Linda.Richenderfer@usdoj.gov)); (c) counsel to the Prepetition Agent, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020-1001 (Attn: Brian Trust (btrust@mayerbrown.com) and Joaquin M. C de Baca (jcdebaca@mayerbrown.com)) and Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801-6108 (Attn. L. Katherine Good (kgood@potteranderson.com)); and (d) counsel to the Committee; (collectively, the "Objection Recipients"); in each case, by no later than August 15, 2023 at 4:00 p.m. (prevailing Eastern Time). Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.

**4.3    Requirements for Confirmation**. The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129. Among other requirements, the Plan (i) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (ii) must be feasible. The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

**4.4    Classification of Claims and Interests**

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders. In accordance with Bankruptcy Code section 1123, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to Bankruptcy Code section 1123(a)(1) need not be and have not been classified). The Debtors also are required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Bankruptcy Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Bankruptcy Code section 1122 and applicable case law. It is possible that a

Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular Holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by Creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

## 4.5 Impaired Claims or Interests

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in Bankruptcy Code section 1124) under a plan may vote to accept or reject such plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under Bankruptcy Code section 1126(g) and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 3 and 4 are Impaired and are entitled to vote on the Plan. Under the Plan, Holders of Claims or Interests in Classes 5 and 6 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and deemed to reject the Plan. Under the Plan, holders of Claims in Classes 1 and 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4.**

### 4.6    Confirmation Without Necessary Acceptances; Cramdown

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b). Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because Holders of Claims and Interests in Classes 5 and 6 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in Bankruptcy Code section 1129(b). The Debtors believe that such requirements are satisfied, as no Holder of a Claim or Interest junior to those in Classes 5 and 6 is entitled to receive any property under the Plan.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, and no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

*(a)*    <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

*(b)*     Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

*(c)*     Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

## 4.7     Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Inasmuch as the Assets have been, or will be, liquidated and the Plan provides for the Distribution of all of the Cash proceeds of the Assets to Holders of Claims that are Allowed in accordance with the Plan, for purposes of this test, the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under the Plan.  Based on the Debtors' analysis, the Plan Administrator will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## 4.8     Best Interests Test and Liquidation Analysis

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the

distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan. However, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidating the Estates in a chapter 7 case.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Assets. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) that are allowed in the chapter 7 cases.

Accordingly, the Debtors believe that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases, and therefore, the classification and treatment of Claims and Interests in the Plan complies with Bankruptcy Code section 1129(a)(7).

## 4.9 Acceptance of the Plan

The rules and procedures governing eligibility to vote on the Plan, solicitation of votes, and submission of ballots are set forth in the Solicitation Procedures Order.

For the Plan to be accepted by an Impaired Class of Claims, a majority in number and two-thirds in dollar amount of the Claims voting in such Class must vote to accept the Plan. At least one Voting Class, excluding the votes of insiders, must actually vote to accept the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE SOLICITATION AND CLAIMS AGENT (I) BY TELEPHONE AT: (888) 819-5647 (TOLL-FREE), (646) 440-4398 (INTERNATIONAL) OR (II) BY EMAIL AT: BIGVILLAGEINFO@RA.KROLL.COM. THE SOLICITATION AND CLAIMS AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4 WHO DO NOT WISH TO PROVIDE THE RELEASES SET FORTH IN SECTION 14.1(c) HEREIN MUST AFFIRMATIVELY INDICATE SO BY CHECKING THE "OPT-OUT" BOX ON THEIR BALLOT.**

**PLEASE BE ADVISED THAT ALL HOLDERS OF CLAIMS IN CLASS 3 AND CLASS 4 THAT (I) VOTE TO ACCEPT THE PLAN; OR (II) VOTE TO REJECT THE PLAN, BUT DO NOT AFFIRMATIVELY MAKE THE OPT-OUT ELECTION ON THEIR BALLOT SHALL BE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN SECTION 14.1(c) HEREIN.**

**ARTICLE V**
**CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING**

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**5.1      The Plan May Not Be Accepted**

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, that may not have the support of the Creditors and/or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Creditors as those proposed in the Plan.

**5.2      The Plan May Not Be Confirmed**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan. Even if the Bankruptcy Court determined that the combined Disclosure Statement and Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met. Moreover, there can be no assurance that modifications to the combined Disclosure Statement and Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what distribution the holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable

treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**5.3     Distributions to Holders of Allowed Claims under the Plan May Be Inconsistent with Projections**

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**5.4     Objections to Classification of Claims**

Bankruptcy Code section 1122 requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.  Issues

or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## 5.5    Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of the Plan, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court.  Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

## 5.6    Plan Releases May Not Be Approved

There can be no assurance that the releases, as provided in Article XIV of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

## 5.7    Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially. The amount of cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

## 5.8    Certain Tax Considerations

There are a number of material income tax considerations, risks, and uncertainties associated with the plan of liquidation of the Debtors described in the combined Disclosure Statement and Plan.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## ARTICLE VI
## TREATMENT OF UNCLASSIFIED CLAIMS

**6.1    Administrative Claims**.  Except as otherwise set forth in this Article VI, or as soon as practicable after the Final Administrative Claim Bar Date, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim: (i) Cash equal to the amount of such Allowed

Administrative Claim; or (ii) such other treatment as to which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Administrative Claim shall have agreed upon in writing.

(a) **Final Administrative Claim Bar Date**.  Holders of Administrative Claims, other than Professional Fee Claims, accruing after the date of entry of the Solicitation Procedures Order through and including the Effective Date ("**Final Administrative Claims**") shall file with the Claims Agent and serve on the Plan Administrator requests for payment, in writing, together with supporting documents, substantially complying with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, so as to actually be received on or before the Final Administrative Claim Bar Date.  The Effective Date Notice shall set forth the Final Administrative Claim Bar Date and shall constitute notice of such Bar Date.  Absent further Court order, any Final Administrative Claim not filed by the Final Administrative Claim Bar Date shall be deemed waived and the Holder of such Final Administrative Claim shall be forever barred from receiving payment on account thereof.

(b) **Objections by the Plan Administrator**.  Objections to requests for payment of Administrative Claims, other than requests for payment of Professional Fee Claims, must be Filed and served on the requesting party by the Claims Objection Deadline.

(c) **Professional Fee Claims**.  All applications for allowance and payment of Professional Fee Claims shall be Filed on or before the Professional Fee Claims Bar Date. If an application for a Professional Fee Claim is not Filed by the Professional Fee Claims Bar Date, such Professional Fee Claim shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  The Effective Date Notice shall set forth the Professional Fee Claims Bar Date and shall constitute notice of such Professional Fee Claim Bar Date.  Objections to any Professional Fee Claims must be Filed and served on the Plan Administrator and the requesting party by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.  Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the earlier of (i) the Effective Date or (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, and in each case, as soon as reasonably practicable.

(d) **U.S. Trustee Fees**.  All fees payable on or before the Effective Date, pursuant to United States Code title 28 section 1930, shall be paid by the Debtors on or before the Effective Date.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a request for Administrative Claims.

**6.2     Priority Tax Claims**.  Within the time period provided in Article X of the Plan, each Holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim: (i) Cash equal to the amount of such Allowed Priority Tax Claim; or (ii) such other treatment as to which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing.

# ARTICLE VII
## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

For purposes of administrative convenience and efficiency, the Plan is a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors. The Plan does not provide for the substantive consolidation of the Debtors. Rather, except as set forth in Section 9.4 with respect to Class 4, this Plan constitutes a separate Plan proposed by each Debtor, and the classifications set forth in Classes 1, 2, 3, 5, and 6 of the Plan apply to each Debtor. Each Class constitutes a separate Sub-Class of Claims against, and Interests in. each of the Debtors, as applicable, and each such Sub-Class of a Class of Claims entitled to vote on the Plan shall vote as a single separate Class for, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to, each of the Debtors.

All Claims and Interests are classified in the Classes set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date

Unless the Holder of an Allowed Claim and the Debtors or the Plan Administrator, as applicable, agree to a different treatment, each Holder of an Allowed Claim shall receive the following Distributions in accordance with Article X of the Plan:

**7.1** **Class 1: Priority Non-Tax Claims**. Each Holder of an Allowed Priority Non-Tax Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

**7.2** **Class 2: Other Secured Claims**. Each Holder of an Allowed Other Secured Claim shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 2 Claim: (A) return of the collateral securing such Allowed Other Secured Claim; or (B) Cash equal to the amount of such Allowed Other Secured Claim; or (C) such other treatment which the Debtors or the Plan Administrator, as applicable, and the Holder of such Allowed Other Secured Claim have agreed upon in writing.

**7.3** **Class 3: Prepetition Loan Secured Claims**. Each Holder of an Allowed Prepetition Loan Secured Claim shall receive, in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 3 Claim, such Holder's pro rata share of (i) on or before the Initial Distribution Date, the Initial Distribution Amount, (ii) on or before the Second Distribution Date, the Second Distribution Amount, and (iii) as soon as practicable thereafter, the Distribution Proceeds until the Prepetition Loan Secured Claims are paid in full.

**7.4** **Class 4: General Unsecured Claims**. Unless the Holder agrees to a different treatment,

and pursuant to the Global Settlement, each Holder of a General Unsecured Claim shall receive such Holder's pro rata share of the GUC Cash Allocation, solely on account of the Global Settlement, without regard to the Debtor against whom each Holder has a Claim, *provided, however*, that the Lake Capital Claims and Prepetition Loan Deficiency Claim shall not participate in any Distributions from the GUC Cash Allocation.

**7.5      Class 5:  Intercompany Claims**.  Holders of Intercompany Claims shall receive no Distribution on account of their Intercompany Claims.

**7.6      Class 6: Interests**.  On the Effective Date, all Interests shall be extinguished as of the Effective Date, and owners thereof shall receive no Distribution on account of such Interests.

**7.7      Reservation of Rights Regarding Claims and Interests**.  Except as otherwise explicitly provided in the Plan, nothing shall affect the Debtors' rights and defenses, both legal and equitable, with respect to any Claims or Interests, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## ARTICLE  VIII
## ACCEPTANCE OR REJECTION OF THE PLAN

**8.1      Class Entitled to Vote**.  Because Claims in Classes 3 and 4 are Impaired and Holders thereof will receive or retain property or an interest in property under the Plan, only a Holder of Claims in Classes 3 and 4 shall be entitled to vote to accept or reject the Plan.

**8.2      Acceptance by Impaired Classes of Claims or Interests**.  In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.  In accordance with Bankruptcy Code section 1126(d) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Interests shall have accepted the Plan if such Plan is accepted by Holders of at least two-thirds (2/3) in amount of the Allowed Interests in such Class that have timely and properly voted to accept or reject the Plan.

**8.3      Presumed Acceptance by Unimpaired Classes**.  Because Claims in Classes 1 and 2 are Unimpaired pursuant to Bankruptcy Code section 1126(f), Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and, therefore, such Holders of Claims are not entitled to vote to accept or reject the Plan.

**8.4      Presumed Rejections by Impaired Classes**.  Because Holders of Claims or Interests in Classes 5 and 6 are not entitled to receive or retain any property under the Plan, pursuant to Bankruptcy Code section 1126(g), such Holders of Claims or Interests are presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**8.5      Confirmation Pursuant to Bankruptcy Code Section 1129(b)**.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to request confirmation of the Plan, as it may be modified from time to time, under Bankruptcy

Code section 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the documents submitted in support thereof or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

**8.6     Controversy Concerning Impairment**. If a controversy arises as to whether any Claim or Interest is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**8.7     Elimination of Vacant Classes**. Any Class of Claims or Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

# ARTICLE  IX
# IMPLEMENTATION OF THE PLAN

**9.1     Implementation of the Plan**. The Plan will be implemented by, among other things, the appointment of the Plan Administrator as the sole officer and director of the Post-Effective Date Debtors as of the Effective Date, the representative of the Estates, and the making of Distributions to Holders of Allowed Claims from the Plan Administration Assets. Pursuant to Section 303 of the DGCL, the Plan Administrator shall be authorized to wind-up and dissolve the Debtors once the Plan Administration Assets have been monetized and Distributions have been made to Holders of Allowed Claims.

**9.2     Source of Consideration**. All consideration necessary to make all monetary payments in accordance with the Plan shall be obtained from the remaining Cash, and cash equivalents of the Debtors and their Estates, or their subsidiaries, and the proceeds of Plan Administration Assets to be monetized through the Plan Administrator.

**9.3     Vesting of Assets**. Except as otherwise provided herein, on the Effective Date, all property of the Estate, including any net operating losses or similar tax attributes, shall vest in the Estates of the Post-Effective Date Debtors, free and clear of all Claims, liens, charges, other encumbrances and Interests.  On and after the Effective Date, except as otherwise provided herein, the Plan Administrator may use, acquire, or dispose of Assets and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**9.4     Deemed Consolidation of Class 4**. Pursuant to the Global Settlement and limited solely for the purpose of holders of Allowed General Unsecured Claims receiving distributions in accordance with the terms of the Plan, (a) all assets and liabilities of the Debtors shall be deemed merged into Debtor Big Village Holding, LLC, (b) all guarantees or responsibility of one Debtor of the obligations of any other Debtor shall be deemed eliminated, and all guarantees or responsibility executed by multiple Debtors of the obligations of any other Entity shall be deemed consolidated into a single obligation, and (c) each and every General Unsecured Claim Filed or to be Filed in the Chapter 11 Case of any Debtor shall be Filed against, and shall be a single obligation

of, the Debtors with respect to any distribution from the GUC Cash Allocation to the holder of such General Unsecured Claim.

**9.5     Directors and Officers**.  On the Effective Date, each of the Debtors' directors, officers, members, and managers shall be terminated automatically without the need for any corporate action or approval and without the need for any corporate filings, and shall have no continuing obligations to the Debtors following the occurrence of the Effective Date.

**9.6     Wind-Up and Dissolution of the Debtors**.  On the Effective Date, and in accordance with the Plan Administration Agreement: (i) all of the Debtor Affiliates shall be merged into Debtor Big Village Holding, LLC and the Plan Administrator may dissolve such Debtor Affiliates and complete the winding up of such Debtor Affiliates without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith, other than the filing of a certificate of dissolution with the appropriate governmental authorities; (ii) all General Unsecured Claims Filed or scheduled in the Debtor Affiliates' cases shall be deemed to have been Filed in the Chapter 11 Case of Big Village Holding, LLC; and (iii) the Chapter 11 Cases of the Debtor Affiliates may be closed by the Plan Administrator in accordance with Section 16.10 of this Plan.  In the reasonable discretion of the Debtors, after the Effective Date, Big Village Holding, LLC may engage in any other transaction in furtherance of this Plan.  Any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors.

**9.7     Plan Administrator and Plan Administration Agreement**.  From and after the Effective Date, except as expressly set forth in the Plan or the Confirmation Order, subject in all respects to the Wind Down Budget, pursuant to and in accordance with the terms and provisions of the Plan and the Plan Administration Agreement, the Plan Administrator shall be empowered and directed to: (i) take all steps and execute all instruments and documents necessary to make Distributions to Holders of Allowed Claims and Interests, and to perform the duties assigned to the Plan Administrator under the Plan or the Plan Administration Agreement; (ii) comply with the Plan and the obligations under the Plan; (iii) employ, retain or replace professionals to represent the Plan Administrator with respect to the Plan Administrator's responsibilities; (iv) object to Claims and Interests as provided in the Plan and prosecute such objections; (v) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment or allowance of any Claims or Interests, provided that any claim settlement over $1,000,000 shall require the consent of the Prepetition Agent, which shall not be unreasonably withheld, provided further that such consent right shall not apply to General Unsecured Claims paid through the GUC Cash Allocation; (vi) establish or release the Disputed Claim Reserve, as provided in the Plan, as applicable; (vii) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administration Agreement or any other Order of the Bankruptcy Court, including the Confirmation Order, or otherwise act on behalf of and for the Debtors and the Plan Administrator from and after the Effective Date; (viii) file applicable tax returns for the Debtors; (ix) monetize any of the Plan Administration Assets; and (x) prosecute, compromise, resolve or withdraw any

of the Retained Causes of Action. In the event any provision in the Plan Administration Agreement conflicts with the Plan, the terms of the Plan shall prevail.

The Plan Administrator may, without the need for further Court approval, retain or employ agents, financial advisors, attorneys, consultants, independent contractors, representatives and other professionals to advise the Plan Administrator in the performance of the Plan Administrator's duties, which may include counsel for the Debtors, and other advisors for the Debtors. The Plan Administrator may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Debtors) to assist in carrying out the Plan Administrator's duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Plan Administration Assets in accordance with the Plan and the Plan Administration Agreement.

The Plan Administrator shall be authorized to obtain and pay for, out of the funds of the Estate, subject to the Wind Down Budget, all reasonably necessary insurance coverage for the Plan Administrator, the Plan Administrator Professionals, and the Debtors, their officers and directors, including, but not limited to, coverage with respect to: (i) any property that is or may in the future become the property of the Debtors or their Estates; and (ii) the Plan Administrator Expenses, the latter of which insurance coverage may remain in effect for a reasonable period of time after the termination of the Plan Administration Agreement, as determined by the Plan Administrator.

The Plan Administrator shall not take any action (aside from those enumerated in this Article IX or in the Plan Administration Agreement) without the consent of the Prepetition Agent.

**9.8    Distributions by Plan Administrator**. The Plan Administrator, on behalf of the Post-Effective Date Debtors, shall make continuing efforts to monetize all Plan Administration Assets in accordance with the Plan and the Plan Administration Agreement; provided that, the timing of all Distributions, except for the Initial Distribution Amount and the Second Distribution Amount, shall be made by the Plan Administrator to Holders of Allowed Claims and Interests at its reasonable discretion; provided, further, that Distributions to Holders of Allowed Claims and Interests shall be consistent with the Wind Down Budget and made as soon as practicable after applicable Bar Dates have passed.

**9.9    Cash Investments**. The Plan Administrator' Cash shall be invested in demand-and-time deposits in banks or other savings institutions, or in other temporary, liquid investments, such as Treasury bills, consistent with the liquidity needs of the Plan Administrator as determined by the Plan Administrator, in accordance with Bankruptcy Code section 345, unless the Bankruptcy Court otherwise requires.

**9.10    Limitation of Liability; Indemnification**. The Plan Administrator and all of its respective designees, employees, agents, representatives or professionals shall not be liable for the act or omission of any other member, designees, agent or representative of the Plan Administrator, nor shall they be liable for any act or omission taken or omitted to be taken in their respective capacities, other than acts or omission resulting from willful misconduct, gross negligence, or actual fraud. The Plan Administrator shall be entitled to enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee. The Plan Administrator may, in connection with the performance of its functions, consult with attorneys, accountants, financial advisors and agents,

which consultation may act as a defense for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons. Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or actual fraud. The Plan Administrator shall indemnify and hold harmless the Plan Administrator and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided, however, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**9.11    Compensation and Duties of Plan Administrator**.  The salient terms of the Plan Administrator's employment, including the Plan Administrator's duties and compensation, shall be set forth in the Plan Administration Agreement.  The Plan Administrator shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.  The Plan Administrator shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of his or her duties under the Plan Administration Agreement, subject to the Wind-Down Budget.

**9.12    Certain Tax Considerations.**

*(a)    General.* **HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND ADVISORS.   THE BELOW TAX SUMMARY HAS BEEN PROVIDED FOR GENERAL INFORMATIONAL PURPOSES ONLY.   THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.**

The following discussion summarizes certain United States federal income tax consequences of the Plan to the Debtors and to certain holders of Claims.  This discussion is based on the IRC, the Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rulings and pronouncements of the IRS, all as in effect on the date hereof. Legislative, judicial, or administrative changes in law or its interpretation, as well as other events occurring after the date of this Disclosure Statement, and which may be retroactive, could materially alter the tax treatment described below.  Furthermore, this discussion is not binding on the IRS or any other tax authority.  There is no assurance that a tax authority will not take, or that a court will not sustain, a position with respect to the tax consequences of the Plan that differs from the tax consequences described below.  No ruling has been or will be sought from the IRS, no

opinion of counsel has been or will be obtained, and no representations are made regarding any tax aspect of the Plan.

The following discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of such Holder's facts and circumstances, or to certain types of Holders subject to special treatment under the IRC (for example, governmental entities and entities exercising governmental authority, non-U.S. taxpayers, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, persons holding a Claim as part of a hedge, straddle, constructive sale, conversion transaction, or other integrated transaction, Holders that are or hold their Claims through a partnership or other pass-through entity, and Persons that have a functional currency other than the U.S. dollar). This summary does not address state, local, or non-United States tax consequences of the Plan, nor does this summary address federal taxes other than income taxes. Furthermore, this discussion generally does not address U.S. federal income tax consequences to Holders that are unimpaired under the Plan or that are not entitled to receive or retain any property under the Plan or to Persons who are deemed to have rejected the Plan.

(b)     *Federal Income Tax Consequences to the Debtors.*

(i)     *Sale of Assets.* The Sales will constitute taxable dispositions of the Debtors' assets. The Debtors will recognize gain or loss equal to the difference between the amount received for those assets in the Sales and the Debtors' adjusted tax basis in those assets. The Debtors expect to have tax losses generated from other activities in the current year that may be used to offset gain from the Sales. The Debtors also expect to have net operating losses ("**NOLs**") from prior taxable years available that may be carried forward to offset a portion of the gain from the Sales. For NOLs arising prior to 2018, such NOLs can generally be carried forward for 20 years to offset taxable income. As a result of the enactment Tax Cuts and Jobs Act of 2017, NOLs arising in 2018 and thereafter can be carried forward indefinitely, but can only offset 80% of taxable income for a taxable year. The Debtors have not done an analysis of the amount of pre-2018 NOLs and NOLs arising in 2018 and thereafter to determine if all taxable income arising from the Debtors' assets sales can be offset with prior NOLs. To the extent current year losses and NOLs and other tax deductions are not available to offset Debtors' gain from the Sales, Debtors will owe tax on such gains. Any such tax will be an Administrative Claim.

(ii) Cancellation of Indebtedness and Reduction of Tax Attributes. For U.S. federal income tax purposes, gross income generally includes income from cancellation of indebtedness ("**COD**"). In general, the Debtors will have COD income equal to the excess of the amount of debt discharged pursuant to the Plan over the adjusted issue price of the debt, less the amount of cash and the fair market value of property distributed to holders of the debt. Various statutory or judicial exceptions limit the incurrence of COD income (such as where payment of the cancelled debt would have given rise to a tax deduction). COD income also includes interest accrued on obligations of the Debtors but unpaid at the time of discharge. An exception to the recognition of COD income applies to a debtor in a

chapter 11 bankruptcy proceeding. Bankrupt debtors generally do not include COD in taxable income, but must instead reduce certain tax attributes (such as NOLs, capital losses, certain credits, and the excess of the tax basis of the debtor's property over the amount of liabilities outstanding after discharge) by the amount of COD income that was excluded under the bankruptcy exception. Tax benefits are reduced after the tax is determined for the year of discharge. Existing NOLs will therefore be available to offset gains on asset sales in the year of the discharge regardless of the amount by which NOLs are reduced due to COD income.

*(c)*     *Exemption from Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*(d)*     *Federal Income Tax Consequences to Holders.*

    *(i)*     *Characterization.* The tax treatment of Holders, and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and any Distributions pursuant to the Plan may vary, depending upon, among other things: (A) whether the Claim (or a portion of the Claim) is for principal or interest; (B) the type of consideration the Holder receives for the Claim, (C) whether the Holder receives Distributions under the Plan in more than one taxable year; (D) the manner in which the Holder acquired the Claim; (E) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (F) whether the Holder of the Claim has taken a bad debt deduction with respect to part or all of the Claim; (G) whether the Holder of the Claim has previously included in income accrued but unpaid interest on the Claim; (H) the Holder's method of tax accounting; (I) whether the Claim is an installment obligation for U.S. federal income tax purposes; (J) whether the Claim, and any instrument received in exchange for the Claim, is a "security" for U.S. federal income tax purposes; and (K) whether and the manner in which the "market discount" rules of the IRC apply to the holder of the Claim.

    *(ii)*     *Gain and Loss Recognition.* Holders that receive cash and property other than stock and securities for their Claim will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the "amount realized" by the Holder and the Holder's tax basis in the Claim. The "amount realized" is the sum of the amount of cash and the fair market

value of any other property received under the Plan in respect of the Claim (other than amounts received in respect of a Claim for accrued unpaid interest). The Holder's tax basis in the Claim (other than a Claim for accrued unpaid interest) is generally the Holder's cost, though tax basis could be more or less than cost depending on the specific facts of the Holder. Any gain or loss realized may be capital gain or loss or ordinary gain or loss, depending on the circumstances of the Holder.

(iii)    *Interest Issues*. Holders that previously included in income accrued but unpaid interest on a Claim may be entitled to a deductible loss to the extent such interest is not satisfied under the Plan. Conversely, a Holder has ordinary income to the extent of the amount of cash or the fair market value of property received in respect of a Claim for (or the portion of a Claim treated as allocable to) accrued unpaid interest that was not previously included in income by the Holder. The Plan treats all amounts payable to a Holder as principal until the principal amount of the Claim has been paid in full. The Debtors' tax returns will be filed in a manner consistent with this allocation, but it is uncertain whether this allocation will be respected by the IRS. The IRS may take the position that payments should be allocated first to interest or should be pro-rated between principal and interest. If the IRS prevails in this assertion, Holders may be required to recognize ordinary interest income even though they have an overall loss (and possibly a capital loss, the deductibility of which may be limited) with respect to such Holder's Claims. Each Holder is urged to consult such Holder's own tax advisor regarding the amount of such Holder's Claim allocable to accrued unpaid interest and the character of any loss with respect to accrued but unpaid interest that the holder previously included in income.

(iv)    *Bad Debt and Worthless Security Deductions*. A Holder who receives, in respect of such Holder's Claim, an amount that is less than such Holder's tax basis in the Claim may be entitled to a bad debt or worthless securities deduction. The rules governing the character, timing, and amount of these deductions depend upon the facts and circumstances of the Holder, the obligor, and the instrument with respect to which the deduction is claimed, including whether (i) the Holder is a corporation or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with the Holder's trade or business or (b) a debt, the loss from worthlessness of which is incurred in the holder's trade or business. A Holder that has previously recognized a loss or deduction in respect of such Holder's Claim may be required to include in income amounts received under the Plan that exceed the Holder's adjusted basis in its Claim.

(iv)    *Installment Obligations*. A Holder if a Claim that is an installment obligation for U.S. federal income tax purposes may be required to recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

(v)    *Market Discount*. A Holder of a Claim that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the Claim as ordinary income to the extent of the market discount that accrued during the period the Claim was held by the Holder and that was not previously included in income by the Holder.

(vi)    *Withholding*. Amounts paid to Holders are subject to generally applicable withholding, information, and backup withholding rules. The Plan authorizes the Debtors and the

Plan Administrator, as applicable, to withhold and report amounts required by law to be withheld and reported. Amounts properly withheld from Distributions to a Holder and paid over to the applicable taxing authority for the account of such Holder will be treated as amounts distributed to such Holder. Holders are required to provide the Debtors and the Plan Administrator, as applicable, with the information necessary to effect information reporting and withholding as required by law. Notwithstanding any other provision of the Plan, holders of Claims that receive a Distribution pursuant to the Plan are responsible for the payment and satisfaction of all tax obligations, including income, withholding, and other tax obligations imposed with respect to the Distribution, and no Distribution shall be made until a Holder has made arrangements satisfactory to the Debtors or the Plan Administrator, as applicable, for the payment and satisfaction of such obligations.

(vii)    *Backup Withholding*.  Holders may be subject to backup withholding on payments pursuant to the Plan unless the Holder (A) is not a corporation and is not otherwise exempt from backup withholding and, when required, demonstrates that or (B) provides a correct taxpayer identification and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of previous failure to report dividend and interest income. Amounts withheld due to backup withholding will be credited against the Holder's federal income tax liability and excess withholding may be refunded if a timely claim for refund (generally, a U.S. federal income tax return) is filed with the IRS.

(viii)    *Certain Disclosure Requirements*.  Treasury regulations require tax return disclosure of certain types of transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and would require such disclosure.

# ARTICLE X
## PROVISIONS GOVERNING DISTRIBUTIONS

**10.1    Distributions for Allowed Claims**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable distribution date shall be made on or as soon as practicable after the applicable distribution date. Distributions on account of Claims that first become Allowed Claims after the applicable distribution date shall be made pursuant to the terms of this Plan and on the day selected by the Plan Administrator. Any distributions with respect to the Prepetition Loan Claims shall be made to the Prepetition Agent for its further distribution to the Prepetition Lenders in accordance with the Prepetition Financing Documents.

The Plan Administrator may accelerate any Distribution date with respect to Distributions if the facts and circumstances so warrant and to the extent not inconsistent with the Plan.

Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein shall be deemed to have been made on such date**.**

**10.2    Interest of Claims**.  Expect to the extent provided in Bankruptcy Code section 506(b), the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims, and no Holder of an Allowed Claim shall be entitled to interest accruing on any Claim from and after the Petition Date.

**10.3    Distributions by Plan Administrator as Disbursement Agent**.  From and after the Effective Date, the Plan Administrator shall serve as the Disbursement Agent under the Plan with respect to Distributions to Holders of Allowed Claims (provided that the Plan Administrator may hire professionals or consultants to assist with making disbursements or to act as the Disbursement Agent).  The Plan Administrator shall cause to be made all Distributions required to be made to such Holders of Allowed Claims pursuant to the Plan and the Plan Administration Agreement. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of the Plan Administrator's duties as Disbursement Agent unless otherwise ordered by the Bankruptcy Court.

**10.4    Means of Cash Payment**.  Cash payments under the Plan shall be made, at the option, and in the sole discretion, of the Plan Administrator, by wire, check, or such other method as the Plan Administrator deems appropriate under the circumstances.  Cash payments to foreign creditors may be made, at the option, and in the sole discretion, of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Pursuant to Section 10.7 of the Plan, cash payments in the form of checks issued by the Plan Administrator shall be null and void if not cashed within ninety (90) days of the date of the issuance thereof and deemed undeliverable Distributions.  Following the expiration of ninety (90) days after issuance of such null and void checks, in accordance with Section 10.13 of the Plan, amounts in respect of these undeliverable Distributions shall be become unrestricted Assets redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administration Expenses.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator, and any Claims held by such Holder shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

**10.5    Fractional Distributions**.  Notwithstanding anything in the Plan to the contrary, no payment of fractional cents shall be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**10.6    De Minimis Distributions**.  Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than $50 shall be forever barred from asserting such Claim against Plan Administration Assets.

**10.7    Delivery of Distributions; Unclaimed Distributions**.  All Distributions to Holders of Allowed Claims shall be made at the address of such Holder as set forth in the claims register maintained in the Chapter 11 Cases (subject to any transfer effectuated pursuant to Bankruptcy Rule 3001(e) or, after the Effective Date, a change of address notification provided by a Holder in a manner reasonably acceptable to the Plan Administrator) or, in the absence of a Filed proof of Claim, the Schedules.  The responsibility to provide the Plan Administrator a current address of a Holder of Claims shall always be the responsibility of such Holder and at no time shall the Plan Administrator have any obligation to determine a Holder's current address.  Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim. Amounts in respect of undeliverable Distributions made by the Plan Administrator shall be held in trust on behalf of the Holder of the Claim to which they are payable by the Plan Administrator until the earlier of the date that such undeliverable Distributions are claimed by such Holder and the date ninety (90) days after the date the undeliverable Distributions were made.  Following the expiration of ninety (90) days after the date the undeliverable Distributions were made, the amounts in respect of undeliverable Distributions shall be become unrestricted Assets redistributed to Holders of Allowed Claims after reserving as necessary for payment of Plan Administration Expenses.  Such Holder shall be deemed to have forfeited its right to any reserved and future Distributions from the Plan Administrator and such interests shall be deemed cancelled, and the Claims of such Holder shall be forever barred.

**10.8    Application of Distribution Record Date**.  At the close of business on the Distribution Record Date, the Debtors' claims registers shall be closed, and there shall be no further changes in the record holders of Claims or Interests.  Beneficial interests in the Plan Administrator shall be non-transferable except upon death of the interest holder or by operation of law.  Except as provided herein, the Plan Administrator and the Plan Administrator's respective agents, successors, and assigns shall have no obligation to recognize any transfer of any Claim or Interest occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Entities or the date of such Distributions.

**10.9    Withholding, Payment and Reporting Requirements With Respect to Distributions**. All Distributions under the Plan shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions shall be subject to any such withholding, payment, and reporting requirements.  The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  The Plan Administrator may require, in the Plan Administrator's sole and absolute discretion and as a condition to the receipt of any Distribution, that the Holder of an Allowed Claim complete and return to the Plan Administrator the appropriate Form W-8 or Form W-9, as applicable, to each Holder.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the

Plan unless and until such Holder has made arrangements reasonably satisfactory to the Plan Administrator for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Plan Administrator in connection with such Distribution.

**10.10   Setoffs**.  Except as otherwise expressly provided for in this Plan, each Debtor and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to this Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Claims, rights and Causes of Action of any nature that such Debtor or the Plan Administrator, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by such Debtor of any such Claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.  For the avoidance of doubt, the Filing of a Proof of Claim is sufficient to preserve a right of setoff hereunder.

**10.11   No Distribution in Excess of Allowed Amounts**.  Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

**10.12   Allocation of Distributions**.  The Plan Administrator may, in the Plan Administrator's sole discretion, make Distributions jointly to any Holder of a Claim and any other Entity who has asserted, or whom the Plan Administrator has determined to have, an interest in such Claim; *provided, however*, that the Plan Administrator shall provide notice of such Distribution to any Holder of a Claim or other Entity that has asserted an interest in such Claim.

**10.13   Forfeiture of Distributions**.  If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 10.4, fails to claim an undeliverable Distribution within the time limit set forth in Section 10.7, or fails to complete and return to the or Plan Administrator the appropriate Form W-8 or Form W-9 within one hundred twenty (120) days of a request for the completion and return to it of the appropriate form pursuant to Section 10.9, then such Holder shall be deemed to have forfeited its right to any reserved and future Distributions and the claims of such Holder shall be forever barred. The forfeited Distributions shall become Plan Administration Assets and shall be redistributed to Holders of Allowed Claims and Interests after reserving as necessary for payment of Plan Administrator Expenses and otherwise in compliance with the Plan and the Plan Administration Agreement. In the event the Plan Administrator determine that any such amounts are too small in total to redistribute cost-effectively to Holders of Allowed Claims and Interests, the Plan Administrator may instead donate them to a charitable organization(s) free of any restrictions thereon, notwithstanding any federal or state escheat laws to the contrary.

# ARTICLE XI
## PROVISIONS FOR CLAIMS OBJECTIONS AND ESTIMATION OF CLAIMS

**11.1    Claims Administration Responsibility**.  Except as otherwise specifically provided in the Plan and the Plan Administration Agreement, after the Effective Date, the Plan Administrator shall have the sole authority (a) to file, withdraw, or litigate to judgment objections to Claims, (b) to settle, compromise, or Allow any Claim or Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, (c) to amend the Schedules in accordance with the Bankruptcy Code, and (d) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  Any agreement entered into by the Plan Administrator (acting in accordance with the terms of the Plan Administration Agreement) with respect to the Allowance of any Claim shall be conclusive evidence and a final determination of the Allowance of such Claim.

**11.2    Claims Objections**.  All objections to Claims shall be Filed by the Plan Administrator on or before the Claim Objection Deadline, which date may be extended by the Bankruptcy Court upon a motion filed by the Plan Administrator on or before the Claim Objection Deadline with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 as of the filing of such motion.  If a timely objection has not been Filed to a proof of Claim or the Schedules have not been amended with respect to a Claim that was scheduled by the Debtors but was not set forth in the Schedules by the Debtors as contingent, unliquidated, and/or disputed, then the Claim to which the proof of Claim or the Claim set forth in the Schedules relates will be treated as an Allowed Claim.

**11.3    Estimation of Contingent or Unliquidated Claims**.  The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute the Allowed amount of such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**11.4    Expungement and Disallowance of Certain Claims**.  Any Claim that has been paid, satisfied, duplicated (by virtue of the consolidation of Class 4 General Unsecured Claims provided for under the Global Settlement, this Plan, or otherwise), or otherwise dealt with or treated in the Plan, may be adjusted or expunged on the Claims Register at the direction of the Plan Administrator on or after 14 calendar days after the date on which notice of such adjustment or expungement has been filed with the Bankruptcy Court, without an objection to such Claim having to be filed, and without any further action, order or approval of the Bankruptcy Court.

**11.5    Distributions on Account of Disputed Claims**.  Distributions may be made on account of an undisputed portion of a Disputed Claim.  The Plan Administrator shall, on the applicable distribution date, make Distributions on account of any Disputed Claim (or portion thereof) that has become an Allowed Claim.  Such Distributions shall be based upon the Distributions that

would have been made to the Holder of such Claim under the Plan if such Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

**11.6    [RESERVED]**

**11.7    Claims Paid and Payable by Third Parties**.  A Claim shall be Disallowed without an Objection thereto having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtors, or the Plan Administrator.

**11.8    Adjustment to Claims Without Objection**. Any Claim that has been paid or otherwise satisfied may be designated on the Claims Register as such at the direction of the Plan Administrator by the Filing of a Notice of Satisfaction by the Plan Administrator, and without any further notice to or action, order, or approval of the Bankruptcy Court.

**ARTICLE  XII**
**EXECUTORY CONTRACTS**

**12.1    Executory Contracts Deemed Rejected**.  On the Effective Date, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of Bankruptcy Code sections 365 and 1123, except to the extent: (a) the Debtors previously have assumed, assumed and assigned or rejected such Executory Contract, or (b) prior to the Effective Date, the Debtors have Filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of all rejections of Executory Contracts pursuant to this Article and Bankruptcy Code sections 365(a) and 1123.  Any and all Claims arising from the rejection of Executory Contracts under this Plan must be filed and served on the Plan Administrator no later than thirty days after the Effective Date, provided that the foregoing deadline shall apply only to Executory Contracts that are rejected automatically by operation of this Article XII of the Plan.

**ARTICLE  XIII**
**CONFIRMATION AND CONSUMMATION OF THE PLAN**

**13.1    Conditions Precedent to the Effective Date**.  Each of the following is a condition precedent to the occurrence of the Effective Date:

> *(a)* The Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect;

> *(b)* all actions, documents, and agreements necessary to implement this combined Disclosure Statement and Plan, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this combined Disclosure Statement and Plan, shall have been effectuated or executed;

> *(c)* the Plan Administration Agreement shall be executed.

**13.2    Notice of Effective Date**.  On or before five (5) Business Days after the Effective Date, the Plan Administrator shall mail or cause to be mailed to all Holders of Claims a notice that informs such Entities of (a) the occurrence of the Effective Date, (b) notice of the Final Administrative Claim Bar Date, Professional Fee Claim Bar Date, (c) the deadline to file Claims arising from the rejection of Executory Contracts under Article XII of the Plan, and (d) such other matters as the Plan Administrator deems appropriate or as may be ordered by the Bankruptcy Court.

**13.3    Waiver of Conditions Precedent to the Effective Date**.  The Debtors, with the prior written consent of the Prepetition Agent, may at any time, without notice or authorization of the Bankruptcy Court, waive in writing any or all of the conditions precedent to the Effective Date set forth in this Article, whereupon the Effective Date shall occur without further action by any Entity, *provided, however*, that the condition specified in section 13.1(a) may not be waived.  The Debtors reserve the right to assert that any appeal from the Confirmation Order shall be moot after the Effective Date of the Plan.

**13.4    Effect of Non-Occurrence of Effective Date**.  If each of the conditions specified in this Article have not been satisfied or waived in the manner provided herein within sixty (60) calendar days after the Confirmation Date (or such later date as may be agreed to by the Debtors and the Prepetition Agent), then: (i) the Confirmation Order shall be vacated and of no further force or effect; (ii) no Distributions under the Plan shall be made; (iii) the Debtors and all Holders of Claims against or Interests in the Debtors shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Entity or to prejudice in any manner the rights of the Debtors or any Entity in any further proceedings involving the Debtors, and the Plan shall be deemed withdrawn.  Upon such occurrence, the Debtors shall File a written notification with the Bankruptcy Court and serve it upon such parties as the Bankruptcy Court may direct.

### ARTICLE  XIV
### EFFECTS OF CONFIRMATION

**14.1    Exculpation, Releases, and Injunctions**

> **The exculpations, releases, and injunctions provided for in Section 14.1 of the Plan shall be effective upon the Effective Date.**

*(a)*    **Exculpation and Limitation of Liability.  Notwithstanding anything contained in this Plan to the contrary, effective as of the Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby exculpated from any right of action for any claim related to any act or omission occurring between the Petition Date and the Effective Date in connection with, relating to, or arising out of, (i) the Chapter 11 Cases, (ii) formulating, negotiating or implementing the combined Disclosure Statement and Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the combined Disclosure Statement and Plan; (iii) the Sales; (iv) any other postpetition act taken or omitted to be taken in connection with or in**

contemplation of the restructuring, sale or liquidation of the Debtors; (v) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan or (vi) the property to be distributed under the Plan, except for their actual fraud, gross negligence or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)     **Releases by the Debtors.**  Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on their own behalf and as a representative of their respective Estates, shall, and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of the Released Parties of and from any and all Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or prior to the Effective Date (including prior to the Petition Date) in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Facility Documents, any of the Debtors' in- or out-of-court restructuring efforts, or the combined Plan and Disclosure Statement,  that may be asserted by or on behalf of any of the Debtors or their respective Estates, against any of the Released Parties.

(c)     **Consensual Party Releases by Certain Parties.**  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to forever release, waive and discharge the Released Parties of all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action and liabilities of any nature whatsoever in connection with or related to any of the Debtors, their respective Assets, the Estates, the Chapter 11 Cases, the Prepetition Facility Documents, any of the Debtors' in- or out-of-court restructuring efforts, or the combined Plan and Disclosure Statement, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date (other than the rights of Holders of Allowed Claims to enforce the obligations under the Confirmation Order and the Plan); *provided, however*, that nothing in this section shall operate as a release, waiver or discharge of (i) any causes of action or liabilities unknown to such Entity as of the Petition Date arising out of gross negligence, willful misconduct, fraud, (ii) any obligations of the Debtors, Estates, or the Plan Administrator under the Plan arising from and after the Effective Date, or (iii) criminal acts of any such Released Party as determined by a Final Order.

(d)     **Non-Discharge of the Debtors; Injunction.**  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtors.  As such, no Entity holding a Claim against the Debtors may receive any payment from, or seek recourse against, any

30535619.2

assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. All parties are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, from:

(1) commencing or continuing in any manner any action or other proceeding of any kind against any of the Estates, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(2) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(3) creating, perfecting or enforcing any encumbrance of any kind against any Estate, the Plan Administrator, their successors and assigns, and any of their assets and properties;

(4) asserting any right of setoff or subrogation of any kind against any obligation due from any Estate, the Plan Administrator or their successors and assigns, or against any of their assets and properties, except to the extent a right to setoff or subrogation is asserted with respect to a timely filed proof of Claim; or

(5) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Interest or Cause of Action released under Article XIV of the Plan.

Any Entity injured by any willful violation of such injunction may seek actual damages and, in appropriate circumstances, may seek punitive damages from the willful violator.

**14.2    Term of Bankruptcy Injunction or Stays**.  All injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases.

**14.3    Comprehensive Settlement of Claims and Controversies**. Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including all claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or

against any Released Party, or holders of Claims, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors, as well as the compromises and arrangements provided for in the Global Settlement. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable

## ARTICLE XV
## <u>RETENTION OF JURISDICTION</u>

**15.1 Exclusive Jurisdiction of Bankruptcy Court**. Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

*(a)* allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not Contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any Objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim or Interest to the extent permitted under applicable law;

*(b)* grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

*(c)* hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action, and consider and act upon the compromise and settlement of any Claim or Interest, or Cause of Action;

*(d)* determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

*(e)* ensure that all Distributions to Holders of Allowed Claims under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

*(f)* construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and Consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code sections 524 and 1141 following the occurrence of the Effective Date;

*(g)* determine and resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules to the Plan) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

*(h)* modify the combined Plan and Disclosure Statement or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Plan and Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

*(i)* issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Plan or the Confirmation Order;

*(j)* enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

*(k)* determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the combined Plan and Disclosure Statement or the Confirmation Order;

*(l)* determine such other matters and for such other purposes as may be provided in the Confirmation Order;

*(m)* hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

*(n)* enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

*(o)* determine and resolve controversies related to the Estates, the Debtors, the Plan Administrator or the Plan Administrator from and after the Effective Date;

*(p)* hear and determine any other matter relating to the combined Plan and Disclosure Statement; and

*(q)* enter a final decree closing any or all the Chapter 11 Cases.

# ARTICLE XVI
# MISCELLANEOUS PROVISIONS

**16.1    Modification of the Plan**.  The Debtors may, with the prior written consent of the Prepetition Agent and the Committee, alter, amend, or modify the Plan or any exhibits or schedules hereto under Bankruptcy Code section 1127(a) at any time prior to or after the Confirmation Date but prior to the substantial Consummation of the Plan, provided, however, that any such alteration, amendment or modification does not materially and adversely affect the treatment of Holders of Claims or Interests under the Plan.   Any Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such Holder.  The Debtors shall provide notice to the U.S. Trustee of any such alteration, amendment, or modification.

**16.2    Revocation, Withdrawal, or Non-Confirmation of the Plan**.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Hearing.  If the Plan is revoked or withdrawn prior to the Confirmation Hearing, or if the Plan is not confirmed by the Bankruptcy Court, then:

*(a)* the Plan shall be null and void in all respects, and

*(b)* nothing contained in the combined Plan and Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**16.3    Binding Effect**.  Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

**16.4    Subordination Rights**.  The classification and manner of satisfying all Claims and the respective Distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims in each Class in connection with the contractual, legal and equitable subordination rights relating thereto, whether arising under contract, general principles of equitable subordination, Bankruptcy Code section 510(b) Code or otherwise.  All subordination rights that a Holder of a Claim may have with respect to any Distribution to be made under the Plan shall be implemented through the Plan, and all actions by such Holder of a Claim related to the enforcement of such subordination rights shall be enjoined permanently.  The provisions of any contractual or structural subordination of Claims shall remain enforceable by the Plan Administrator on behalf of the Estates after the occurrence of the Effective Date.  Without

limitation hereunder, the Plan Administrator, on behalf of the Estates, may likewise enforce any right of the Debtors or the Estates to equitably or otherwise subordinate Claims under Bankruptcy Code section 510, which rights are deemed transferred to, remain and are preserved in the Plan Administrator, except as otherwise expressly set forth herein or as expressly provided in a Final Order of the Bankruptcy Court in the Chapter 11 Cases.

**16.5    Severability of Plan Provisions**.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may be altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**16.6    Payment of Statutory Fees; Filing of Quarterly Reports**.  All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date the Post-Effective Date Debtors and any entity making disbursements on behalf of any Debtor or any Post-Effective Date Debtor, or making disbursements on account of an obligation of any Debtor or any Post-Effective Date Debtor (each a "**Disbursing Entity**"), shall be jointly and severally liable to pay Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Post-Effective Date Debtors, and any entity making disbursements on behalf of any Debtor or any Post-Effective Date Debtor, or making disbursements on account of an obligation of any Debtor or any Post-Effective Date Debtor, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Notwithstanding the deemed consolidation of Class 4 called for in the Plan, each and every one of the Debtors, the Post-Effective Date Debtors, and Disbursing Entities shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

**16.7    Payment of Restructuring Expenses**.  Consistent with the process set forth in the Final Cash Collateral Order, the accrued and unpaid Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition and postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases in accordance with the Final Cash Collateral Order) without the need for any further notice or approval by the Bankruptcy Court of otherwise.  All Restructuring Expenses to be paid on the Effective Date shall be estimated in good faith prior to and as of the Effective Date and such estimates shall be delivered to the Debtors no later than five (5) days before the anticipated Effective Date.  Any Restructuring Expenses incurred after the Effective

Date shall be paid from the Restructuring Expenses Reserve (after first applying any funds remaining from the amount paid on the Effective Date under this section). For the avoidance of doubt, any surplus remaining after the wind down of the Estates shall be allocated by the Plan Administrator to the Prepetition Secured Parties in further satisfaction of their Prepetition Loan Secured Claims.

**16.8    Dissolution of the Committee**. The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee. The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

**16.9    Exemption from Section 1146**. Pursuant to Bankruptcy Code section 1146(a), under the Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; or (ii) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax. To the extent that the Debtors or Plan Administrator elect to sell any property prior to or after the Confirmation Date, such sales of property will be exempt from any transfer taxes in accordance with Bankruptcy Code section 1146(c). All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases shall be deemed to be or have been done in furtherance of the Plan.

**16.10    Closing of Chapter 11 Cases; Caption Change**. As of the Effective Date, the Plan Administrator may file a motion to close the Chapter 11 Cases of all of the Debtors except for Debtor Big Village Holding LLC, and changing the caption of the Chapter 11 Cases accordingly. Upon the Filing of a motion to close the Chapter 11 Case of Big Village Holding LLC, the Plan Administrator shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

**16.11    Filing of Additional Documents**. On or before the Effective Date of the Plan, the Debtors may issue, execute, deliver, and File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan, in each case, in form and substance satisfactory to the Prepetition Agent.

**16.12 Insurance.** Confirmation of the Plan and the occurrence of the Effective Date shall have no effect on insurance policies of the Debtors in which the Debtors are or were insured parties. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering, or delaying coverage on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan, including the treatment or means of liquidation set out within the Plan for insured Claims.

**16.13 Successors and Assigns.** The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**16.14 Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws is applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.**Exhibits and Schedules.** All exhibits and schedules annexed hereto, and all documents submitted in support hereof, are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims and Interests may obtain copies of the Filed exhibits and schedules upon written request to the Debtors. Upon their Filing, the exhibits and schedules may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours. The documents contained in the exhibits and schedules shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. To the extent any exhibit or schedule annexed hereto is inconsistent with the Plan, the contents of the Plan shall control.**Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**16.17 Reservation of Rights.** The Filing of the combined Disclosure Statement and Plan, any statement or provision contained in the combined Disclosure Statement and Plan, or the taking of any action by the Debtors with respect to the Plan shall not be, and shall not be deemed to be, an admission or waiver of any rights of the Debtors with respect to the Holders of Claims and Interests.

Dated: August 24, 2023

**Big Village Holding LLC,** *et al.*

/s/ Matthew Ray

Name: Matthew Ray
Title: Chief Executive Officer and Chief Restructuring Officer

30535619.2

## EXHIBIT B

### Effective Date Notice

| In re: | Chapter 11 |
|---|---|
| Big Village Holding LLC, *et al.*,[1] | Case No. 23-10174 (CTG) |
| Debtors. | (Jointly Administered) |
| | Re: Docket No. _____ |

## NOTICE OF (I) ENTRY OF CONFIRMATION ORDER, (II) OCCURRENCE OF EFFECTIVE DATE, AND (III) RELATED BAR DATES

**TO:     ALL PARTIES IN INTEREST**

**PLEASE TAKE NOTICE THAT:**

**Confirmation of Plan**.  On [_____], the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") entered its *Findings of Fact, Conclusions of Law, and Order Approving and Confirming the Combined Disclosure Statement and Joint Chapter 11 Plan of the Debtors* [D.I. ___] (the "**Confirmation Order**").  Unless otherwise defined herein, capitalized terms used in this Notice shall have the meanings ascribed to such terms in the *Combined Disclosure Statement and Joint Chapter 11 Plan of Big Village Holding LLC and Its Affiliated Debtors* [D.I. ___] (the "**Plan**").[2]  Copies of the Confirmation Order and the Plan may be obtained by accessing https://cases.ra.kroll.com/BigVillage/Home-Index.

**Effective Date**.  The Effective Date of the Plan occurred on [_____].  Each of the conditions precedent to consummation of the Plan enumerated in Article XIII, Section 13.1 of the Plan have been satisfied and/or waived as provided in Article XIII, Section 13.3 of the Plan.

**Release, Exculpation, and Injunction**.  Pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in Article XIV of the Plan are now in full force and effect.

**Bar Date for Administrative Expense Claims**.  In accordance with Article VI, Section 6.1 of the Plan, unless required to be filed by an earlier date by another order of this Court, any Holder of an Administrative Claim that arose after 5:00 p.m. (prevailing Eastern Time) on August 11, 2023, but prior to the Effective Date, other than a Professional Fee Claim or a claim

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Big Village Holding LLC (6595); Big Village Group Holdings LLC (5882); Big Village Group Inc. (6621); Big Village Insights, Inc. (8960); EMX Digital, Inc. (5543); Big Village USA Corporation, Inc. (3414); Big Village Agency, LLC (0767); Balihoo, Inc. (9666); Deep Focus, Inc. (8234); and Trailer Park Holdings Inc. (1447).  The Debtors' service address is 301 Carnegie Center, Suite 301, Princeton, NJ 80540.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan or the Confirmation Order, as applicable.

for U.S. Trustee Fees, must file with this Court and serve on (a) the Plan Administrator and its counsel, (b) the U.S. Trustee, and (c) all parties requesting notice pursuant to Bankruptcy Rule 2002, a request for payment of such Administrative Claim so as to be received by **5:00 p.m. (ET) on [_____]**(the "**Administrative Claims Bar Date**"). Such request must include at a minimum: (i) the name of the Debtor(s) that are purported to be liable for the Administrative Claim; (ii) the name of the Holder of the Administrative Claim; (iii) the amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) all supporting documentation for the Administrative Claim. Any Administrative Claim that is not timely filed as set forth above will be forever barred, and holders of such Administrative Claims will not be able to assert such Claims in any manner against the Plan Administrator, the Debtors, or their Estates, or their respective successors or assigns or their respective property.

    **Bar Date for Professional Fee Claims**. In accordance with the Article VI, Section 6.1 of the Plan, Professionals asserting Professional Fee Claims for services rendered by Professionals in connection with the Chapter 11 Cases from the Petition Date through and including the Effective Date must file an application for allowance and payment of such Professional Fee Claim no later than **5:00 p.m. (ET) on [_____]** (the "**Professional Fee Claims Bar Date**"). Objections to any applications of Retained Professionals must be filed by no later than twenty-one (21) days after service of the applicable final application for allowance and payment of Professional Fee Claims.

    **Bar Date for Rejection Damages**. In accordance with Article XII of the Plan, on the Effective Date, all Executory Contracts will be deemed rejected as of the Effective Date in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except to the extent: (a) the Debtors previously have assumed, assumed and assigned, or rejected such Executory Contract, including such Executory Contracts and related obligations assumed through the Plan, or (b) prior to the Effective Date, the Debtors have filed a motion to assume, assume and assign, or reject an Executory Contract on which the Bankruptcy Court has not ruled. Any and all Claims arising from the rejection of Executory Contracts under the Plan (the "**Rejection Damage Claims**") must be filed and served on the Plan Administrator **no later than [_____]** (the "**Rejection Claims Bar Date**"), *provided,* that the foregoing deadline shall apply only to Executory Contracts that are rejected automatically by operation of Article XII of the Plan. Holders of Rejection Damage Claims that are required to file and serve a request for such payment of Rejection Damage Claims that do not file and serve such a request by the Rejection Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Rejection Damage Claims against the Debtors, the Plan Administrator, or their respective property. Subject to further order of the Bankruptcy Court, any requests for payment of Rejection Damage Claims that are not properly filed and served by the Rejection Claims Bar Date shall not appear on the Debtors' claims register and shall be disallowed automatically without the need for further action by the Debtors or the Plan Administrator, or further order of the Bankruptcy Court.